**EXHIBIT H - Complaint**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Wilmington Trust, National Association, as Trustee for the Registered Holders of Wells Fargo Commercial Mortgage Securities, Inc., Multifamily Mortgage Pass-Through Certificates, Series 2019-SB65,<br><br>                              Plaintiff,<br><br>v.<br><br>Kunba, LLC, Robert Khomari, The New York City Department of Housing Preservation and Development, County Oil Company, Inc. and John Doe No. I through John Doe No. XXX, inclusive, the last thirty names being fictitious and unknown to Plaintiff, the persons or parties intended being the tenants, occupants, persons, or corporations, if any, having or claiming an interest in or lien upon the premises described in the Complaint,<br><br>                              Defendants. | Case No. |

<u>**VERIFIED COMPLAINT FOR MORTGAGE FORECLOSURE**</u>

Plaintiff Wilmington Trust, National Association, as Trustee for the Registered Holders of Wells Fargo Commercial Mortgage Securities, Inc. Multifamily Mortgage Pass-Through Certificates, Series 2019-SB65 ("**Lender**") by and through its undersigned counsel, brings forth its cause of action against Defendants Kunba LLC ("**Borrower**"), Robert Khomari ("**Guarantor**"), The New York City Department of Housing Preservation and Development ("**DHPD**"), County Oil Company, Inc. ("**County Oil**") and John Doe No. I through John Doe No. XXX, and states as follows:

<u>**PARTIES**</u>

1.    Wilmington Trust, National Association ("**Wilmington**") is a national banking association organized under federal law with its main office and principal place of business at 1100 North Market Street, Wilmington, Delaware 19890.  Wilmington serves as trustee for Lender,

which is a trust that has elected to be treated as a real estate mortgage investment conduit ("**REMIC**") under the Internal Revenue Code of 1986 ("**Trust**"). With respect to the loan transaction that is the subject of this action, KeyBank National Association acts as the Special Servicer and authorized agent for Lender.

2.    KeyBank and Lender are parties to that certain Limited Power of Attorney dated as of July 29, 2024 (the "**POA**"). A true and accurate copy of the POA is attached hereto as **Exhibit A**.

3.    The POA gives KeyBank the authority to take all actions necessary to, among other things, "demand, sue for, recover, collect and receive each and every sum of money, debt, account and interest (which now is, or hereafter shall become due and payable) belonging to or claimed by the Trustee" including the amounts due and owing under the Loan Documents (defined below). *See* POA, at ¶ 1.

4.    The POA further extends KeyBank the authority for, through counsel, "foreclosing on the properties under the Security Instruments by judicial or non-judicial foreclosure." *See* POA, at ¶ 1.

5.    KeyBank is the appointed Special Servicer for Lender, which gives KeyBank the authority to act on behalf of Lender. However, from time to time, and as needed, formal, limited power of attorneys are executed (such as the one attached as Exhibit A).

6.    At all times relevant for this litigation, KeyBank had (and continues to have) the authority to act on behalf of Lender.

7.    Borrower is a limited liability company organized and existing under the law of the State of New York. Borrower has an address of 36 West 37th Street, New York, New York 10018.

8.      Guarantor is an individual and citizen of the State of New York.  Guarantor has an address of 19 Hillside Avenue, Roslyn Heights, New York 11577.

9.      DHPD is a New York City agency and has its principal place of business at 100 Gold Street, New York, New York 10038.  DHPD is named as a party-defendant herein by virtue of any liens upon the Property, including a Judgment in Bronx County for $1,550.00 against Borrower filed on August 24, 2022 in Index No. LT309785/22, and any possible Orders issued in Index No. 80515/04, Index No. 30425/09, Index No. 36062/16, Index No. 50324/19, and Index No. 215828/22, which liens, if any, are subordinate to the lien of Lender's mortgage sought to be foreclosed herein.

10.     County Oil Company has its principal place of business at 65 South 11th Street, Suite 1E, Brooklyn, New York 11249 and is incorporated in the State of New York.  County Oil is named as a party-defendant herein by virtue of any liens upon the Property, including a UCC Financing Statement filed/recorded February 11, 2020 in Bronx County as CRFN 2020000054709, which liens, if any, are subordinate to the lien of Lender's mortgage sought to be foreclosed herein.

11.     Defendants John Does I through XXX are currently unknown to Plaintiff, but, on information and belief, are tenants, occupants, persons or corporations, if any, having or claiming an interest in or lien upon the Property.

## JURISDICTION AND VENUE

12.     This is a civil action over which this Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332(a)(1).

13.     In *Navarro Sav. Ass'n v. Lee*, 446 U.S. 458 (1980) and *Americold Realty Tr. V. Conagra Foods, Inc.*, 577 U.S. 378 (2016), the United States Supreme Court confirmed a long-standing rule of jurisprudence than an express, "traditional" trust is not a juridical person—it is a

3

fiduciary relationship—and, therefore, for purposes of diversity jurisdiction, only the citizenship of the trustee is considered. Courts sitting in the Second Circuit have adhered to the principles set forth in *Navarro* and *Americold* and held that the citizenship of the trustee of a traditional trust litigating in its own right, controls for the purposes of diversity jurisdiction. *See, e.g.*, *Raymond Loubier Irrevocable Trust v. Loubier*, 858 F.3d 719, 731 (2d Cir. 2017) ("because the party trusts here are not organized according to state law as distinct juridical entities but, rather, are traditional trusts, establishing only fiduciary relationships . . . it is the trustees' citizenship that must determine diversity"); *Wilmington N.A. v. 2150 Joshua's Path, LLC*, No. 13-CV-1598, 2017 WL 4480869, *3 (E.D.N.Y. 2017) (affirming that an express common law trust is deemed to have the citizenship of its trustee); *SPV-LS, LLC v. Bergman*, No. 15 CV 6231, 2019 WL 2257244, *16 (E.D.N.Y. 2019) ("For traditional trusts, it is the citizenship of the trustees holding legal right to sue on behalf of the trusts that is relevant to jurisdiction")

14. Plaintiff is a traditional trust, and its trustee, Wilmington, is the real party in interest. Plaintiff's trustee, Wilmington, brings this action in its own name and in its capacity as trustee. Wilmington is the owner of a pool of mortgage loans, which includes the loan that is the subject of this lawsuit, and holds these assets in trust for the benefit of the registered holders of "Wells Fargo Commercial Mortgage Securities, Inc., Multifamily Mortgage Pass-Through Certificates, Series 2019-SB65." This trust relationship was organized as a common law trust under the laws of the State of New York and is governed by a Pooling and Servicing Agreement dated as of August 1, 2019 (the "**PSA**"). The New York Civil Practice Law and Rules provides that a trustee of an express trust may sue in its own name. *See* N.Y. CPLR § 1004. Under the PSA, Wilmington holds trust assets for the exclusive benefit of the certificate holders. It is Wilmington, acting through its loan servicer, KeyBank National Association, who has dominion over the loans and

the right and authority to defend lawsuits and file lawsuits with respect to trust assets. The beneficiaries of the trust (i.e., the certificate holders) have no such authority, nor do the beneficiaries of the trust have any ownership interest in the trust's property.

15.    For purposes of diversity jurisdiction, Plaintiff has the citizenship of its trustee. Plaintiff's trustee, Wilmington is a national banking association. As stated in *Wachovia Bank, N.A. v. Schmidt*, 546 U.S. 303 (2006), a national banking association is a citizen of the state where the bank has its main office. Wilmington's main office is in Wilmington, Delaware. Accordingly, Plaintiff is a citizen of Delaware for purposes of federal diversity jurisdiction.

16.    Defendant Borrower is a limited liability company which, for diversity jurisdiction purposes, has the citizenship of its members.

17.    There is one member of the Borrower, Guarantor.

18.    Guarantor is an individual and a citizen and resident of the state of New York, with an address of 19 Hillside Avenue, Roslyn Heights, New York 11577.

19.    Therefore, Borrower's citizenship for federal diversity jurisdiction purposes is New York.

20.    Guarantor is an individual and citizen and resident of the state of New York, therefore Guarantor's citizenship for federal diversity jurisdiction purposes is New York.

21.    DHPD is a New York City agency and a citizen and resident of the state of New York.

22.    County Oil is a New York corporation with a principal place of business in New York. County Oil is a citizen and resident of the state of New York.

23.    There exists complete diversity between Lender (Delaware citizenship) and all Defendants (New York citizenship).

24.     Borrower is indebted to Lender pursuant to a commercial mortgage loan transaction, as described in more detail below. The outstanding balance on the loan exceeds $75,000.00. Accordingly, the amount in controversy is greater than the $75,000.00 threshold for diversity jurisdiction.

25.     The action properly lies in the Southern District of New York as the property which is the subject of this action lies in this judicial district, and all or substantially all of the events or omissions giving rise to the claims occurred in this judicial district. 28 U.S.C. § 1391(a)(2). Further, the assignor of Plaintiff, and Borrower, consented to venue in this judicial district pursuant to the operative documents which are the subject of this suit. 28 U.S.C. § 1391(b)(2).

## STATEMENT OF FACTS

### *The Loan Transaction*

26.     On or about February 7, 2019, CPC Mortgage Company LLC ("**Original Lender**") made a $1,750,000.00 loan (the "**Loan**") to Borrower.  In connection with the Loan, Borrower executed that certain Loan Agreement – SBL effective as of February 7, 2019, by and between Borrower and Original Lender (the "**Loan Agreement**").  A true and correct copy of the Loan Agreement is attached hereto as **Exhibit B**.

27.     The Loan is evidenced by that certain New York Consolidated, Amended and Restated Note dated as of February 7, 2019 (the "**Note**") by and between Borrower and Original Lender in the original principal amount of $1,750,000.00[1].  A true and correct copy of the Note is attached hereto as **Exhibit C**.

---

[1] The Note consolidated two prior notes consisting of: (a) that certain Substitute Note A in the original principal amount of $1,075,000.00 made by Kunba LLC to Signature Bank, dated February 7, 2019; and (b) that certain Gap Note Fixed Rate – SBL in the original principal amount of $675,000.00 made by Kunba LLC to CPC Mortgage Company LLC, dated February 7, 2019.

101490620

28.    The indebtedness owed under the Note is secured by Borrower's real property, improvements thereon and personal property, with a street address of 430 East 162nd Street, Bronx, New York 10451 (as more particularly described in the Security Instrument, collectively, the "**Property**").

29.    Lender's lien on the Property is evidenced by, among other things:

(a)    Substitute Mortgage A in the original principal amount of $1,075,000.00 made by Kunba LLC to Signature Bank, dated as of February 7, 2019, and recorded with the City Register of Bronx County (the "**Register**") on February 25, 2019 as CRFN 2019000063492 ("**Substitute Mortgage A**");

(b)    that certain Gap Multifamily Mortgage, Assignment of Rents and Security Agreement in the original principal amount of $675,000.00 made by Kunba LLC to CPC Mortgage Company LLC, dated as of February 7, 2019, and recorded with the Register on February 25, 2019 as CRFN 20190000634495 ("**Gap Mortgage**");

(c)    that certain Consolidation, Extension and Modification Agreement in the original principal amount of $1,750,000.00 made by Kunba LLC to CPC Mortgage Company LLC, dated as of February 7, 2019, and recorded with the Register on February 25, 2019, as CRFN 2019000063497, which mortgage consolidated Substitute Mortgage A and the Gap Mortgage (the "**Security Instrument**").

i.    Pursuant to Section 4 of the Security Instrument, Borrower and Lender agreed that the covenants and agreements of the consolidated mortgage are the terms of the mortgage set forth in Exhibit C to the Security Instrument (the "**Consolidated Mortgage**").  A true and accurate copy of the Security Instrument, including the Consolidated Mortgage, is attached hereto as

101490620

**Exhibit D**.  At the time of recording, all requisite New York State recording taxes were paid thereon.

30.    To further secure certain obligations under the Loan Documents, Guarantor executed that certain Guaranty, dated to be effective as of February 7, 2019, pursuant to which Guarantor guaranteed certain of Borrower's obligations, as described therein.  A true and accurate copy of the Guaranty is attached hereto as **Exhibit E**.

31.    Original Lender further perfected its interest in the Property by virtue of a UCC Financing Statement dated February 7, 2019, and recorded with the Register on March 7, 2019, as CRFN 2019000076023 (the "**UCC**").  A true and accurate copy of the UCC is attached hereto as **Exhibit F**.

### *Assignment of the Loan to Lender*

32.    On February 7, 2019, Original Lender assigned the Loan, Loan Agreement, Note, Security Instrument, Guaranty, and all other documents executed in connection with the Loan (collectively, the "**Loan Documents**") to Federal Home Loan Mortgage Corporation, as evidenced by: (a) the Allonge to the Note (part of Exhibit C); (b) that certain Assignment of Consolidated Security Instruments; and (c) that certain Omnibus Assignment.  Copies of the assignments to Federal Home Loan Mortgage Corporation are attached hereto as **Exhibit G**.

33.    On August 29, 2019, Federal Home Loan Mortgage Corporation assigned the Loan Documents to Lender, as evidenced by: (a) the Allonge to the Note (part of Exhibit C); (b) that certain Assignment of Mortgage; and (c) that certain UCC Financing Statement Amendment (Assignment).  Copies of the assignments to Lender are attached hereto as **Exhibit H**.

34.    Lender is the current owner and holder of the Loan and Loan Documents and all of Original Lender's right, title and interest in, to and under the Loan Documents.

101490620

35.     Prior to the commencement of this action, following the assignments set forth herein, Lender has been in exclusive possession of the original Loan Documents and has not transferred the same to any other person or entity.

### *Borrower's Default Under the Loan Documents*

36.     Under the terms of the Loan Documents, on or before March 1, 2024 (the "**Maturity Date**"), Borrower was required to pay to Lender the entire outstanding Indebtedness and all other amounts due and owing under the Note and other Loan Documents.

37.     Borrower defaulted under the Loan Documents due to Borrower's failure to pay the entire outstanding Indebtedness and all other amounts due and owing under the Note and other Loan Documents by the Maturity Date.

38.     As a result of Borrower's default under the Note and Loan Documents, the amounts owed under the Loan are currently accruing interest at the Default Annual Interest Rate as that term is defined in the Note.

39.     By letter dated August 7, 2024 (the "**Notice of Default**"), Lender notified Borrower and Guarantor of Borrower's default under the Loan Documents due to Borrower's failure to pay the entire outstanding Indebtedness and all other amounts due and owing under the Note and other Loan Documents by the Maturity Date.  A true and correct copy of the Notice of Default sent to Borrower is attached hereto as **Exhibit I**.

40.     Borrower has failed to repay the indebtedness in full despite demand from Lender. Thus, Borrower remains in default under the terms of the Note and Loan Documents.

### *Amounts Due Under the Loan Documents*

41.     As of January 31, 2025, the unpaid amounts due and owing under the Note include the principal balance of $1,570,182.04, together with interest, at the Default Rate, and any and all

101490620

fees and costs incurred by Lender, both to date and hereafter, in connection with the collection of the amounts due and owing under the Loan Documents for the protection, preservation, and realization of the Property, including processing fees, late charges, inspection fees, forced place insurance fees, environmental fees, appraisal fees, expenses, filing fees, administrative fees, attorneys' fees, and costs incurred in connection with the issuance of third-party reports in connection with the Property, less any funds paid by Borrower but not yet applied to the debt by Lender, and any other amounts due and owing under the Loan Documents

### *Right to Possession and Rents*

42.     Under Section 3(c)(i) of the Security Instrument, upon Borrower's default under the Loan Documents, Lender is entitled to take possession of the Property and to collect and receive the rents and the value of the use and occupation of the Property.

43.     In addition, under Section 3(b)(iii) of the Security Instrument, the license to collect rents granted to Borrower automatically terminated upon Borrower's default, and Lender has the right to enter upon the Property and collect all rents, among other things.

44.     Further, under Section 3(c)(ii) of the Security Instrument, upon an Event of Default, Lender may apply for the appointment of a receiver for the Property, without notice and without the adequacy of the security for the amounts owed under the Note.

45.     Lender is entitled to an order directing that all rents, issues, proceeds, revenues, profits, and income from the Property be remitted to Lender in accordance with the terms of the Security Instrument and directing that any such amounts be used to reduce the indebtedness described above.

101490620

**_Right to Foreclosure_**

46.     Under the terms of the Loan Documents, including Section 31(a) of the Security Instrument, upon an Event of Default, Lender has the right to institute a proceeding for foreclosure and thus is entitled to an order of the Court that the Security Instrument be foreclosed, that the lien provided therein be declared as a first and prior lien on the Property, and that Lender be granted the right of immediate possession of the Property.

47.     No other action has been brought to recover any part of the debt under the Security Instrument, Note, or other Loan Documents.

48.     The Defendants herein have or claim to have some interest in, or lien upon, the Property or some part thereof, which interest or lien, if any, has accrued subsequent to the lien of the Security Instrument and is subject and subordinate thereto. As such, Defendants should assert whatever interest they have or may claim to have in the Property.

49.     Lender may not be deemed to have waived, altered, released, or changed its election to foreclose by reason of any payment made after the date of commencement of this action of any and all of the defaults identified herein.

50.     Lender specifically reserves the right to pursue a temporary injunction, to seek appointment of a receiver, or to seek other relief with respect to its rights under the Loan Documents.  Pursuant to N.Y. Real Prop. Acts. Law §1371, Lender reserves the right to move the Court to enter final judgment against Borrower or any other liable party, including Guarantor, for any residue of the debt under the Note and other Loan Documents remaining unsatisfied after the foreclosure sale of the Property is completed.

**WHEREFORE**, Lender respectfully requests that the Court enter judgment in favor of Lender for foreclosure of the Property as follows:

101490620

A.      Finding that Lender has a first and best lien on the Property;

B.      Finding that Borrower has defaulted upon the terms and conditions of the Loan Documents;

C.      Ordering that Lender has the legal right and is authorized to foreclose on the Property:

   (i)      In one or more parcels according to law together with the fixtures and articles of personalty upon the Property;

   (ii)     Subject to zoning restrictions and ordinances adopted by any municipality or other governmental authority, and violations thereof;

   (iii)    Subject to any state of facts that an accurate survey would show;

   (iv)     Subject to covenants and restrictions of record, if any;

   (v)      Subject to violations, if any, noted by any federal, state, city, town or village agency having authority over the Property;

C.      Finding that such foreclosure will vest in the purchaser thereat free and clear title to the Property, free of any and all interests that are or might be asserted by the Defendants to this Complaint;

D.      Ordering that Lender has the right to credit bid at such foreclosure sale any and all amounts due to Lender under the Note and other Loan Documents;

E.      Ordering and directing that the Sheriff of Bronx County, or any referee appointed in this action, foreclose the Property and deliver title via a Sheriff's Deed or Referee's Deed, and bill of sale, as appropriate, to the successful bidder at such foreclosure;

F.      Ordering and directing that the proceeds of the sale be applied as follows:

101490620

(i)     to payment of the expenses of the sale;

(ii)    to the payment of the debt owed to Lender under the Note and other Loan Documents;

(iii)   to the payment of foreclosure costs and other accrued costs in connection with the foreclosure, including attorney's fees;

(iv)   to the payment, at Lender's option, of any real property taxes that may be due and unpaid in connection with the Property;

(v)    to the payment, at Lender's option, of all other assessments against or attributable to the Property;

(vi)   the surplus, if any, to the payment of the debts secured by junior liens on the Property and then, to Borrower, in accordance with further order of the Court;

G.    Ordering that Borrower has no right of redemption or reinstatement with respect to the Property;

H.    Finding that Lender has preserved its rights to pursue any deficiency that may exist under the Note or other Loan Documents after application of the proceeds of the foreclosure sale pursuant to N.Y. Real Prop. Acts Law §1371 and may move the Court to enter final judgment against Borrower for such deficiency; and

I.    Ordering all further relief the Court deems just, proper and equitable.

101490620

Dated:  New York, New York
        February 19, 2025

                                    POLSINELLI PC


                                    By: */s/  Carter J. Wallace*
                                        AARON P. DAVIS
                                        CARTER J. WALLACE
                                        600 Third Avenue, 42nd Floor
                                        New York, New York 10016
                                        (212) 803-9914
                                        cwallace@polsinelli.com

                                    ATTORNEYS FOR PLAINTIFF

101490620

## **VERIFICATION**

Parker H. Walet, being duly sworn, says that he is a Real Estate Analyst for KeyBank National Association, the servicer for Lender in this action, that he has read the foregoing Verified Complaint and said Verified Complaint is true to his own knowledge except as to matters therein stated to be alleged on information and belief and that as to those matters, he believes them to be true.

STATE OF _Kansas_       )
                        ) ss.
COUNTY OF _Johnson_     )

On this _17TH_ day of _February_, 20_25_, to me personally known, appeared _Parker Walet_ who, being by me duly sworn did say that he/she is the _Real Estate Analyst_ [title] of _KeyBank N.A._, a _Special Servicer_, and that said instrument was signed and delivered on behalf of said _Special Servicer_ [type of entity] by authority of its _Members_ [board of directors, members, etc.], as the free act and deed of said _Special Servicer_ [type of entity] acting with full power and authority to so bind the _Trust_ [type of entity].

In Testimony Whereof, I have hereunto set my hand and affixed my official seal the day and year first above written.

_____
NOTARY PUBLIC

My Commission Expires:
_2.14.2028_
[SEAL]

ETHAN J MEYER
Notary Public - State of Kansas
My Appointment Expires _2.14.28_

15

**CERTIFICATE OF CONFORMITY**

The undersigned does hereby certify that he is an attorney at law duly admitted to practice in the State of Kansas; that he is a person duly qualified to make this certificate of conformity pursuant to Section 2309(c) of the Civil Practice Law and Rules of the State of New York; that he is fully acquainted with the laws of the State of Kansas pertaining to oaths and affirmations; that the foregoing acknowledgment of Parker H. Walet named in the foregoing instrument taken before Ethan J. Meyer, a Notary Public in the State of Kansas, being the state in which it was taken; and that it duly conforms with such laws and is in all respects valid and effective in such state.

Dated: February 24, 2025
Kansas City, Missouri

Bradley Gardner

16

101490620

# EXHIBIT A

Document drafted by and
RECORDING REQUESTED BY:
KeyBank National Association
11501 Outlook Street, Suite 300
Overland Park, KS 66211

SPACE ABOVE THIS LINE FOR RECORDER'S USE

LIMITED POWER OF ATTORNEY

Wilmington Trust, National Association, a national banking association organized and existing under the laws of the United States and having an office at 1100 North Market Street, Wilmington, Delaware 19890, not in its individual capacity but solely as Trustee ("Trustee"), hereby constitutes and appoints KeyBank National Association ("Special Servicer"), and in its name, aforesaid Attorney-In-Fact, by and through any officer appointed by the Board of Directors of Special Servicer, to execute and acknowledge in writing or by facsimile stamp all documents customarily and reasonably necessary and appropriate for the tasks described in the items (1) through (11) below; *provided however,* that the documents described below may only be executed and delivered by such Attorneys-In-Fact if such documents are required or permitted under the terms of the related servicing agreements ("Agreements") and no power is granted hereunder to take any action that would be adverse to the interests of Wilmington Trust, National Association.

This Limited Power of Attorney is being issued in connection with Servicer's responsibilities to service certain mortgage loans (the "Loans") held by the Trustee. These Loans are secured by collateral comprised of Mortgages, Deeds of Trust, Deeds to Secure Debt and other forms of Security instruments (collectively the "Security instruments") encumbering any and all real and personal property delineated therein (the "Property") and the Notes secured thereby. Capitalized terms used but not defined herein shall have the respective meanings assigned thereto in the Agreements. Please refer to <u>Schedule</u> attached hereto.

1. Demand, sue for, recover, collect and receive each and every sum of money, debt, account and interest (which now is, or hereafter shall become due and payable) belonging to or claimed by the Trustee, and to use or take any lawful means for recovery by legal process or otherwise, including but not limited to the substitution of trustee serving under a Deed of Trust, the preparation and issuance of statements of breach, notices of default, and/or notices of sale, accepting deeds in lieu of foreclosure, evicting (to the extent allowed by federal, state or local laws) and foreclosing on the properties under the Security Instruments by judicial or non-judicial foreclosure, actions for temporary restraining orders, injunctions, appointments of receiver, suits for waste, fraud and any and all other tort, contractual or other claims of whatever nature, including execution of any evidentiary affidavits or verifications in support thereof, as may be necessary or advisable in any bankruptcy action, state or federal suit or any other action.

2. Execute and/or file such documents and take such other action as is proper and necessary to defend the Trustee in litigation and to resolve any litigation where the Special Servicer has an obligation to defend the Trustee, including but not limited to dismissal, termination, cancellation, rescission and settlement.

3.  Transact business of any kind regarding the Loans.

4.  Obtain an interest therein and/or building thereon, as the Trustee's act and deed, to contract for, purchase, receive and take possession and evidence of title in and to the property and/or to secure payment of a promissory note or performance of any obligation or agreement.

5.  Execute, complete, indorse or file bonds, notes, mortgages, deeds of trust and other contracts, agreements and instruments regarding the Borrowers and/or the Property, including but not limited to the execution of estoppel certificates, financing statements, continuation statements, releases, satisfactions, assignments, loan modification agreements, payment plans, waivers, consents, amendments, forbearance agreements, loan assumption agreements, subordination agreements, property adjustment agreements, management agreements, listing agreements, purchase and sale agreements and other instruments pertaining to mortgages or deeds of trust, and execution of deeds and associated instruments, if any, conveying the Property, in the interest of the Trustee.

6.  Endorse on behalf of the undersigned all checks, drafts and/or other negotiable instruments made payable to the undersigned and draw upon, replace, substitute, release or amend letters of credit as Property securing the Loans.

7.  Execute any document or perform any act described in items (3), (4), and (5) in connection with the termination of any Trust as necessary to transfer ownership of the affected Loans to the entity (or its designee or assignee) possessing the right to obtain ownership of the Loans.

8.  Such other actions and file such other instruments and certifications as are reasonably necessary to complete or accomplish the Servicer's duties and responsibilities under the Agreement.

9.  Subordinate the lien of a mortgage, deed of trust, or deed to secure debt (i) for the purpose of refinancing Loans, where applicable, or (ii) to an easement in favor of a public utility company or a government agency or unit with powers of eminent domain, including but not limited to the execution of partial satisfactions and releases and partial re-conveyances reasonably required for such purpose, and the execution or requests to the trustees to accomplish the same.

10. Convey the Property to the mortgage insurer, or close the title to the Property to be acquired as real estate owned, or convey title to real estate owned property ("REO Property").

11. Execute and deliver the following documentation with respect to the sale of REO Property acquired through a foreclosure or deed-in-lieu of foreclosure, including, without limitation: listing agreements; purchase and sale agreements; grant / limited or special warranty / quit claim deeds or any other deed, but not general warranty deeds, causing the transfer of title of the property to a party contracted to purchase same; escrow instructions; and -any and all documents necessary to effect the transfer of REO Property.

The undersigned gives said Attorney-in-Fact full power and authority to execute such instruments and to do and perform all and every act and thing necessary and proper to carry into effect the power or powers granted by or under this Limited Power of Attorney as fully as the undersigned might or could do as of July 18, 2024.

This appointment is to be construed and interpreted as a limited power of attorney. The enumeration of specific items, rights, acts or powers herein is not intended to, nor does it give rise to, and it is not to be construed as a general power of attorney.

The Special Servicer hereby agrees to indemnify and hold Wilmington Trust, National Association, as Trustee, and its directors, officers, employees and agents harmless from and against any and all liabilities, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever incurred by reason or result of the misuse of this Limited Power of Attorney by the Special

50507326.2

Servicer. The foregoing indemnity shall survive the termination of this Limited Power of Attorney and the Agreement or the earlier resignation or removal of Wilmington Trust, National Association, as Trustee under the Agreement.

This Limited Power of Attorney is effective as of the date below and shall continue to remain in full force and effect until (a) revoked in writing by the Trustee, or (b) the termination, resignation or removal of the Trustee as trustee of the Trust, or (c) the termination, resignation or removal of the Special Servicer as servicer of the trust.

Witness my hand and seal this 29th day of July, 2024.

Signed, sealed and delivered
in the presence of:

Witness: Miranda Kernagan

WILMINGTON TRUST, NATIONAL
ASSOCIATION, AS TRUSTEE

By: _____
Name:  Drew H. Davis
Title:   Vice President

STATE OF DELAWARE     )
                                            ) ss.
COUNTY OF NEW CASTLE )

The foregoing limited power of attorney was acknowledged before me on July 29, 2024 by Drew H. Davis  as Vice President  of Wilmington Trust, National Association, a national banking association.

MARY KATHERINE KLODARSKA
Notary Public
STATE OF DELAWARE
My Commission Expires 09-09-2025

_____
Notary Public

Mary Kate Klodarska
_____
Printed Name of Notary Public

My Commission Expires: 09/09/2025

50507326.2

### SCHEDULE A

| Transaction Name: FRESB 2019-SB65 |
| --- |
| Wilmington Trust, National Association, as trustee for the registered Holders of Wells Fargo Commercial Mortgage Securities, Inc., Multifamily Mortgage Pass-Through Certificates, Series 2019-SB65 |

# EXHIBIT B



**MULTIFAMILY**

Loan Agreement — SBL (10-18-2018)

| | |
|---|---|
| **Freddie Mac Loan Number:** | **501841342** |
| **Property Name:** | **430 East 162nd Street** |

| | |
|---|---|
| **Borrower:** | **KUNBA LLC,** a New York limited liability company |
| **Lender:** | **CPC MORTGAGE COMPANY LLC,** a New York limited liability company |
| **Effective Date:** | **February 7, 2019** |
| **Loan Amount:** | **$1,750,000.00** |

This Loan Agreement **("Loan Agreement")** is made by and between Borrower and Lender and is dated as of the Effective Date. Lender has agreed to make and Borrower has agreed to accept a loan for the Loan Amount **("Loan")** upon the terms and subject to the conditions in this Loan Agreement. The Loan will be evidenced by the Note and will bear interest and be paid in accordance with the payment terms set forth in the Note. Lender and Borrower each acknowledge the receipt and sufficiency of adequate consideration for the making and receiving of this Loan.

| Table of Contents | | | |
|---|---|---|---|
| Article I | Key Terms | Article VII | Transfers |
| Article II | Security Agreement | Article VIII | Events of Default and Remedies |
| Article III | Personal Liability | Article IX | Release; Indemnity |
| Article IV | Reserve Funds and Requirements | Article X | Miscellaneous Provisions |
| Article V | Representations and Warranties | Article XI | Defined Terms |
| Article VI | Covenants | | |

## ARTICLE I - KEY TERMS.

### Modifications and Riders

q   Loan Agreement modifications are included in Exhibit B

The following rider(s) are attached to this Loan Agreement:

[if checked, list]

### Base Recourse

A portion of the Indebtedness equal to **0%** of the Loan Amount *(see Article III)*

### Tax and Insurance Reserves

Taxes -    Collected or q  Deferred          Insurance premiums - q   Collected or E] Deferred

*(See Article IV)*

### Capital Replacement and Repair Reserve

Capital Replacement and Repair Reserve **Monthly** Deposit of **$187.50** is q   Collected or [S] Deferred

| | **One Time** Capital Replacement Deposit of $        is required for Additional Capital Replacements. |
|---|---|
| | **One Time** Repair Deposit of $_____ is required for Priority Repairs (including PR-90 Repairs) |

*(See Article IV)*

### Required Additional Capital Replacements and Repairs

q   Additional Capital Replacements are required and are listed in Exhibit B.

The Additional Capital Replacements Completion Date is        days after the Effective Date.

Priority Repairs (may include PR-90 Repairs) are required and are listed in the Physical Risk Report.

*Recourse and other requirements related to Repairs are detailed in Sections 3.03, 3.04, and Section 6.14.*

**Special Purpose Reserve Fund**

| | |
|---|---|
| ☐ | One Time Special Purpose Reserve Fund Deposit in the amount of $ _____ is required |
| CI | The Termination Date is _____ days after the Effective Date. The Release Conditions are listed in <u>Exhibit B</u>. |

*(See Article IV)*

**Management**

Prope

The M  Property is:

| | |
|---|---|
| @ | Self-managed by Borrower |
| q | Managed by a Property Manager that is an Affiliate of Borrower |
| q | Managed by a Property Manager that is not an Affiliate of Borrower |

*The requirements for property management of the Mortgaged Property are detailed in Section 6.09.*

**Aluminum Wiring, Galvanized Steel/Polybutylene Piping, Stab-Lok Electric Circuit Breakers or Panels**

The Mortgaged Property includes (check all that apply):

| | |
|---|---|
| q | Aluminum wiring |
| EI | Galvanized steel/polybutylene piping |
| q | *Stab-Lok* electric circuit breakers or panels |

*Recourse and other requirements related to these features are detailed in Sections 3.03, 3.04, and 6.09.*

**Borrower Entity Requirements and Limitations**

Borrower is a(n):

| | |
|---|---|
| q | Individual |
| q | Revocable Trust |
| ► | Single Asset Entity |
| q | Restricted Multiple Asset Entity |
| q | Tenancy in common made up of multiple Co-Borrowers<br>*See the attached "Tenants in Common" rider for the Borrower Entity Requirements and Limitations for each Co-Borrower.* |
| q | Collection of Co-Borrowers that are not tenants in common, but have common ownership<br>*See the attached "Co-Borrowers" rider for the Borrower Entity Requirements and Limitations for each Co-Borrower.* |

*The limitations on Single Asset Entities and Restricted Multiple Asset Entities are detailed in Section 6.13.*

**O&M Program(s)**

Borrower must implement and maintain each O&M Program and Moisture Management Plan checked below.

| | | | |
|---|---|---|---|
| r | Asbestos | q | Storage tanks |
| ►I | Lead-based paint | q | Drinking water |
| q | Radon | q | Prior use of Mortgaged Property |
| 0 | Polychlorinated Biphenyls (PCBs) | q | Neighborhood waste sites |
| q | Hazardous Materials | • | Other (describe: _____ ) |
| 4 | Moisture Management Plan | • | Other (describe: _____ ) |

*O&M Program requirements are detailed in Section 6.12, and Moisture Management Plan requirements are detailed in Section 6.09.*

| **Guarantor(s)** |
| **ROBERT KHOMARI** |

| **Notices** |
| *Addresses for Notices to Borrower, Guarantor, and Lender as of the Effective Date are listed on the signature pages (See Section 10.03).* |

## ARTICLE II     SECURITY AGREEMENT.

**2.01     Uniform Commercial Code Security Agreement.**  This Loan Agreement is also a security agreement for any of the Mortgaged Property which, under applicable law, may be subjected to a security interest under the UCC, for the purpose of securing Borrower's obligations under this Loan Agreement and to further secure Borrower's obligations under the Note, Security Instrument and other Loan Documents, whether such Mortgaged Property is owned now or acquired in the future, and all products and cash and non-cash  proceeds of the Mortgaged  Property  (collectively,  **"UCC Collateral"),**  and by this Loan Agreement, Borrower grants to Lender a security interest under the UCC in the UCC Collateral.

## ARTICLE III     PERSONAL LIABILITY.

**3.01     Limited Recourse Generally.** Except as otherwise provided in this Article III, none of Borrower or any member or limited partner of Borrower (if applicable) will have any personal liability under the Note, this Loan Agreement or any other Loan Document for the repayment of the Indebtedness or for the performance of or compliance with any other obligations of Borrower under the Loan Documents, and Lender's only recourse for the satisfaction of the Indebtedness and the performance of such obligations will be Lender's exercise of its rights and remedies with respect to the Mortgaged Property and to any other collateral held by Lender as security for the Indebtedness. This limitation on Borrower's liability will not limit or impair Lender's enforcement of its rights against any Guarantor.

**3.02     Base Recourse.** Borrower will be personally liable to Lender for the Base Recourse specified in Article I **("Base Recourse"),** plus any other amounts for which Borrower has personal liability under this Article III.

**3.03     Loss or Damage Recourse.** Borrower will be personally liable to Lender for the repayment of a portion of the Indebtedness equal to any loss or damage suffered by Lender as a result of the occurrence of any of the following events:

(a)     Borrower or any Affiliate or employee of Borrower makes an unintentional written material misrepresentation in connection with the application for or creation of the Indebtedness or any action or consent of the Lender; provided that the assumption will be that any written material misrepresentation was intentional and the burden of proof will be on Borrower to prove there was no intent.

(b)     Borrower fails to complete any of the Priority Repairs (including PR-90 Repairs) identified in the Physical Risk Report.

(c)     Borrower undertakes and fails to complete any Capital Improvement, Property Improvement, or other alteration of the Mortgaged Property (whether or not such alteration is permitted under Sections 6.09(d) or (e)).

(d)     Borrower engages in any willful act of material waste of the Mortgaged Property.

(e)     Borrower fails to pay when due any of the following:

    (i)     Taxes, if Lender does not collect a Tax Reserve Fund.

    (ii)     Insurance premiums, if Lender does not collect an Insurance Reserve Fund.

(iii) Water and sewer charges that could become a lien on the Mortgaged Property.

(iv) Assessments or other charges that could become a lien on the Mortgaged Property, including homeowner association dues.

(v) Transfer or recording Taxes required to be paid by Borrower.

(g) Any of the following Transfers occurs:

(I) Any Person that is not an Affiliate of Borrower or a Borrower Principal creates a mechanic's lien or other involuntary lien or encumbrance against the Mortgaged Property and Borrower has not complied with the provisions of Article VII.

(ii) A Transfer by devise, descent or operation of law occurs upon the death of a natural person and such Transfer does not meet Lender's requirements in Section 7.03(a) or (b), as applicable.

(iii) Borrower grants an easement that does not meet Lender's requirements.

(iv) Borrower executes a Lease that does not meet Lender's requirements.

(h) Borrower fails to apply all Insurance proceeds and Condemnation proceeds as required by this Loan Agreement. This Section 3.03(h) will not apply if Borrower's failure is a result of a valid order issued in, or an automatic stay applicable because of, a bankruptcy, receivership, or a similar judicial proceeding.

(I) Borrower fails to pay to Lender upon demand after an Event of Default all Rents to which Lender is entitled under Section 3 of the Security Instrument and the amount of all security deposits collected by Borrower from tenants then in residence. This Section 3.03(i) will not apply if Borrower's failure is a result of a valid order issued in, or an automatic stay applicable because of, a bankruptcy, receivership, or a similar judicial proceeding.

(j) If an Event of Default has occurred and is continuing, Borrower fails to deliver all Books and Records, contracts, Leases and other instruments relating to the Mortgaged Property or its operation in accordance with the provisions of Section 6.07.

(k) If the Mortgaged Property is subject to any oil or gas lease, pipeline agreement, or other instrument related to the production or sale of oil or natural gas that under applicable state law has been given priority over the Security Instrument.

(l) If the Mortgaged Property is non-conforming under the applicable zoning laws, ordinances and/or regulations in the Property Jurisdiction **("Zoning Code"),** either of the following circumstances occurs following a casualty affecting the Mortgaged Property:

(I) The Improvements impacted by the casualty cannot be rebuilt or restored to their pre-casualty condition under the terms of the Zoning Code and the Property Insurance proceeds available to Lender under the terms of this Loan Agreement are insufficient to repay the Indebtedness in full.

(ii) Borrower fails to commence and diligently pursue completion of any Restoration within the time frame required by both the Zoning Code and any permits issued pursuant to the Zoning Code which are necessary to allow the Restoration of the Mortgaged Property to its pre-casualty condition.

(m) If primary ingress to and egress from the Mortgaged Property is through an easement or private road, any party takes, or threatens to take, any action to deny ingress to or egress from the

Mortgaged Property from or to a publicly dedicated and maintained right-of-way.

(n)    If the Mortgaged Property is subject to a Regulatory Agreement restricting rents or occupancy, a default or breach by Borrower (however such terms may be defined in the Regulatory Agreement) extends beyond any applicable notice and/or cure periods under the Regulatory Agreement.

(o)    If the operation of the Mortgaged Property requires that Borrower and its tenants have access to a management office, recreational facility, and/or other amenity that is not located on the Mortgaged Property, and Borrower has entered into an agreement (whether recorded or unrecorded) to ensure such access, any party takes, or threatens to take, any action to deny Borrower and its tenants such access.

(p)    If the Mortgaged Property includes aluminum wiring, galvanized steel/polybutylene piping, or *Stab-Lok* electric circuit breakers or panels, an Aluminum Wiring Event, a Galvanized Steel/PB Piping Event, or a Stab-Lok Event occurs.

(q)    If a Process Agent is required by the Guaranty, either of the following circumstances occurs:

    (i)    The Process Agent is no longer able to act as Guarantor's agent for service of process for any reason and Borrower fails to cause Guarantor to appoint a substitute Process Agent in accordance with the terms of the Guaranty.

    (ii)    Borrower fails to cause Guarantor to maintain the Minimum U.S. Deposit amount set forth in the Guaranty in a U.S. federally insured banking institution in accordance with the terms of the Guaranty or fails to provide Lender with copies of the required documentation evidencing the Minimum U.S. Deposits in accordance with the terms of the Guaranty.

(r)    Reserved [Florida Amended and Restated Loans].

**3.04**    **Performance and Cost Recourse.** Borrower will be personally liable to Lender for all the following:

(a)    The performance of, and the cost to Lender of any nonperformance, all of Borrower's obligations under each of the following:

    (i)    Section 6.14(a) (relating to completion of Priority Repairs (including PR-90 Repairs)).

    (ii)    Sections 6.12 and 9.02(b) (relating to environmental matters).

    (iii)    Sections 6.09(h), 6.09(i) and 6.09(j) if the Mortgaged Property includes aluminum wiring, galvanized steel/polybutylene piping, or *Stab-Lok* electric circuit breakers or panels.

(b)    The cost to Lender of each of the following:

    (i)    Any audit required under Section 6.07.

    (ii)    Any expenses incurred in connection with the collection of any amount for which Borrower is personally liable under this Article III, including Attorneys' Fees and Costs and the costs of conducting any independent audit of Borrower's Books and Records to determine the amount for which Borrower has personal liability.

    (iii)    Any expenses incurred in connection with Borrower's termination of any agreement for services at the Mortgaged Property, including cable, internet, garbage collection and recycling, landscaping, security, and cleaning.

**3.05    Full Recourse.** Borrower will become personally liable to Lender for the repayment of all the Indebtedness upon the occurrence of any of the following:

(a)    Borrower fails to comply with Section 6.13.

(b)    A Transfer that is an Event of Default under Section 7.02 occurs, other than a Transfer set forth in Section 3.03(g) (for which Borrower will have personal liability for Lender's loss or damage); provided, however, that Borrower will not have any personal liability for a Transfer consisting solely of the involuntary removal or involuntary withdrawal of a general partner in a limited partnership or a manager in a limited liability company.

(c)    There was fraud or intentional written material misrepresentation by Borrower, any Affiliate, or any employee of Borrower in connection with the application for or creation of the Indebtedness or there is fraud in connection with any request by Borrower or Guarantor for any action or consent by Lender.

(d)    A Bankruptcy Event.

**3.06    Exercise of Lender's Rights and Application of Payment.** If Borrower has personal liability under this Article III, then Lender may, to the fullest extent permitted by applicable law, exercise its rights against Borrower personally without regard to whether Lender has exercised any rights against the Mortgaged Property or any other security, or pursued any rights against any Guarantor, or pursued any other rights available to Lender under the Note, this Loan Agreement, any other Loan Document or applicable law. To the fullest extent permitted by applicable law, in any action to enforce Borrower's personal liability under this Article HI, Borrower waives any right to set off the value of the Mortgaged Property against such personal liability.    All payments made by Borrower with respect to the Indebtedness and all amounts received by Lender from the enforcement of its rights under the Loan Documents will be applied first to the portion of the Indebtedness for which Borrower has no personal liability.

**3.07    Reserved.** [Ground Lease]

**ARTICLE IV    RESERVE FUNDS AND REQUIREMENTS.**

**4.01    Reserves Generally.**

(a)    _Establishment of Reserve Funds._    Each Reserve Fund marked in Article I as required or collected will be established on the Closing Date and funded in accordance with this Article IV. Upon Notice to Borrower following (i) an Event of Default, (ii) a Transfer requiring Lender's approval under Article VII, or (iii) the placement of a Subordinate Loan, Lender may require Borrower to establish and make deposits into any Reserve Fund marked in Article I as deferred.

(b)    _Investment of Reserve Funds._    All Reserve Funds will be deposited in an Eligible Account at an Eligible Institution or invested in "permitted investments" as then defined and required by the Rating Agencies.    Lender will not be obligated to open additional accounts or deposit Reserve Funds in additional institutions when the amount of any Reserve Fund exceeds the maximum amount of the federal deposit insurance or guaranty. Borrower acknowledges and agrees that it will not have the right to direct Lender as to any specific investment of monies in any Reserve Fund.    Lender will not be responsible for any losses resulting from investment of monies in any Reserve Fund or for obtaining any specific level or percentage of earnings on such investment. Unless applicable law requires, Lender will not be required to pay Borrower any interest, earnings or profits on any Reserve Funds.    Any amounts deposited with Lender under this Article IV will not be trust funds, nor will they operate to reduce the Indebtedness, unless applied by Lender for that purpose pursuant to the terms of this Loan Agreement.

(c)    _Use of Reserve Funds; No Disbursements during Event of Default._    Each Reserve Fund will, except as otherwise provided in this Loan Agreement, be used for the sole purpose of paying, or reimbursing Borrower for payment of, the item(s) for which the applicable Reserve Fund is established.    Except as specified in this Loan Agreement, monies in one Reserve Fund will not be

used to pay, or reimburse Borrower for, matters for which another Reserve Fund has been established. Lender will not be obligated to make disbursements from any Reserve Fund if any Event of Default has occurred and is continuing. If an Event of Default has occurred and is continuing, then Lender may use any Reserve Fund for the payment or performance of any obligation of Borrower to Lender or otherwise with respect to the Mortgaged Property.

(d)    <u>Termination of Reserve Funds.</u>    Upon payment in full of the Indebtedness, Lender will pay to Borrower all funds remaining in any Reserve Funds.

**4.02    Tax and Insurance Reserves.**

(a)    <u>Deposits.</u>    When required by Lender, Borrower will deposit with Lender on the Closing Date and on each Payment Date under the Note an additional amount sufficient to accumulate with Lender the entire sum required to pay, when due, Taxes **("Tax Reserve Fund")** and Insurance premiums **("Insurance Reserve Fund").**

The amount of each required deposit into the Tax Reserve Fund and Insurance Reserve Fund must be sufficient to enable Lender to pay the Taxes or Insurance premiums, as applicable, before the last date upon which the payment may be made without any penalty or interest charge being added.

(b)    <u>Disbursements.</u>

(0    Lender will pay Taxes from the Tax Reserve Fund held by Lender upon Lender's receipt of a bill or invoice for Taxes. Lender will have no obligation to pay Taxes to the extent the amount payable exceeds the Tax Reserve Fund then held by Lender. Lender may pay Taxes according to any bill, statement or estimate from the appropriate public office without inquiring into the accuracy of the bill, statement or estimate.

(ii)    Lender will pay Insurance premiums from the Insurance Reserve Fund held by Lender upon Lender's receipt of a bill or invoice for Insurance premiums. Lender will have no obligation to pay Insurance premiums to the extent the amount payable exceeds the Insurance Reserve Fund then held by Lender. Lender may pay Insurance premiums according to any bill, statement or estimate from an insurance company without inquiring into the accuracy of the bill, statement or estimate.

(c)    <u>Adjustments to Reserve Fund Deposits.</u>    If at any time the amount of either the Tax Reserve Fund or the Insurance Reserve Fund held by Lender for payment of Taxes or Insurance premiums exceeds the amount reasonably deemed necessary by Lender, then the excess will be credited against future payments into the applicable Reserve Fund. If at any time the amount of either the Tax Reserve Fund or the Insurance Reserve Fund is less than the amount reasonably estimated by Lender to be necessary, then Borrower will pay to Lender the amount of the deficiency within 20 days after Notice from Lender.

(d)    <u>Delivery of Invoices; Proof of Payment by Borrower.</u>    Borrower will promptly deliver to Lender a copy of all notices of, and invoices for, Taxes and Insurance premiums. If Lender has not established a Reserve Fund for either Taxes or Insurance premiums, then on or before the date the Taxes or Insurance premiums are due, Borrower will provide Lender with proof of payment of the Taxes or Insurance premiums.

**4.03    Special Purpose Reserve Fund.**

(a)    <u>Deposit.</u>    If a Special Purpose Reserve is required in Article I, then Borrower will pay to Lender on the Closing Date the amount set forth in Article I **("Special Purpose Reserve Fund").**

(b)    <u>Disbursements.</u>    Lender will disburse the funds in the Special Purpose Reserve Fund to Borrower when the Release Conditions specified in *Exhibit B* have been satisfied in Lender's discretion.

(c)    <u>Application of Reserve Funds after the Termination Date.</u>    If Borrower has not satisfied the Release Conditions on or before the Termination Date specified in Article I, then Lender may apply some or all the Special Purpose Reserve Fund to the Indebtedness, and Borrower will pay a prepayment premium computed using the formula set forth in the Note with respect to any such prepayment of principal under the Note. Borrower may not pay the prepayment premium from funds drawn from the Special Purpose Reserve Fund.

**4.04    Capital Replacement and Repair Reserve Fund.**

(a)    <u>Monthly Deposits.</u>    If the Capital Replacement and Repair Reserve Monthly Deposit is shown as collected in Article I, then on each Payment Date under the Note, Borrower will pay to Lender the Capital Replacement and Repair Reserve Monthly Deposit amount shown in Article I **("Capital Replacement and Repair Reserve Fund").**

(b)    <u>Disbursements from Capital Replacement and Repair Reserve Fund.</u>    Lender will disburse funds from the Capital Replacement and Repair Reserve Fund to Borrower for reimbursement of, or to defray the cost of, each of the following, provided the conditions set forth in Sections 4.04(f) and (g) are satisfied:

(i)    Replacing any of the following:

Carpet/vinyl flooring, window treatments, roofs, furnaces/boilers, air conditioners, ovens/ranges, refrigerators, dishwashers, water heaters, garbage disposals, and other items that Lender may approve after the Effective Date, subject to any conditions that Lender may require **("Basic Capital Replacements,"** and together with any Additional Capital Replacements listed in <u>Exhibit B</u>, **"Capital Replacements").**

(ii)    Completing the Priority Repairs described in the Physical Risk Report, provided a Repair Deposit is required in Article I.

(c)    <u>Additional Capital Replacements Deposit</u>    If an Additional Capital Replacements Deposit is required in Article I, then on the Closing Date, Borrower will pay the Additional Capital Replacements Deposit to Lender for deposit into the Capital Replacement and Repair Reserve Fund. The Additional Capital Replacements Deposit will be available to reimburse Borrower only for reimbursement of, or to defray, the cost of the Additional Capital Replacements listed in <u>Exhibit B.</u>

Borrower may not displace or relocate tenants to undertake or complete the Additional Capital Replacements unless such displacement or relocation has been approved by Lender. Borrower must complete the Additional Capital Replacements on or before the Additional Capital Replacements Completion Date specified in Article I, as may be extended by Lender in its discretion. Any funds from the Additional Capital Replacements Deposit remaining in the Capital Replacement and Repair Reserve Fund after the Additional Capital Replacements are completed in a manner satisfactory to Lender will be returned to Borrower.

(d)    <u>Repair Deposit.</u>    If a Repair Deposit is required in Article I, then on the Closing Date, Borrower will pay the Repair Deposit to Lender for deposit into the Capital Replacement and Repair Reserve Fund.  The Repair Deposit will be available to reimburse Borrower only for reimbursement of, or to defray, the cost of Priority Repairs (including PR-90 Repairs). Any funds from the Repair Deposit remaining in the Capital Replacement and Repair Reserve Fund after all the Priority Repairs are completed in a manner satisfactory to Lender will be returned to Borrower.

(e)    <u>Insufficient Amount in Capital Replacement and Repair Reserve Fund.</u>    If Borrower requests disbursement from the Capital Replacement and Repair Reserve Fund for a Capital Replacement or a Priority Repair (including PR-90 Repairs) in an amount that exceeds the amount on deposit in the Capital Replacement and Repair Reserve Fund, then Lender will disburse to Borrower only the amount on deposit in the Capital Replacement and Repair Reserve Fund.  Borrower will pay

all additional amounts required in connection with any such Capital Replacement or Priority Repair from Borrower's own funds.

(f) <u>Limits on Disbursements.</u>  Lender will disburse funds from the Capital Replacement and Repair Reserve Fund no more frequently than once per calendar month, and no disbursement will be made in an amount less than $1,000.

(g) <u>Performance of Capital Replacements and Priority Repairs (including PR-90 Repairs); Requests for Disbursement.</u>

   (I)  If Borrower determines that a Capital Replacement is necessary or desirable, then Borrower will perform such Capital Replacement and request from Lender, in writing, reimbursement for the cost of such Capital Replacement from the Capital Replacement and Repair Reserve Fund using the Disbursement Request attached to this Loan Agreement as <u>Exhibit A.</u>  The Disbursement Request must be accompanied by paid invoices or bills that show Borrower has paid for the applicable Capital Replacement.

   (ii)  Borrower must complete all Priority Repairs (including PR-90 Repairs) pursuant to Section 6.14. After Borrower performs one or more Priority Repairs, Borrower may request from Lender reimbursement for the cost of such Priority Repair(s) from the Capital Replacement and Repair Reserve Fund using the Disbursement Request attached to this Loan Agreement as Exhibit A. The Disbursement Request must be accompanied by paid invoices or bills that show Borrower has paid for the applicable Priority Repair.

   (iii)  If requested by Lender, Borrower must provide any other information, documents, lien waivers, certifications, or professional engineering reports regarding the work and the cost of such Capital Replacements or Priority Repairs. Lender, at its option, may retain a professional inspection engineer or other qualified third party to inspect any Capital Replacement or Priority Repair. If Lender retains such a third party, then it will charge Borrower an amount sufficient to pay all reasonable costs and expenses charged by such third party inspector. Lender may, at its election, either deduct such cost from the Capital Replacement and Repair Reserve Fund or send Borrower a Notice of the amount of such charge, which Borrower must pay within 20 days following its receipt of such Notice.

   (iv)  If Lender reasonably determines at any time that a Capital Replacement or a Repair is necessary for the proper maintenance of the Mortgaged Property, then Lender will give Notice to Borrower requesting that Borrower obtain and submit to Lender bids for all labor and materials required in connection with such Capital Replacement or Repair.  In response, Borrower will submit such bids and a time schedule for completing each Capital Replacement or Repair to Lender within 30 days after Borrower's receipt of Lender's Notice.  Borrower will perform such Capital Replacement or Repair in conformity with the requirements of this Section 4.04 and then may request reimbursement for such Capital Replacement or Repair in accordance with this Section 4.04.

(h) <u>Adjustments to Reserve Fund Deposits.</u>  If the initial term of the Loan is greater than 120 months, then following each of the 120th and 180th Payment Dates under the Note, Lender may adjust the amount of the Capital Replacement and Repair Reserve Monthly Deposit based on Lender's most recent assessment of the physical condition of the Mortgaged Property and will provide Borrower Notice of this revised Capital Replacement and Repair Reserve Monthly Deposit amount.  Borrower will begin paying this revised Capital Replacement and Repair Reserve Monthly Deposit on the next Payment Date following its receipt of the Notice from Lender.

**4.05    Reserved**

**4.06    Reserved** [Ground Lease]

**ARTICLE V     REPRESENTATIONS AND WARRANTIES.**

Borrower represents and warrants to Lender as follows as of the Effective Date:

**5.01     Review of Documents.**  Borrower has reviewed: (a) the Physical Risk Report, (b) the Commitment Letter (c) the Note, (d) this Loan Agreement, (e) the Security Instrument, and (f) all other Loan Documents.

**5.02     Condition of Mortgaged Property.**  Except as Borrower may have disclosed to Lender in writing in connection with the issuance of the Commitment Letter (which written disclosure may be in certain written reports accepted by Lender in connection with the funding of the Indebtedness and dated prior to the Effective Date), the Mortgaged Property has not been damaged by fire, water, wind or other cause of loss, or, if so damaged, any previous damage to the Mortgaged Property has been fully restored.

**5.03     No Condemnation.**  No part of the Mortgaged Property has been taken in Condemnation or other similar proceeding, and, to the best of Borrower's knowledge after due inquiry and investigation, no such proceeding is pending or threatened for the partial or total Condemnation or other taking of the Mortgaged Property.

**5.04     Actions; Suits; Proceedings.**  There are no judicial, administrative, mediation or arbitration actions, suits or proceedings pending or, to the best of Borrower's knowledge, threatened in writing against or affecting Borrower, any Borrower Principal, or the Mortgaged Property which, if adversely determined, would have a Material Adverse Effect.

**5.05     Environmental.**  Except as previously disclosed  by  Borrower to Lender in writing (which written disclosure may be in certain environmental assessments and other written reports accepted by Lender in connection with the funding of the Indebtedness and dated prior to the Effective Date), each of the following is true:

(a)     Borrower has not at any time engaged in, caused, or permitted any Prohibited Activities or Conditions on the Mortgaged Property.

(b)     To the best of Borrower's knowledge after due inquiry and investigation, no Prohibited Activities or Conditions exist or have existed on the Mortgaged Property.

(c)     The Mortgaged Property does not now contain any underground storage tanks, and, to the best of Borrower's knowledge after due inquiry and investigation, the Mortgaged Property has not contained any underground storage tanks in the past.  If there is an underground storage tank located on the Mortgaged Property that has been previously disclosed by Borrower to Lender in writing, that tank complies with all requirements of Hazardous Materials Laws.

(d)     To the best of Borrower's knowledge after due inquiry and investigation, Borrower has complied with all Hazardous Materials Laws, including all requirements for notification regarding releases of Hazardous Materials.   All Environmental Permits required for the operation of the Mortgaged Property in accordance with Hazardous Materials Laws now in effect have been obtained and all such Environmental Permits are in full force and effect.

(e)     To the best of Borrower's knowledge after due inquiry and investigation, no event has occurred with respect to the Mortgaged Property that constitutes, or with the passage of time or the giving of notice, or both, would constitute, noncompliance with the terms of any Environmental Permit.

($^1$)     There are no actions, suits, claims,  or proceedings pending or, to the best of Borrower's knowledge after due inquiry and investigation, threatened in writing, that involve the Mortgaged Property and allege, arise out of, or relate to any Prohibited Activity or Condition.

(g)     Borrower has received no actual or constructive notice of any written complaint, order, notice of violation or other communication from any Governmental Authority with regard to air emissions, water discharges, noise emissions or Hazardous Materials, or any other environmental, health or

safety matters affecting the Mortgaged Property or any property that is adjacent to the Mortgaged Property.

**5.06    No Labor or Materialmen's Claims.** Borrower represents and warrants that all parties furnishing labor and materials for which a Lien or claim of Lien may be filed against the Mortgaged Property have been paid in full and there are no mechanics', laborers' or materialmen's Liens or claims outstanding for work, labor or materials affecting the Mortgaged Property, whether prior to, equal with or subordinate to the Lien of the Security Instrument, except such Liens or claims that Borrower has disclosed to both Lender and the title company and which are insured against by the policy of title insurance to be issued in connection with the Loan.

**5.07    Compliance with Applicable Laws and Regulations.** To the best of Borrower's knowledge after due inquiry and investigation, each of the following is true:

(a)    All Improvements and the use of the Mortgaged Property comply with all applicable statutes, rules, and regulations, including all applicable statutes, rules, and regulations pertaining to requirements for equal opportunity, anti-discrimination, fair housing, environmental protection, zoning, and land use ("legal non-conforming" status with respect to uses or structures will be considered to comply with zoning and land use requirements for the purposes of this representation).

(b)    The Improvements comply with, or will comply with upon completion of the Priority Repairs, applicable health, fire, and building codes.

(c)    There is no evidence of any illegal activities relating to controlled substances on the Mortgaged Property.

**5.08    Access; Utilities; Tax Parcels.** The Mortgaged Property: (a) has ingress and egress via a publicly dedicated right of way or via an irrevocable easement permitting ingress and egress, (b) is served by public utilities and services generally available in the surrounding community or otherwise appropriate for the current use of the Mortgaged Property, and (c) constitutes one or more separate tax parcels.

**5.09    Licenses and Permits.** Borrower and any operator of the Mortgaged Property, if applicable, and to the best of Borrower's knowledge, any commercial tenant of the Mortgaged Property, are in possession of all material licenses, permits, and authorizations required for use of the Mortgaged Property, which are valid and in full force and effect as of the Effective Date.

**5.10    No Other Interests.** To the best of Borrower's knowledge after due inquiry and investigation, no Person has (a) any possessory interest in the Mortgaged Property or right to occupy the Mortgaged Property except under the provisions of existing Leases by and between tenants and Borrower, or (b) an option to purchase the Mortgaged Property or an interest in the Mortgaged Property, except as has been disclosed to and approved in writing by Lender.

**5.11    Term of Leases.** All Leases for residential units at the Mortgaged Property satisfy all the following conditions:

(a)    They are on forms acceptable to Lender.

(b)    They do not include options to purchase or have purchase options associated with them.

(c)    They are for initial terms of at least one month and not more than 2 years.

**5.12    No Prior Assignment; Prepayment of Rents.** Borrower has (a) not executed any prior assignment of Rents (other than an assignment of Rents securing any prior indebtedness that is being assigned to Lender or that is being paid off and discharged with the proceeds of the Loan), and (b) not performed any acts and has not executed, and will not execute, any instrument which would prevent Lender from exercising its rights under any Loan Document. At the time of execution of this Loan Agreement, there

has been no prepayment of any Rents for more than 2 months prior to the due dates of such Rents other than the last month's Rent, if collected at the time a tenant enters into a Lease.

**5.13   Illegal Activity.**  No portion of the Mortgaged Property has been or will be purchased with the proceeds of any illegal activity.

**5.14   Taxes Paid.**  Borrower has filed all federal, state, county, and municipal tax returns required to have been filed by Borrower, and has paid all Taxes which have become due pursuant to such returns or to any notice of assessment received by Borrower, and Borrower has no knowledge of any basis for additional assessments with respect to such Taxes.   To the best of Borrower's knowledge after due inquiry and investigation, there are not presently pending any special assessments against the Mortgaged Property or any part of the Mortgaged Property.

**5.15   Title Exceptions.**   To the best of Borrower's knowledge after due inquiry and investigation, none of the items shown in the schedule of exceptions to coverage in the title insurance policy issued to and accepted by Lender contemporaneously with the execution of this Loan Agreement and insuring Lender's interest in the Mortgaged Property **("Permitted Encumbrances")** will have a Material Adverse Effect on the:  (a) ability of Borrower to pay the Loan in full, (b) ability of Borrower to use all or any part of the Mortgaged Property in the manner in which the Mortgaged Property is being used on the Effective Date, (c) operation of the Mortgaged Property, or (d) value of the Mortgaged Property.

**5.16   No Change in Facts or Circumstances.**

(a)   All information in the application for the Loan submitted to Lender, including all financial statements for the Mortgaged Property, Borrower, and any Borrower Principal, and all Rent Schedules, reports, certificates, the Form 1114, Certification — Organizational Chart (if applicable), and any other documents submitted in connection with the application (collectively, **"Loan Application")** is complete and accurate in all material respects as of the date such information was submitted to Lender.

(b)   There has been no change in any fact or circumstance since the Loan Application was submitted to Lender that would make any information submitted as part of the Loan Application materially incomplete or inaccurate.

**5.17   ERISA - Borrower Status.**

(a)   Borrower is not an "investment company," or a company under the Control of an "investment company," as such terms are defined in the Investment Company Act of 1940, as amended.

(b)   Borrower is not an "employee benefit plan," as defined in Section 3(3) of ERISA, which is subject to Title I of ERISA or a "plan" to which Section 4975 of the Tax Code applies, and the assets of Borrower do not constitute "plan assets" of one or more such plans within the meaning of 29 C.F.R. Section 2510.3-101, as modified by Section 3(42) of ERISA.

(c)   Borrower is not a "governmental plan" within the meaning of Section 3(32) of ERISA, and is not subject to state statutes regulating investments or fiduciary obligations with respect to governmental plans.

**5.18   No Fraudulent Transfer or Preference.**  No Borrower or Borrower Principal has taken or will take any of the following actions:

(a)   Transfer of an interest in the property of Borrower or Borrower Principal to or for the benefit of Lender or otherwise as security for any of the obligations under the Loan Documents which is or could constitute a voidable preference under federal bankruptcy, state insolvency or similar applicable creditors' rights laws.

(b)     Transfer of (including any Transfer to or for the benefit of an insider under an employment contract) an interest of Borrower or any Borrower Principal in property which is or could constitute a voidable preference under federal bankruptcy, state insolvency or similar applicable creditors' rights laws.

(c)     Incur any obligation (including any obligation to or for the benefit of an insider under an employment contract) which is or could constitute a fraudulent transfer under federal bankruptcy, state insolvency or similar applicable creditors' rights laws.

**5.19    No Insolvency or Judgment.**

(a)     No Borrower or Borrower Principal is (i) the subject of or a party to (other than as a creditor) any completed or pending bankruptcy, reorganization or insolvency proceeding, or (ii) the subject of any unsatisfied judgment that is of record or docketed in any court located in the United States.

(b)     Borrower is not presently insolvent, and the Loan will not render Borrower insolvent. As used in this Section 5.19, the term **"insolvent"** means that the total of all of a Person's liabilities (whether secured or unsecured, contingent or fixed, or liquidated or unliquidated) is in excess of the value of all the assets of the Person that are available to satisfy claims of creditors.

**5.20    Working Capital.** After the Loan is made, Borrower intends to have sufficient working capital, including cash flow from the Mortgaged Property or other sources, to (a) adequately maintain the Mortgaged Property, and (b) to pay all of Borrower's outstanding debts as they come due (other than any balloon payment due upon the maturity of the Loan). Lender acknowledges that no members or partners of Borrower or any Borrower Principal will be obligated to contribute equity to Borrower for purposes of providing working capital to maintain the Mortgaged Property or to pay Borrower's outstanding debts except as may otherwise be required under their organizational documents.

**5.21    Regulatory Agreement.** If the Mortgaged Property is subject to one or more Regulatory Agreements, Borrower represents and warrants that all the following are correct as to each applicable Regulatory Agreement:

(a)     Borrower is in compliance with all requirements of the Regulatory Agreement. Borrower has not received any notice from the party or parties responsible for monitoring or enforcing the Regulatory Agreement that Borrower is in default under the Regulatory Agreement.

(b)     The copy of the Regulatory Agreement that Borrower has provided to Lender includes all amendments, schedules and exhibits and is complete and accurate in all respects.

(c)     Unless otherwise approved by Lender in writing, the Regulatory Agreement by its terms terminates upon foreclosure under the Security Instrument or upon a transfer of the Mortgaged Property by instrument in lieu of foreclosure.

**5.22    Commercial Purpose; No Right to Residency.** Borrower represents that Borrower is incurring the Indebtedness solely for the purpose of carrying on a business or commercial enterprise, and not for consumer, personal, family, household or agricultural purposes. If Borrower is a natural person, he/she waives any right to residency at the Mortgaged Property.

**5.23    Prohibited Parties Lists and AML Laws.**

(a)     Neither Borrower, and to the best of Borrower's knowledge after due inquiry and investigation, no Borrower Principal or Non-U.S. Equity Holder:

(i)     is identified on the OFAC Lists.
(ii)    has been convicted of a violation of the AML Laws or been the subject of a final enforcement action relating to the AML Laws.
(iii)   Is the subject of any pending proceedings for any violation of the AML Laws.

(b)   Borrower is not listed, and to the best of Borrower's knowledge after due inquiry and investigation, no Borrower Principal is listed, on the FHFA SCP List.

**5.24    Internal Controls.** Borrower has in place, and to the best of Borrower's knowledge after due inquiry and investigation, Borrower has determined that each Borrower Principal has in place, practices and procedures for the admission of investors which prevent the admission of:

(a)   Any investor that is in violation of any criminal or civil law or regulation intended to prevent money laundering or the funding of terrorist or illegal drug trafficking activities.

(b)   Any Person that will have a 25% or more ownership interest in Borrower (whether directly or indirectly) that is on the Prohibited Parties Lists.

(c)   Any Non-U.S. Equity Holder that is on the OFAC Lists.

**5.25    Crowdfunding.** Except as has been disclosed in writing to and approved in writing by Lender, no direct or indirect ownership (or other economic) interest of 25% or more in the aggregate in Borrower or any Borrower Principal has been marketed or sold to investors through any form of Crowdfunding.

**5.26    Survival.**   The representations and warranties set forth in this Loan Agreement will survive until the Indebtedness is paid in full; however, the representations and warranties set forth in Section 5.05 will survive beyond repayment of the entire Indebtedness, as provided in Sections 9.02(b) and 9.02(h).

**5.27    Reserved.** [Co-Borrowers]

## ARTICLE VI    BORROWER COVENANTS.

**6.01    Compliance with Laws.**   Borrower will at all times comply with all laws, ordinances, rules, regulations, and requirements of any Governmental Authority having jurisdiction over the Mortgaged Property and with the terms of all licenses and permits and all recorded covenants and agreements relating to or affecting the Mortgaged Property, including all laws, ordinances, regulations, requirements, and covenants pertaining to health and safety, construction of improvements on the Mortgaged Property, Repairs, Capital Replacements, fair housing, disability accommodation, zoning and land use, applicable building codes, special use permits, environmental regulations, Leases, and the maintenance and disposition of tenant security deposits.   Borrower will at all times take appropriate measures to prevent, and will not engage in or knowingly permit, any illegal activities at or on the Mortgaged Property, including those that could endanger tenants or visitors, result in damage to the Mortgaged Property, result in forfeiture of the Mortgaged Property, or otherwise materially impair the Lien created by the Security Instrument or Lender's interest in the Mortgaged Property.   Borrower will at all times maintain records sufficient to demonstrate compliance with the provisions of this Section 6.01.

**6.02    Compliance with Organizational Documents (Entity Borrowers).**

(a)   This Section 6.02 will not apply to any Borrower who is a natural person.

(b)   Borrower will at all times comply with all laws, regulations and requirements of any Governmental Authority relating to Borrower's formation, continued existence and good standing in its state of formation and, if different, in the Property Jurisdiction.   Borrower will at all times comply with its organizational documents.  If Borrower is a housing cooperative corporation or association, then Borrower will at all times maintain its status as a "cooperative housing corporation" as such term is defined in  Section 216(b) of the Internal Revenue Code of 1986, as amended, or any successor statute.

**6.03    Use of Mortgaged Property.** Unless required by applicable law, without the prior written consent of Lender, Borrower will not take any of the following actions:

(a)  Allow changes in the use for which all or any part of the Mortgaged Property is being used as of the Effective Date.

(b)  Initiate or acquiesce to a change in the zoning classification of the Mortgaged Property.

(c)  Establish any condominium or cooperative regime with respect to the Mortgaged Property beyond any that may be in existence on the Effective Date.

(d)  Combine all or any part of the Mortgaged Property with all or any part of a tax parcel which is not part of the Mortgaged Property.

(e)  Subdivide or otherwise split any tax parcel constituting all or any part of the Mortgaged Property.

(f)  Add to or change any location at which any of the Mortgaged Property is stored, held or located unless Borrower (A) gives Notice to Lender within 30 days after the occurrence of such addition or change, (B) executes and delivers to Lender any modifications of or supplements to this Loan Agreement that Lender may require, and (C) authorizes the filing of any financing statement or amendment which may be filed in connection with this Loan Agreement, as Lender may require.

**6.04**  **Non-Residential Leases.**  Borrower will not enter into any new Non-Residential Lease, or modify or terminate any existing Non-Residential Lease (except for extending an existing Non-Residential Lease on identical terms) without the prior written consent of Lender.

**6.05**  **Prepayment of Rents.**  Borrower will not receive or accept Rent under any Lease (whether a residential Lease or a Non-Residential Lease) for more than 2 months in advance.

**6.06**  **Inspection.**  Borrower authorizes Lender and its agents, representatives, and designees to enter, at any reasonable time (subject to applicable law and the rights of tenants) any portion of the Mortgaged Property to inspect, attend to Lender's interests, and perform any of the acts that Lender is authorized to perform pursuant to the Loan Documents, including with respect to Restoration, Repairs, and Capital Replacements.

**6.07**  **Books and Records; Financial Reporting.**

(a)  <u>Maintenance of Books and Records.</u>

(0  Borrower will keep and maintain at all times at the Mortgaged Property, Borrower's main business office, or Property Manager's office, and upon Lender's request will make available at the Mortgaged Property (or, at Borrower's option, at Property Manager's office),  complete and accurate books of account and records (including copies of supporting bills and invoices) adequate to reflect correctly the operation of the Mortgaged Property, and copies of all written contracts, Leases, and other instruments that affect the Mortgaged Property **("Books and Records").**

(ii)  The Books and Records will be kept in accordance with one of the following accounting methods, consistently applied, and Borrower will promptly provide Lender Notice of any change in Borrower's accounting methods:

(A)  GAAP, or generally accepted accounting principles.

(B)  Tax method of accounting, provided that under the tax method of accounting, the accrual basis may be used for interest expense, real estate taxes and insurance expense, and the cash basis will be used for all other items, including income, prepaid rent,  utilities  and payroll expense. Financial statements may exclude depreciation and amortization.

(C)  Such other method that is acceptable to Lender.

(iii)    The Books and Records will be subject to examination and inspection by Lender at any reasonable time with or without prior Notice to Borrower.

(b)    <u>Delivery of Borrower Financial Information — Annual Requirements.</u>  Within 90 days after the end of each calendar year (or the end of Borrower's fiscal year, if Borrower has adopted fiscal year financial reporting), Borrower will deliver all the following to Lender:

(I)    A Rent Schedule dated no earlier than the date that is 5 days prior to the end of such year.

(ii)    An annual statement of income and expenses for Borrower's operation of the Mortgaged Property.

(iii)    If the Mortgaged Property is subject to one or more Regulatory Agreements, evidence that the Mortgaged Property is in ongoing compliance with all income, occupancy and rent restrictions under the Regulatory Agreement(s).

(c)    <u>Delivery of Borrower Financial Information — Mid-Year Requirement.</u>  Within 25 days after the end of the second calendar quarter each year (or the end of the second quarter of Borrower's fiscal year, if Borrower has adopted fiscal year financial reporting), Borrower will deliver to Lender a Rent Schedule dated no earlier than the date that is 5 days prior to the end of such quarter.

(d)    <u>Delivery of Borrower Financial  Information — When Requested by Lender.</u>   Within 25 days following a Notice from Lender including a request for such information, Borrower will deliver the following to Lender:

(i)    The Rent Schedule for any period specified by Lender.

(ii)    A statement of income and expenses for Borrower's operation of the Mortgaged Property for the period specified by Lender.

(iii)    A balance sheet showing all assets and liabilities of Borrower relating to the Mortgaged Property as of the date specified by Lender.

(iv)    An accounting of all security deposits held pursuant to all Leases, including the name of the institution (if any) and the names and identification numbers of the accounts (if any) in which such security deposits are held and the name of the person to contact at such financial institution, along with any authority or release necessary for Lender to access information regarding such accounts.

(v)    A property management report for the Mortgaged Property, showing the number of inquiries made and rental applications received from tenants or prospective tenants and deposits received from tenants for any period specified by Lender.

(vi)    Copies of Borrower's state and federal tax returns, including current tax return extensions.

(vii)    Written updates on the status of all litigation proceedings that were disclosed or should have been disclosed by Borrower to Lender either (A) as of the Effective Date or (B) during the term of the Loan pursuant to Section 6.16.

(viii)    A statement that identifies all owners of any direct interest in Borrower and any Person(s) that Control(s) Borrower (except that the statement need not identify the owners of a publicly-traded entity). The statement must identify the percentage and type of ownership or Control interest held by each Person and must also identify any Non-U.S. Equity Holders.

(ix) Such other financial information or property management information as Lender may require (including information on tenants under Leases if such information is available to Borrower and copies of bank account statements from financial institutions where funds owned or controlled by Borrower are maintained).

(e) <u>Delivery of Guarantor Financial Information — When Requested by Lender.</u> Within 25 days following a Notice from Lender including a request for such information, Borrower will cause Guarantor to deliver the following to Lender:

(I) Guarantor's personal financial statements (or if Guarantor is an entity, Guarantor's balance sheet and profit and loss statement) as of the date specified by Lender.

(ii) Other Guarantor financial statements as Lender may reasonably require.

(iii) Written updates on the status of all litigation proceedings that Guarantor disclosed or should have disclosed to Lender as of the Effective Date.

(iv) If an Event of Default has occurred and is continuing, copies of Guarantor's state and federal tax returns, including current tax return extensions.

(f) <u>Delivery of General Partner Financial Statements — When Requested by Lender.</u> If Borrower is a general partnership, then within 25 days following a Notice from Lender including a request for such information, Borrower will cause each of its general partners to deliver the following to Lender:

(i) The general partner's balance sheet and profit and loss statement as of the date specified by Lender.

(ii) Other general partner financial statements as Lender may reasonably require.

(iii) Written updates on the status of all litigation proceedings that the general partner disclosed or should have disclosed to Lender as of the Effective Date.

(iv) If an Event of Default has occurred and is continuing, copies of the general partner's state and federal tax returns, including current tax return extensions.

(9) <u>Certification of Statements; Audited Financials.</u> A natural person having authority to bind Borrower, Guarantor, or the general partner of Borrower, as applicable, will certify each of the statements, schedules and reports required by Sections 6.07(b)-(f) to be complete and accurate. Each of the statements, schedules and reports required by Sections 6.07(b)-(f) will be in such form and contain such detail as Lender may reasonably require. At any time when an Event of Default has occurred and is continuing, or at any time that Lender determines that audited financial statements are required for an accurate assessment of the financial condition of Borrower or the Mortgaged Property, Lender also may require that any of the statements, schedules or reports listed in Sections 6.07(b)-(f) be audited at Borrower's expense by an independent certified public accountant acceptable to Lender.

(h) <u>Failure to Timely Provide Financial Statements.</u> If Borrower fails to provide in a timely manner the statements, schedules and reports required by Sections 6.07(b)-(f), then Lender will give Notice to Borrower specifying the statements, schedules and reports required by Sections 6.07(b)-(f) that Borrower has failed to provide. If Borrower has not provided the required statements, schedules and reports within 10 Business Days following such Notice, then (i) Borrower will pay a late fee of $500 for each late statement, schedule or report, plus an additional $500 per month that any such statement, schedule or report continues to be late, and (ii) Lender will have the right to have Borrower's Books and Records audited, at Borrower's expense, by an independent certified public accountant acceptable to Lender.

(l)     <u>Reporting Upon Event of Default.</u>   If an Event of Default has occurred and is continuing, then Borrower will deliver to Lender upon written demand all Books and Records and other instruments that affect the Mortgaged Property.

(0)     <u>Credit Reports.</u>   Borrower authorizes Lender to obtain a credit report on Borrower, and if Borrower is a general partnership, on any of its general partners, at any time.

**6.08  Taxes; Operating Expenses.**

(a)     <u>Payment of Taxes.</u>   Subject to the provisions of Section 6.08(c), Borrower will pay or cause to be paid all Taxes when due and before the addition of any interest, fine, penalty or cost for nonpayment.

(b)     <u>Payment of Operating Expenses and Insurance Premiums.</u>   Subject to the provisions of Section 6.08(d), Borrower will (i) pay the expenses of operating, managing, maintaining and repairing the Mortgaged Property (including utilities, Repairs and Capital Replacements) before the last date upon which each such payment may be made without any penalty or interest charge being added, and (ii) pay Insurance premiums prior to the expiration date of each policy of Insurance.

(c)     <u>Payment of Taxes and Reserve Funds.</u>   If Lender is collecting Tax Reserves pursuant to Article IV, then so long as no Event of Default exists, Borrower will not be obligated to pay Taxes, but only if Lender holds sufficient Tax Reserves and Borrower has timely delivered to Lender any bills or notices that it has received with respect to Taxes. Lender will have no liability to Borrower for failing to pay any Taxes if any of the following conditions exist: (i) any Event of Default has occurred and is continuing, (ii) Lender holds insufficient Tax Reserves at the time a Tax becomes due and payable, or (iii) Borrower has failed to provide Lender with bills and notices as provided in this Section 6.08.

(d)     <u>Payment of Insurance and Reserve Funds.</u>   If Lender is collecting Insurance Reserves pursuant to Article IV, then so long as no Event of Default exists, Borrower will not be obligated to pay Insurance premiums but only if Lender holds sufficient Insurance Reserve Deposits and Borrower has timely delivered to Lender any bills or premium notices that it has received with respect to Insurance premiums. Lender will have no liability to Borrower for failing to pay any Insurance premiums if any of the following conditions exist: (i) any Event of Default has occurred and is continuing, (ii) Lender holds insufficient Insurance Reserve Deposits at the time an Insurance premium becomes due and payable, or (iii) Borrower has failed to provide Lender with bills and premium notices as provided in this Section 6.08.

(e)     <u>Right to Contest.</u>   Borrower, at its own expense, may contest by appropriate legal proceedings, conducted diligently and in good faith, the amount or validity of Taxes, if: (i) Borrower notifies Lender of the commencement or expected commencement of such proceedings, (ii) the Mortgaged Property is not in danger of being sold or forfeited, (iii) if Borrower has not already paid the Taxes, Borrower deposits with Lender reserves sufficient to pay the contested Taxes, if requested by Lender, and (iv) Borrower furnishes whatever additional security is required in the proceedings or is reasonably requested by Lender, which may include the delivery to Lender of reserves established by Borrower to pay the contested Taxes.

**6.09  Preservation, Management, and Maintenance of Mortgaged Property.**

(a)     <u>Maintenance of Mortgaged Property: No Waste.</u>   Borrower will keep the Mortgaged Property in good repair, including replacing Personalty and Fixtures with items of equal or better function and quality.  Borrower will not commit waste or permit impairment or deterioration of the Mortgaged Property.

(b)     <u>Abandonment of Mortgaged Property.</u>   Borrower will not abandon the Mortgaged Property.

(c)     <u>Preservation of Mortgaged Property.</u>

(i) Borrower will promptly restore or repair, in a good and workmanlike manner, any damaged part of the Mortgaged Property to the equivalent of its original condition, or such other condition as Lender may approve in writing, whether or not Insurance proceeds or Condemnation awards are available to cover any costs of such Restoration or Repair; provided, however, that Borrower will not be obligated to perform such Restoration or Repair if (A) no Event of Default has occurred and is continuing, and **(B)** Lender has elected to apply any available Insurance proceeds and/or Condemnation awards to the payment of Indebtedness pursuant to Section 6.10(j) or Section 6.11(b).

(ii) Borrower will give Notice to Lender of and, unless otherwise directed in writing by Lender, will appear in and defend any action or proceeding purporting to affect the Mortgaged Property, Lender's security or Lender's rights under this Loan Agreement.

(d) <u>Alteration of Mortgaged Property — Consent Required.</u> Before taking any of the following actions, or permitting any tenant or other Person to take any of the following actions, Borrower must have the prior written consent of Lender:

(i) Converting any residential unit or common area to non-residential use.

(ii) Converting any non-residential unit or common area to residential use.

(iii) Converting, in whole or in part, any income producing unit to a non-income producing unit.

(iv) Modifying the number of bedrooms in any residential unit.

(v) Displacing or relocating more than 20% of tenants to undertake or complete any Repair, Capital Replacement, or Property Improvements, unless such displacement or relocation is required by law.

(vi) Removing, demolishing, or altering the Mortgaged Property or any part of the Mortgaged Property, including any removal, demolition, or alteration occurring in connection with a rehabilitation of all or part of the Mortgaged Property.

(e) <u>Alteration of Mortgaged Property — Consent Not Required.</u> Notwithstanding Section 6.09(d)(vi), Borrower may undertake, or permit a Tenant to undertake, any of the following without the prior written consent of Lender.

(i) Repairs and Capital Replacements.

(ii) Replacement of tangible Personalty.

(iii) Making an individual unit ready for a new occupant.

(iv) Preservation and maintenance of the Mortgaged Property in accordance with Sections 6.09(a) and (d).

(v) Alterations intended to renovate or upgrade the Mortgaged Property **("Property Improvement"),** provided the Property Improvement complies with Section 6.14 and it does not:

(A) Include any of the actions listed in Sections 6.09(d)(i)-(v).

(B) Require demolition of any existing Improvements.

(C) Cause a permanent obstruction of tenants' access to units or a temporary obstruction of tenants' access to units without a reasonable alternative access provided during the period the Property Improvement is underway.

(D)     Have an adverse effect on any major building systems, including the following:

    (1)     Electrical (electrical lines or power upgrades, excluding fixture replacement).

    (2)     HVAC (central and unit systems, excluding replacement of in kind unit systems).

    (3)     Plumbing (supply and waste lines, excluding fixture replacement).

    (4)     Structural (foundation, framing, and all building support elements).

  (vi)     If Borrower is a cooperative housing corporation or association, removal, demolition, or alteration of the Mortgaged Property as permitted with respect to individual residential units under the form of a proprietary lease or occupancy agreement.

(f)     <u>Establishment of MMP.</u>   If MMP is marked "Required" in Article I, then on or prior to the Effective Date, Borrower will establish and will adhere to an MMP. If Borrower is required to have an MMP, then Borrower will keep all MMP documentation at the Mortgaged Property, Borrower's main business office, or at Property Manager's office and available for review by Lender or the Loan Servicer during any annual assessment or other inspection of the Mortgaged Property. At a minimum, a required MMP must contain provisions for: (i) staff training, (ii) information to be provided to tenants, (iii) documentation of the plan, (iv) the appropriate protocol for incident response and remediation, and (v) routine, scheduled inspections of common space and unit interiors.

(9)     <u>Inspection of Mold.</u>   If Lender determines that Mold has or may have developed as a result of a water intrusion event or leak, then Lender may require that a professional inspector inspect the Mortgaged Property to confirm whether Mold has developed and, if so, thereafter as frequently as Lender determines is necessary until any issue with Mold and its cause(s) are resolved to Lender's satisfaction.   Such inspection will be limited to a visual and olfactory inspection of the area that has experienced the Mold, water intrusion event or leak. Borrower will be responsible for the cost of each such professional inspection and any remediation deemed to be necessary as a result of the professional inspection.

(h)     <u>Aluminum Wiring.</u>   If the Mortgaged Property includes aluminum wiring, then Borrower will give prompt Notice to Lender of any malfunction or fire associated with, or resulting from, the existence of any aluminum wiring located on the Mortgaged Property  **("Aluminum Wiring Event").**  In addition to any Restoration of the Mortgaged Property required as a result of the Aluminum Wiring Event, following the Aluminum Wiring Event, Borrower will complete each of the following Repairs:

  (i)     Replace all aluminum wiring associated with the Aluminum Wiring Event with building code compliant copper wiring within 30 days following the Aluminum Wiring Event or as otherwise required by Lender.

  (ii)     Replace all remaining aluminum wiring located in each building affected by the Aluminum Wiring Event with building code compliant copper wiring within 1  year following the Aluminum Wiring Event or as otherwise required by Lender.

(I)     <u>Galvanized Steel or Polybutylene Piping.</u>   If the Mortgaged Property contains galvanized steel piping and/or polybutylene piping, then Borrower will give prompt Notice to Lender of any leaks in or other failure of the galvanized steel/polybutylene piping located on the Mortgaged Property **("Galvanized Steel/PB Piping Event").**  In addition to any Restoration of the Mortgaged Property required as a result of the Galvanized Steel/PB Piping Event, following the Galvanized Steel/PB Piping Event, Borrower will complete each of the following Repairs:

(i)    Replace all galvanized steel/polybutylene piping associated with the Galvanized Steel/PB Piping Event with building code compliant copper, PVC or CPVC piping within 30 days following the Galvanized Steel/PB Piping Event or as otherwise required by Lender.

(ii)    Replace all remaining galvanized steel/polybutylene piping located in each building affected by the Galvanized Steel/PB Piping Event with building code compliant copper, PVC or CPVC piping within 1 year following the Galvanized Steel/PB Piping Event or as otherwise required by Lender.

(j)    *Stab-Lok* Circuit Breakers and Panels.    If the Mortgaged Property includes *Stab-Lok* electric circuit breakers or panels, then Borrower will give prompt Notice to Lender of any malfunction or fire associated with, or resulting from, the existence of any of the *Stab-Lok* electric circuit breakers or panels located on the Mortgaged Property **("Stab-Lok Event")**. In addition to any Restoration of the Mortgaged Property required as a result of the Stab-Lok Event, following the Stab-Lok Event, Borrower will complete each of the following Repairs:

(I)    Replace all *Stab-Lok* electric circuit breakers and panels associated with each Stab-Lok Event with building code compliant electric circuit breakers and panels within 30 days following the Stab-Lok Event or as otherwise required by Lender.

(ii)    Replace all remaining *Stab-Lok* electric circuit breakers and panels located in the building affected by the Stab-Lok Event with building code compliant electric circuit breakers and panels within 1 year following the Stab-Lok Event or as otherwise required by Lender.

(k)    No Reduction of Housing Cooperative Charges.    If Borrower is a housing cooperative corporation or association, then until the Indebtedness is paid in full, Borrower will not reduce the maintenance fees, charges or assessments payable by shareholders or residents under proprietary leases or occupancy agreements below a level which is sufficient to pay all expenses of Borrower, including all operating and other expenses for the Mortgaged Property and all payments due pursuant to the terms of the Note and any Loan Documents.

(l)    Property Management.

(I)    As of the Effective Date, the Mortgaged Property is managed as shown in Article I. Borrower will not change the property management structure or the identity of the Property Manager (if applicable) without Lender's prior consent.

(ii)    During any period in which Borrower self-manages the Mortgaged Property, Borrower will not engage or pay any other Person (whether an Affiliate of Borrower or otherwise) a fee or other compensation for managing the Mortgaged Property.

(iii)    During any period in which Borrower engages a Property Manager (whether an Affiliate of the Borrower or otherwise), all the following are applicable:

(A)    Borrower will maintain a written property management agreement with the Property Manager, and that agreement will be terminable by Borrower with no more than 30 days' Notice to the Property Manager. Borrower's right to terminate the property management agreement will not require Borrower to show cause for the termination or pay the Property Manager a penalty or fee.

(B)    Borrower will provide a copy of the property management agreement and any renewals or modifications of the property management agreement to Lender.

(C)    Without Lender's prior consent, Borrower will not cancel or modify the property management agreement, except that Borrower and Property Manager may renew the property management agreement on identical terms.

**(D)**    As of the Effective Date, Borrower has confirmed the Property Manager is not on any Prohibited Parties List. Borrower will confirm at the time of entering into or renewing any property management agreement that Property Manager is not on any Prohibited Parties List.

(iv)    If at any time, Lender determines that the Mortgaged Property is not being managed in accordance with generally accepted management practices for properties similar to the Mortgaged Property, then Lender may require that Borrower terminate any existing property management agreement or cease to self-manage the Mortgaged Property and engage a Property Manager satisfactory to Lender.

**6.10**    **Insurance.**

(a)    <u>Insurance Covenant.</u>    Borrower will at all times during the term of this Loan Agreement maintain, at its sole expense, for the mutual benefit of Borrower and Lender, Insurance as required by Lender and applicable law, with such endorsements as Lender may reasonably require from time to time and which are customarily required by institutional lenders for properties comparable to the Mortgaged Property.

(b)    <u>Property Insurance.</u>    Borrower will maintain Insurance against relevant physical hazards that may cause damage to the Mortgaged Property, which Insurance may include coverage against loss or damage from fire, wind, hail, and other related perils within the scope of a "Special Causes of Loss" policy form, general boiler and machinery, business income, flood (if any of the Improvements are located in an area identified by the Federal Emergency Management Agency, or any successor to that agency, as a "Special Flood Hazard Area"), windstorm, and "named storm" related perils (collectively, **"Property Insurance"**).  Property Insurance may also include coverage for ordinance or law (if the Mortgaged Property does not conform with applicable building, zoning or land use laws, rules or regulations), earthquake, terrorism, sinkhole, mine subsidence, avalanche, mudslide and volcanic eruption.

(c)    <u>Liability Insurance.</u>    Borrower will maintain commercial general liability Insurance, which may include workers' compensation Insurance, and such other liability, errors and omissions, and fidelity Insurance coverage.

(d)    <u>Builder's Risk.</u>    During any period of construction or Restoration, Borrower will maintain builder's risk Insurance, including fire and other perils within the scope of a policy known as "Causes of Loss — Special Form" or "All Risk" policy.

(e)    <u>Payment of Premiums.</u>    All premiums for Insurance required under this Section 6.10 will be paid in the manner provided in Article IV and Section 6.08, unless Lender has designated in writing another method of payment.

(f)    <u>Policy Requirements.</u>    The following requirements apply with respect to all Insurance required by this Section 6.10:

(i)    All Insurance policies will be in a form and with the terms required by Lender.

(ii)    All Property Insurance policies will contain a standard mortgagee or mortgage holder's clause and a loss payable clause, in favor of, and in a form approved by, Lender.

(iii)    All commercial general liability and excess umbrella liability policies will name Lender and its successors and assigns as an additional insured party.

(iv)    All Property Insurance policies will provide that the insurer will notify Lender in writing of cancellation of policies at least 10 days before the cancellation of the policy by the insurer for nonpayment of the premium or nonrenewal and at least 30 days before cancellation by the insurer for any other reason.

(g)    <u>Evidence of Insurance; Insurance Policy Renewals.</u>    Borrower will deliver to Lender a legible copy of each Insurance policy, and Borrower will promptly deliver to Lender a copy of all renewal, nonrenewal, cancellation, and other notices received by Borrower with respect to the policies. Borrower will ensure that the Mortgaged Property is continuously covered by the required Insurance.  Prior to the expiration date of each Insurance policy, Borrower will deliver to Lender evidence acceptable to Lender that each Insurance policy has been renewed. If the evidence of a renewal does not include a legible copy of the renewal policy, then Borrower will deliver a legible copy of such renewal policy no later than the earlier of (i) 60 days after the expiration date of the original policy or (ii) the date of any Notice of an insured loss given to Lender under Section 6.10(i).

<u>Compliance With Insurance Requirements.</u>    Borrower will comply with all Insurance requirements and will not permit any condition to exist on the Mortgaged Property that would invalidate any part of any Insurance coverage required under this Loan Agreement.

<u>Obligations Upon Casualty; Proof of Loss.</u>

(I)    If  an insured loss occurs,  then  Borrower will give immediate written Notice to the Insurance carrier and to Lender.

(ii)    Borrower will promptly restore or repair the Mortgaged Property to the equivalent of its original condition or to a condition approved by Lender **("Restoration"),** subject to the limitations of Section 6.09(c)(i).

(iii)    Borrower authorizes and appoints Lender as attorney in fact for Borrower to make proof of loss, to adjust and compromise any claims under policies of Property Insurance, to appear in and prosecute any action arising from such Property Insurance policies, to collect and receive the proceeds of Property Insurance, to hold the proceeds of Property Insurance,  and to deduct from such  proceeds Lender's expenses incurred  in  the collection of such proceeds.   This power of attorney is coupled with an interest and therefore is irrevocable.   However, nothing contained in this Section 6.10 will require Lender to incur any expense or take any action.

(j)    <u>Lender's Options Following a Casualty.</u>    Lender may, at Lender's option, (i) hold the insurance proceeds to be used to reimburse Borrower for the cost of Restoration or (ii) apply the Insurance proceeds to the payment of the Indebtedness, whether or not then due.

(k)    <u>Lender's Succession to Insurance Policies.</u>    If the Mortgaged Property is sold at a foreclosure sale or Lender acquires title to the Mortgaged Property, then Lender will automatically succeed to all rights of Borrower in and to any Insurance policies and unearned Insurance premiums and in and to the proceeds resulting from any damage to the Mortgaged Property prior to such sale or acquisition.

(l)    <u>Payments After Application of Insurance Proceeds.</u>    Unless Lender otherwise agrees in writing, any application of any Insurance proceeds to the Indebtedness will not extend or postpone the due date, or change the amount, of any monthly payments referred to in the Note or Article IV of this Loan Agreement.

(m)    <u>Assignment of Insurance Proceeds.</u>    Borrower agrees to execute such further evidence of assignment of any Insurance proceeds as Lender may require.

(n)    <u>Borrower Acknowledgment of Lender's Right to Change Insurance Requirements.</u>    Borrower acknowledges and agrees that Lender's Insurance requirements may change from time to time throughout the term of the Indebtedness to include coverage for the kind of risks customarily insured against and in such minimum coverage amounts and maximum deductibles as are generally required by institutional lenders for properties comparable to the Mortgaged Property. The following requirements apply with respect to all Insurance policies and renewals of Insurance policies required by this Loan Agreement:

     (i)     All Insurance policies will be in the form and with the terms required by Lender.

     (ii)     All Insurance policies will be in such amounts, with such maximum deductibles and for such periods required by Lender.

     (iii)     All Insurance policies will be issued by Insurance companies satisfactory to Lender.

**6.11    Condemnation.**

(a)    <u>Borrower's Obligations Generally.</u>

     (i)     Borrower will promptly notify Lender in writing of any action or proceeding or notice relating to any proposed or actual condemnation or other taking, or conveyance in lieu thereof, of all or any part of the Mortgaged Property, whether direct or indirect **("Condemnation").**

     (ii)     Borrower will appear in, and prosecute or defend any action or proceeding relating to any Condemnation unless otherwise directed by Lender in writing. Borrower authorizes and appoints Lender as attorney in fact for Borrower to commence, appear in and prosecute, in Lender's or Borrower's name, any action or proceeding relating to any Condemnation and to settle or compromise any claim in connection with any Condemnation, after consultation with Borrower and consistent with commercially reasonable standards of a prudent lender. This power of attorney is coupled with an interest and therefore is irrevocable. However, nothing contained in this Section 6.11(a) will require Lender to incur any expense or take any action.

     (iii)     Borrower transfers and assigns to Lender all right, title and interest of Borrower in and to any award or payment with respect to (i) any Condemnation, or any conveyance in lieu of Condemnation, and (ii) any damage to the Mortgaged Property caused by governmental action that does not result in a Condemnation.

(b)    <u>Application of Award.</u>    Lender may hold such awards or proceeds and apply such awards or proceeds, after the deduction of Lender's expenses incurred in the collection of such amounts (including Attorneys' Fees and Costs) at Lender's option, to the Restoration or Repair of the Mortgaged Property or to the payment of the Indebtedness, with the balance, if any, to Borrower. Unless Lender otherwise agrees in writing, any application of any awards or proceeds to the Indebtedness will not extend or postpone the due date, or change the amount, of any monthly payments referred to in the Note or Article IV of this Loan Agreement. Borrower agrees to execute such further evidence of assignment of any Condemnation awards or proceeds as Lender may require.

(c)    <u>Right to Apply Condemnation Proceeds in Connection with a Partial Release.</u> For so long as the Loan or any portion of the Loan is included in a Securitization, then each of the following will apply:

     (i)     If any portion of the Mortgaged Property is released from the Lien of the Loan in connection with a Condemnation and if the ratio of (A) the unpaid principal balance of the Loan to (B) the value of the Mortgaged Property (taking into account only the related land and buildings and not any personal property or going-concern value), as determined by Lender in its discretion based on a commercially reasonable valuation method permitted in connection with a Securitization, is greater than 125% immediately after such Condemnation and before any Restoration or Repair of the Mortgaged Property (but taking into account any planned Restoration or Repair of the Mortgaged Property as if such planned Restoration or Repair were completed), then Lender will apply any net proceeds or awards from such Condemnation, in full, to the payment of the principal of the Indebtedness whether or not then due and payable, unless Lender has received an opinion of counsel that a different application of such net proceeds or awards will not

cause such Securitization to fail to meet applicable federal income tax qualification requirements or subject such Securitization to any tax.

(ii)  If neither Borrower nor Lender has the right to receive any or all net proceeds or awards as a result of the provisions of any agreement affecting the Mortgaged Property (including any condominium document or reciprocal easement agreement) and, therefore cannot apply such net proceeds or awards to the payment of the principal of the Indebtedness as set forth above, then Borrower will prepay the Indebtedness in an amount which Lender, in its discretion, deems necessary to ensure that the Securitization will not fail to meet applicable federal income tax qualification requirements or be subject to any tax as a result of the Condemnation.

(d)  <u>Succession to Condemnation Proceeds.</u>  If the Mortgaged Property is sold at a foreclosure sale or Lender acquires title to the Mortgaged Property, then Lender will automatically succeed to all rights of Borrower in and to any Condemnation proceeds and awards prior to such sale or acquisition.

**6.12  Environmental Hazards.**

(a)  <u>Prohibited Activities and Conditions.</u>

(i)  Except for matters permitted under this Section 6.12, Borrower will not cause or permit Prohibited Activities or Conditions.

(ii)  Borrower will comply with all Hazardous Materials Laws applicable to the Mortgaged Property.

(iii)  Borrower will take each of the following actions:

(A)  Obtain and maintain all Environmental Permits required by Hazardous Materials Laws and comply with all conditions of such Environmental Permits.

(B)  Cooperate with any inquiry by any Governmental Authority.

(C)  Subject to Section 6.12(g), comply with any governmental or judicial order that arises from any alleged Prohibited Activity or Condition.

(b)  <u>Employees, Tenants and Contractors.</u>  Borrower will take all commercially reasonable actions (including the inclusion of appropriate provisions in any Leases executed after the Effective Date) to prevent its employees, agents and contractors and all tenants and other occupants from causing or permitting any Prohibited Activities or Conditions.  Borrower will not lease or allow the sublease or use of all or any portion of the Mortgaged Property to any tenant or subtenant for nonresidential use by any user that, in the ordinary course of its business, would cause or permit any Prohibited Activity or Condition.

(c)  <u>O&M Programs.</u>  On or prior to the Effective Date, Borrower will establish each of the O&M Programs marked as required in Article I. Each such O&M Program and any additional or revised O&M Programs established for the Mortgaged Property pursuant to this Section 6.12 must be acceptable to Lender. Borrower will comply in a timely manner with, and cause all employees, agents and contractors of Borrower and any other Persons present on the Mortgaged Property to comply with, each O&M Program. Borrower will pay all costs of performance of Borrower's obligations under any O&M Program.  Borrower will pay Lender's out of pocket costs incurred in connection with the monitoring and review of each O&M Program upon demand by Lender.  Any such out-of-pocket costs of Lender that Borrower fails to pay promptly will become an additional part of the Indebtedness as provided in Section 8.02.

(d)  <u>Notice to Lender.</u>  Borrower will promptly give Notice to Lender upon the occurrence of any of the following events:

(i)    Borrower's discovery of any Prohibited Activity or Condition.

(ii)    Borrower's receipt of or knowledge of any written complaint, order, notice of violation or other communication from any tenant, Property Manager, Governmental Authority or other Person with regard to present or future alleged Prohibited Activities or Conditions, or any other environmental, health or safety matters affecting the Mortgaged Property.

(iii)    Borrower's breach of any of its obligations under this Section 6.12.

Any such Notice given by Borrower will not relieve Borrower of, or result in a waiver of, any obligation under this Loan Agreement, the Note or any other Loan Document.

(e)    <u>Environmental Inspections, Tests and Audits.</u>    Borrower will pay promptly the costs of any environmental inspections, tests or audits, a purpose of which is to identify the extent or cause of or potential for a Prohibited Activity or Condition **("Environmental Inspections"),** required by Lender in connection with any foreclosure or deed in lieu of foreclosure, or as a condition of Lender's consent to any Transfer under Article VII, or required by Lender following a determination by Lender that Prohibited Activities or Conditions may exist. Any such costs incurred by Lender (including Attorneys' Fees and Costs and the costs of technical consultants whether incurred in connection with any judicial or administrative process or otherwise) that Borrower fails to pay promptly will become an additional part of the Indebtedness as provided in Section 8.02. As long as: (i) no Event of Default has occurred and is continuing, (ii) Borrower has actually paid for or reimbursed Lender for all costs of any such Environmental Inspections performed or required by Lender, and (iii) Lender is not prohibited by law, contract or otherwise from doing so, Lender will make available to Borrower, without representation of any kind, copies of Environmental Inspections prepared by third parties and delivered to Lender.  Lender reserves the right, and Borrower expressly authorizes Lender, to make available to any party, including any prospective bidder at a foreclosure sale of the Mortgaged Property, the results of any Environmental Inspections made by or for Lender with respect to the Mortgaged Property. Borrower consents to Lender notifying any party (either as part of a notice of sale or otherwise) of the results of any Environmental Inspections made by or for Lender.  Borrower acknowledges that Lender cannot control or otherwise ensure the truthfulness or accuracy of the results of any Environmental Inspections and that the release of such results to prospective bidders at a foreclosure sale of the Mortgaged Property may have a material and adverse effect upon the amount that a party may bid at such sale.   Borrower agrees that Lender will have no liability whatsoever as a result of delivering the results of any Environmental Inspections made by or for Lender to any third party, and Borrower releases and forever discharges Lender from any and all claims, damages or causes of action arising out of, connected with or incidental to the results of the delivery of any Environmental Inspections made by or for Lender.

(f)    <u>Remedial Work.</u>    If any investigation, site monitoring, containment, clean-up, Restoration or other remedial work **("Remedial Work")** is necessary to comply with any Hazardous Materials Law or order of any Governmental Authority that has or acquires jurisdiction over the Mortgaged Property or the use, operation or improvement of the Mortgaged Property, or is otherwise required by Lender as a consequence of any Prohibited Activity or Condition or to prevent the occurrence of a Prohibited Activity or Condition, then Borrower will, by the earlier of (i) the applicable deadline required by Hazardous Materials Law, or (ii) 30 days after Notice from Lender demanding such action, begin performing the Remedial Work, and thereafter diligently prosecute it to completion, and must in any event complete the work by the time required by applicable Hazardous Materials Law.  If Borrower fails to begin on a timely basis or diligently prosecute any required Remedial Work, then Lender may, at its option, cause the Remedial Work to be completed, in which case Borrower will reimburse Lender on demand for the cost of doing so.   Any reimbursement due from Borrower to Lender will become part of the Indebtedness as provided in Section 8.02.

(g)    <u>Borrower Contest of Order.</u>    Notwithstanding Section 6.12(f), Borrower may contest the order of any Governmental Authority in good faith through appropriate proceedings, provided that (i) Borrower has demonstrated to Lender's satisfaction that any delay in completing Remedial Work

pending the outcome of such proceedings would not (A) result in damage to the Mortgaged Property or to persons who use or occupy the Improvements or (B) otherwise impair Lender's interest under this Loan Agreement, and (ii) if any delay in completing the Remedial Work results in a Lien against the Mortgaged Property, Borrower must promptly furnish to Lender a bond or other security satisfactory to Lender in an amount not less than 150% of the claim that underlies the Lien.

**6.13    Borrower Entity Requirements and Limitations**

(a)    This Section 6.13 is not applicable to Borrowers who are natural persons.

(b)    Except as set forth in Section 6.13(a), until the Indebtedness is paid in full, Borrower will satisfy each of the following requirements:

  (i)    It will preserve its existence as an entity duly organized, validly existing and in good standing (if applicable) under the laws of the jurisdiction of its formation or organization and will do all things necessary to observe organizational formalities.

  (ii)    It will not merge or consolidate with any other Person.

  (iii)    It will not take any action to dissolve, wind-up, terminate or liquidate in whole or in part; to sell, transfer or otherwise dispose of all or substantially all of its assets; to change its legal structure; to transfer or permit the direct or indirect transfer of any partnership, membership or other equity interests, as applicable, other than Transfers permitted under this Loan Agreement; to issue additional partnership, membership or other equity interests, as applicable, or to seek to accomplish any of the foregoing.

  (iv)    It will not maintain its assets in a way difficult to segregate and identify.

(c)    If Borrower is identified as a Single Asset Entity in Article I, then Borrower will satisfy each of the following requirements:

  (i)    It will not acquire, own, hold, lease, operate, manage, maintain, develop or improve any assets other than the Mortgaged Property and such Personalty as may be necessary for the operation of the Mortgaged Property and will conduct and operate its business as presently conducted and operated.

  (ii)    It will not engage in any business or activity other than the ownership, operation and maintenance of the Mortgaged Property and activities incidental to such ownership, operation, and maintenance.

(d)    If Borrower is identified as a Restricted Multiple Asset Entity in Article I, then Borrower will satisfy each of the following requirements:

  (i)    It will not acquire, own, hold, lease, operate, manage, maintain, develop or improve any assets other than the Mortgaged Property, the Permitted Property, and such Personalty as may be necessary for the operation of the Mortgaged Property and the Permitted Property and will conduct and operate its business as presently conducted and operated.

  (ii)    It will not engage in any business or activity other than the ownership, operation and maintenance of the Mortgaged Property and the Permitted Property and activities incidental to such ownership, operation, and maintenance.

(e)    Reserved. [Larger Loan Requirements]

6.14    **Restoration, Priority Repairs, Capital Replacements, Property Improvements, and Other Repairs.**

(a)    <u>Borrower Obligated to Complete Priority Repairs (including PR-90 Repairs).</u>    Borrower will commence all Priority Repairs (including PR-90 Repairs) identified in the Physical Risk Report as soon as practicable after the Effective Date and will diligently proceed with and complete such Priority Repairs.

(b)    <u>Completion of Work in Good and Workmanlike Manner.</u>  All (i) Restoration, (ii) Priority Repairs, (iii) Capital Replacements, and (iv) Property Improvements and other Repairs that Borrower elects to begin (collectively, **"Work"**) will be completed in a good and workmanlike manner, with suitable materials, and in accordance with good building practices and all applicable laws, ordinances, rules, regulations, building setback lines and restrictions applicable to the Mortgaged Property. Borrower agrees to cause the replacement of any material or work that is defective, unworkmanlike or that does not comply with the requirements of this Loan Agreement, as determined by Lender.

(c)    <u>No Conditional Sales Contracts or Lease Agreements.</u>    Without the prior written consent of Lender, no materials, machinery, equipment, fixtures or any other part of any Work will be purchased or installed  under conditional sale contracts or lease agreements,  or any other arrangement wherein title to such Work or any portion of such Work is retained or subjected to a purchase money security interest, or the right is reserved or accrues to anyone to remove or repossess any such Work or to consider them as personal property.

(d)    <u>Lien Protection.</u>  Borrower will promptly pay or cause to be paid, when due, all costs, charges and expenses incurred in connection with the construction and completion of any Work, and will keep the Mortgaged Property free and clear of any and all Liens other than the Lien of the Security Instrument and any other junior Lien to which Lender has consented.

(e)    <u>Adverse Claims.</u>  Borrower will promptly advise Lender in writing of any litigation, Liens or claims affecting the Mortgaged Property and of all complaints and charges made by any Governmental Authority that may delay or adversely affect any Work.

(f)    <u>Right to Complete Work.</u>  If Borrower abandons or fails to proceed diligently with any Restoration, Priority Repair, or Capital Replacement, or abandons any other Repair or Property Improvement once undertaken by Borrower, and such abandonment or failure continues for 30 days after Notice from Lender, then Lender will have the right (but not the obligation) to enter upon the Mortgaged Property and take over and cause the completion of such Work.  However, no such Notice or cure period will apply in the case of such failure which could, in Lender's discretion, result in harm to Lender, tenants or third parties or impairment of the security given under this Loan Agreement, the Security Instrument or any other Loan Document.  Any contracts entered into or indebtedness incurred upon the exercise of such right may be in the name of Borrower, and Lender is irrevocably appointed the attorney in fact for Borrower, such appointment being coupled with an interest, to enter into such contracts,  incur such obligations,  enforce any contracts or agreements made by or on behalf of Borrower (including the prosecution and defense of all actions and proceedings in connection with the Work and the payment, settlement or compromise of all bills and claims for materials and work performed in connection with the Work and do any and all things necessary or proper to complete any Work, including signing Borrower's name to any contracts and documents as may be deemed necessary by Lender.  In no event will Lender be required to expend its own funds to complete any Work, but Lender may advance such funds.  Any funds advanced will be added to the Indebtedness, secured by the Security Instrument and payable to Lender by Borrower in accordance with the provisions of the Note, this Loan Agreement, the Security Instrument and any other Loan Document pertaining to the protection of Lender's security and advances made by Lender.  Borrower waives all claims it may have against Lender for materials used, work performed or resultant damage to the Mortgaged Property.

(g)  <u>Completion of Work Not a Certification by Lender.</u>  Lender's disbursement of monies from any Reserve Fund or other acknowledgment of completion of any Work in a manner satisfactory to Lender will not be deemed a certification by Lender that the Work has been completed in accordance with applicable building, zoning or other codes, ordinances, statutes, laws, regulations or requirements of any Governmental Authority.  Borrower will at all times have the sole responsibility for ensuring that all Work is completed in accordance with all such requirements of any Governmental Authority.

**6.15    Residential Leases Affecting the Mortgaged Property.**

(a)  All Leases for residential units executed on or after the Effective Date (including renewals of any existing Leases) will satisfy all the following conditions:

    (i)  They will be on forms acceptable to Lender.

    (ii)  They will not include options to purchase or have purchase options associated with them.

    (iii)  They will be for initial terms of at least 6 months and not more than 2 years.

(b)  Borrower will,  promptly upon Lender's request, deliver to Lender an executed copy of each residential Lease then in effect.

(c)  If Borrower is a cooperative housing corporation or association, then so long as Borrower remains a cooperative housing corporation or association and is not in breach of any covenant of this Loan Agreement, Lender consents to each of the following:

    (i)  The execution of Leases for terms in excess of 2 years to a tenant shareholder of Borrower, so long as such Leases, including proprietary Leases, are and will remain subordinate to the Lien of the Security Instrument.

    (ii)  The surrender or termination of such Leases where the surrendered or terminated Lease is  immediately replaced or where Borrower makes its best efforts to secure such immediate replacement by a newly-executed Lease of the same apartment to a tenant shareholder of Borrower.  However, no consent is given by Lender to any execution, surrender, termination or assignment of a Lease under terms that would waive or reduce the obligation of the resulting tenant shareholder under such Lease to pay cooperative assessments in full when due or the obligation of the former tenant shareholder to pay any unpaid portion of such assessments.

**6.16    Litigation; Government Proceedings.**  Borrower will give prompt Notice to Lender of any litigation or governmental proceedings pending or, to the best of Borrower's knowledge after due inquiry and investigation,  threatened in writing against Borrower or any Borrower Principal which might have a Material Adverse Effect

**6.17    Estoppel Certificates; Further Assurances; Lender's Expenses.**  Within 10 days after a request from Lender, Borrower will take each of the following actions:

(a)  Deliver to Lender a written statement, signed and acknowledged by Borrower, certifying to Lender or any Person designated by Lender, as of the date of such statement:

    (i)  that the Loan Documents are unmodified and in full force and effect (or, if there have been modifications, that the Loan Documents are in full force and effect as modified and setting forth such modifications),

    (ii)  the unpaid principal balance of the Note,

    (iii)  the date to which interest under the Note has been paid,

(iv)    that Borrower is not in default under any of the Loan Documents (or, if Borrower is in default, describing such default in reasonable detail),

(v)    whether there are any then-existing setoffs or defenses known to Borrower against the enforcement of any right or remedy of Lender under the Loan Documents, and

(vi)    any additional facts requested by Lender.

(b)    Execute, acknowledge and deliver and, if applicable, cause Guarantor to execute, acknowledge and deliver, at Borrower's expense (i) all amendments, modifications, corrections, deletions or additions to this Loan Agreement, the Note, the Security Instrument and/or any other Loan Document, and (ii) any further acts, deeds, conveyances, assignments, estoppel certificates, financing statements, transfers and assurances, as may be required by Lender from time to time in order to correct clerical errors and legal deficiencies and to better assure, grant and convey to Lender the rights intended to be granted, now or in the future, to Lender under this Loan Agreement and the other Loan Documents, or in connection with Lender's consent rights under Article VII; provided, however, that this Section 6.17 is not intended to require Borrower to execute any corrective amendment or modification of the Loan Documents that has the effect of (x) changing the essential economic terms of the Loan set forth in the Commitment Letter, or (y) imposing greater liability under the Loan Documents than that set forth in the terms of the Commitment Letter.

(c)    Borrower agrees that, in connection with each request by Borrower under this Loan Agreement or any Loan Document, Borrower will pay or reimburse Lender for all reasonable Attorneys' Fees and Costs and expenses incurred by Lender and Loan Servicer, including any fees charged by the Rating Agencies, if applicable, regardless of whether the matter is approved, denied or withdrawn. Any reimbursement due from Borrower to Lender will become part of the Indebtedness as provided in Section 8.02.

**6.18**    **ERISA Requirements.**

(a)    This Section 6.18 is not applicable to Borrowers who are natural persons.

(b)    Borrower will not engage in any transaction which would cause an action by either Borrower or Lender permitted or required under this Loan Agreement or any other Loan Document to be a non-exempt prohibited transaction under either ERISA or Section 4975 of the Tax Code.

(c)    When requested by Lender, Borrower will deliver to Lender a certification from Borrower with supporting evidence satisfactory to Lender that each of the following is true:

(i)    Borrower is not any of the following:

(A)    An "employee benefit plan" as defined in Section 3(3) of ERISA, which is subject to Title I of ERISA.

(B)    A "plan" to which Section 4975 of the Tax Code applies.

(C)    An entity whose underlying assets constitute "plan assets" of one or more of the plans described in Sections 6.18(c)(i)(A) and (B).

(D)    A "governmental plan" within the meaning of Section 3(32) of ERISA.

(ii)    Borrower is not subject to state statutes regulating investments or fiduciary obligations with respect to governmental plans.

(iii)    At least one of the following circumstances is true:

(A)     None of the equity interests in Borrower are held by "benefit plan investors" within the meaning of Section 3(42) of ERISA.

(B)     Less than 25% of each outstanding class of equity interests in Borrower are held by "benefit plan investors" within the meaning of Section 3(42) of ERISA.

(C)     Equity interests in Borrower are publicly offered securities within the meaning of 29 C.F.R. Section 2510.3-101(b)(2), as amended or any successor provision.

(D)     Borrower qualifies as either an "operating company" or a "real estate operating company" within the meaning of 29 C.F.R. Section 2510.3-101(c) or (e), as either may be amended or any successor provisions.

(E)     Borrower is an investment company registered under the Investment Company Act of 1940.

**6.19    Regulatory Agreement.**  If the Mortgaged Property is subject to a Regulatory Agreement, then Borrower will do each of the following:

(a)     Promptly provide Lender with a copy of (i) any compliance report submitted to the Regulatory Agreement Agency concurrently with such submission, and (ii) any notice Borrower receives alleging that Borrower is in breach of the Regulatory Agreement.

(b)     Obtain Lender's prior approval of any amendment to or modification of the Regulatory Agreement.

(c)     Provide Lender with Notice upon termination of the Regulatory Agreement.

**6.20    Economic Sanctions Laws; AML Laws.**  Borrower will comply with, and will take reasonable measures to ensure that each Borrower Principal will comply with, all Economic Sanctions Laws and AML Laws. Borrower and each Borrower Principal will have in place practices and procedures for the admission of investors which prevent the admission of:

(a)     Any Non-U.S. Equity Holder, or any investor that would have a 25% or more ownership interest in Borrower (whether directly or indirectly), and that has been convicted of a violation of the AML Laws or been the subject of a final enforcement action relating to the AML Laws.

(b)     Any Person with a 25% or more ownership interest in Borrower (whether directly or indirectly) that is on the Prohibited Parties Lists.

(c)     Any Non-U.S. Equity Holder that is on the OFAC Lists.

**6.21    Crowdfunding.**  Borrower and each Borrower Principal will not permit direct or indirect ownership (or other economic) interests of 25% or more in Borrower or any Borrower Principal that have been marketed or sold to investors through any fund of Crowdfunding.

**6.22    Reserved.** [Co-Borrowers]


**ARTICLE VII          TRANSFERS OF THE MORTGAGED PROPERTY OR INTERESTS IN BORROWER.**

**7.01    Permitted Transfers.**   The occurrence of any of the following Transfers will not constitute an Event of Default under this Loan Agreement:

(a)     A Transfer to which Lender has consented.

(b)     A Transfer that is not a prohibited Transfer pursuant to Section 7.02.

(c)     A Transfer that is conditionally permitted pursuant to Section 7.03 upon the satisfaction of all applicable conditions

(d)     A Preapproved Intrafamily Transfer that satisfies the requirements of Section 7.04.

(e)     The grant of a leasehold interest in an individual residential unit for a term of 2 years or less (or longer if approved by Lender in writing) not containing an option to purchase.

(f)     Entering into any new Non-Residential Lease, or modifying or terminating any existing Non-Residential Lease, in each case to which Lender has provided its prior written consent.

(g)     A Condemnation with respect to which Borrower satisfies the requirements of Section 6.11.

(h)     A Transfer of obsolete or worn out Personalty or Fixtures that are contemporaneously replaced by items of equal or better function and quality, which are free of Liens, encumbrances and security interests other than those created by the Loan Documents or consented to by Lender.

(i)     The creation of a mechanic's, materialmen's or judgment Lien against the Mortgaged Property which is released of record, bonded or otherwise remedied to Lender's satisfaction within 60 days after the date of creation or is being contested as otherwise provided in this Loan Agreement; provided, however, if Borrower is diligently prosecuting such release or other remedy and advises Lender that such release or remedy cannot be consummated within such 60-day period, Borrower will have an additional period of time (not exceeding 120 days from the date of creation or such earlier time as may be required by applicable law in which the lienholder must act to enforce the Lien) within which to obtain such release of record or consummate such other remedy.

(j)     If Borrower is a housing cooperative corporation or association, the Transfer of the shares in the housing cooperative or the assignment of the occupancy agreements or Leases relating to the occupancy agreements to tenant shareholders of the housing cooperative or association.

**7.02    Prohibited Transfers.**   The occurrence of any of the following Transfers will constitute an Event of Default under this Loan Agreement:

(a)     A Transfer of all or any part of the Mortgaged Property or any interest in the Mortgaged Property, including the grant, creation or existence of any Lien on the Mortgaged Property, whether voluntary, involuntary or by operation of law, and whether or not such Lien has priority over the Lien of the Security Instrument, other than the Lien of the Security Instrument, or any other Lien to which Lender has consented.

(b)     A Transfer or series of Transfers of any legal or equitable interest of any Guarantor which owns a direct or indirect interest in Borrower that result(s) in such Guarantor no longer owning any direct or indirect interest in Borrower.

(c)     A Transfer or series of Transfers of any legal or equitable interest since the Effective Date that result(s) in a change of more than 50% of the ownership interests (or beneficial interests, if the applicable entity is a trust) in Borrower or any Person that Controls Borrower.

(d)     A Transfer of any general partnership interest in a partnership, or any manager interest (whether a member manager or nonmember manager) in a limited liability company, if such partnership or limited liability company, as applicable, is Borrower or a Person that Controls Borrower. However, up to 50% of such general partnership or managing member interests in Borrower or a Person that  Controls Borrower may be converted to limited partnership or non-managing member interests, as applicable, and those interests may then be Transferred subject to the provisions of this Loan Agreement.

(e)     If Borrower or any Person that Controls Borrower is a corporation whose outstanding voting stock is held by 100 or more shareholders, one or more Transfers by a single transferor within a 12-month period affecting an aggregate of 10% or more of that stock.

(f)     The grant, creation or existence of any Lien, whether voluntary, involuntary or by operation of law, and whether or not such Lien has priority over the Lien of the Security Instrument, on any ownership interest in Borrower or any Person that Controls Borrower, if the foreclosure of such Lien would result in a Transfer prohibited under Sections 7.02(b), (c), (d), or (e).

(g)     A change in the trustee of a trust that is a Borrower or a Person that Controls Borrower unless (i) the change is permitted in Section 7.04 or (ii) the trust is a real estate investment trust.

(h)     If Borrower or any Person that Controls Borrower is a trust, the termination or revocation of the trust.

**7.03    Conditionally Permitted Transfers.**  The occurrence of any of the following Transfers will not constitute a prohibited Transfer under Section 7.02, provided that Borrower or New Borrower, as applicable, has complied with all applicable specified conditions in this Section 7.03.

(a)     **Transfer by Devise, Descent or Operation of Law (Entity Borrowers Only).**  Upon the death of a natural person, a Transfer which occurs by devise, descent, or by operation of law (but excluding a Transfer as a result of the death of a Borrower that is a natural person) to one or more Immediate Family Members of such natural person or to a trust or family conservatorship established for the benefit of such Immediate Family Members (each a "Beneficiary"), provided that each of the following conditions is satisfied:

(I)     The Property Manager (if applicable) continues to be responsible for the management of the Mortgaged Property, and such Transfer will not result in a change in the day-to-day operations of the Mortgaged Property.

(ii)     Lender receives confirmation acceptable to Lender that Borrower continues to satisfy the requirements of Section 6.13.

(iii)     Following the Transfer, no Non-U.S. Equity Holder or Person with a direct or indirect interest in Borrower equal to or greater than 25% is on any Prohibited Parties List.

(iv)     Each Guarantor executes such documents and agreements as Lender requires to ratify each Guaranty, or in the event of the death of any Guarantor, Borrower causes one of the following to occur:

(A)     Within 60 days following the Guarantor's death, one or more Persons acceptable to Lender execute(s) and deliver(s) to Lender a replacement guaranty in a form acceptable to Lender and in substantially the same form as the Guaranty executed on the Effective Date, without any cost or expense to Lender.

(B)     The estate of the deceased Guarantor immediately ratifies the Guaranty in writing,  and within 6 months after the date of the death of the deceased Guarantor, one or more Persons acceptable to Lender execute(s) and deliver(s) to Lender a guaranty in a form acceptable to Lender and in substantially the same form as the Guaranty executed on the Effective Date, without any cost or expense to Lender.

(v)     Borrower gives Lender Notice of such Transfer together with copies of all documents effecting such Transfer not more than 30 days after the date of such Transfer, and contemporaneously with the Notice, takes each of the following additional actions:

(A)     Borrower reaffirms the representations and warranties under Article V.

(B) Borrower satisfies Lender that the Beneficiary's organization, credit and experience in the management of similar properties are appropriate to the overall structure and documentation of the existing financing.

(vi) Borrower (A) pays the Transfer Processing Fee to Lender, and (B) pays or reimburses Lender, upon demand, for all costs and expenses, including all Attorneys' Fees and Costs, incurred by Lender in connection with such Transfer; provided, however, that Lender will not be entitled to collect a Transfer Fee.

(b) **Transfer by Devise, Descent or Operation of Law (Individual Borrowers Only).** A Transfer which occurs by devise, descent, or by operation of law upon the death of a Borrower who is a natural person to an entity or individual (either, a **"New Borrower"),** provided that each of the following conditions is satisfied:

(i) New Borrower gives Lender Notice of such Transfer within 60 days after the death.

(ii) The Property Manager (if applicable) continues to be responsible for the management of the Mortgaged Property, and such Transfer will not result in a change in the day-to-day operations of the Mortgaged Property.

(iii) Following the Transfer, no Non-U.S. Equity Holder or Person with a direct or indirect interest in Borrower equal to or greater than 25% is on any Prohibited Parties List.

(iv) Lender receives confirmation acceptable to Lender that New Borrower satisfies the requirements of Section 6.13.

(v) Each Guarantor executes such documents and agreements as Lender requires to ratify each Guaranty.

(vi) All of Lender's requirements are satisfied, as determined by Lender in Lender's discretion within a period of time as determined by Lender in Lender's discretion.

(vii) New Borrower (A) pays the Transfer Processing Fee to Lender, and (B) pays or reimburses Lender, upon demand, for all costs and expenses including all Attorneys' Fees and Costs, incurred by Lender in connection with such Transfer; provided, however, that Lender will not be entitled to collect a Transfer Fee.

(c) Reserved. [Release of Unimproved Portion of Mortgaged Property]

**7.04** **Preapproved Intrafamily Transfers (Entity Borrowers).** The occurrence of a Transfer or series of Transfers that result in a change of more than 50% of the limited partnership or non-managing membership interests in Borrower or a Person that Controls Borrower as set forth in this Section 7.04 will be considered a **"Preapproved Intrafamily Transfer"** provided that each of the conditions set forth in Sections 7.04(a) and (b) is satisfied:

(a) <u>Type of Transfer.</u> The Transfer is one of the following:

(i) A sale or transfer to one or more of the transferor's Immediate Family Members.

(ii) A sale or transfer to any trust having as its sole beneficiaries the transferor and/or one or more of the transferor's Immediate Family Members.

(iii) A sale or transfer from a trust to any one or more of its beneficiaries who are the settlor and/or Immediate Family Members of the settlor of the trust.

(iv) The substitution or replacement of the trustee of any trust with a trustee who is an Immediate Family Member of the settlor of the trust.

(v)    A sale or transfer from a natural person to an entity owned and under the Control of the transferor or the transferor's Immediate Family Members.

(b)    <u>Conditions.</u>  The Preapproved Intrafamily Transfer satisfies each of the following conditions:

(I)    Borrower provides Lender with 30 days prior Notice of the proposed Preapproved Intrafamily Transfer and pays the Transfer Processing Fee.

(ii)    Following the Transfer, Control and management of the day-to-day operations of Borrower continue to be held by the Person exercising such Control and management immediately prior to the Transfer and there is no change in Guarantor, if applicable.

(iii)    Following the Transfer, no Non-U.S. Equity Holder or Person with a direct or indirect interest in Borrower equal to or greater than 25% is on any Prohibited Parties List.

(iv)    At the time of the Preapproved Intrafamily Transfer, no Event of Default has occurred and is continuing and no event or condition has occurred and is continuing that, with the giving of Notice or the passage of time, or both, would become an Event of Default.

(v)    Borrower pays Lender all of Lender's costs, including the cost of all title searches, title insurance and recording costs, and all Attorneys' Fees and Costs; provided, however, that Lender will not be entitled to collect a Transfer Fee.

(vi)    Lender receives confirmation acceptable to Lender that Section 6.13 continues to be satisfied.

**7.05    Lender's Consent to Prohibited Transfers.** With respect to a Transfer that would otherwise constitute an Event of Default under this Article VII, Lender may consent to such Transfer without any adjustment to the rate at which the Indebtedness bears interest or to any other economic terms of the Indebtedness set forth in the Note, provided that, prior to such Transfer, all of Lender's requirements are satisfied, as determined by Lender, including payment by Borrower of each of the following:

(i)    A Transfer Processing Fee.

(ii)    All of Lender's costs, including the cost of all title searches, title insurance and recording costs, and all Attorneys' Fees and Costs incurred in reviewing the Transfer request and any fees charged by the Rating Agencies, if applicable.

(iii)    In the case of a Transfer of either (A) all or any part of the Mortgaged Property or (B) direct or indirect Control of the Borrower, a Transfer Fee.

Notwithstanding subsections 7.05(i) and (iii) above, Borrower will not be required to pay either a Transfer Processing Fee or a Transfer Fee for the review of a proposed easement Transfer.

## ARTICLE VIII   EVENTS OF DEFAULT AND REMEDIES.

**8.01    Events of Default.** The occurrence of any one or more of the following will constitute an **"Event of Default"** under this Loan Agreement:

(a)    Borrower fails to pay or deposit when due any amount required by the Note, this Loan Agreement or any other Loan Document.

(b)    Borrower or any of its officers, directors, trustees, general partners, or managers, or any Guarantor, commits fraud or makes a material misrepresentation or material omission in connection with any of the following:

(i) The application for or creation of the Indebtedness.

(ii) Any financial statement, Rent Schedule or other report or information provided to Lender during the term of the Indebtedness.

(iii) Any request for Lender's consent to any proposed action, including a request for disbursement of funds under this Loan Agreement.

(c) Borrower has made any representation or warranty in this Loan Agreement that is false or misleading in any material respect.

(d) Borrower fails to maintain the Insurance coverage required by Section 6.10.

(e) Borrower fails to comply with the Condemnation provisions of Section 6.11.

(f) Borrower fails to comply with the provisions of Section 6.13.

(g) A Transfer occurs that violates the provisions of Article VII, whether or not any actual impairment of Lender's security results from such Transfer.

(h) A forfeiture action or proceeding, whether civil or criminal, is commenced which could result in a forfeiture of the Mortgaged Property or otherwise materially impair the Lien created by the Security Instrument or Lender's interest in the Mortgaged Property.

(I) The holder of any other debt instrument secured by a mortgage, deed of trust or deed to secure debt on the Mortgaged Property exercises any right to declare all amounts due under that debt instrument immediately due and payable.

(j) Borrower fails to perform any of its obligations under any of the following, and such failure continues beyond any applicable cure period:

(i) Any debt instrument secured by a mortgage, deed of trust or deed to secure debt on the Mortgaged Property and any other loan documents identified in that debt instrument.

(ii) Any covenants, conditions and/or restrictions, land use restriction agreements, or similar agreements recorded against the Mortgaged Property.

(iii) Any ground lease encumbering all or any portion of the Mortgaged Property.

(k) Any default, event of default or breach (however such terms may be defined in the Regulatory Agreement, if applicable) under any applicable Regulatory Agreement which continues beyond the applicable cure period, if any.

(l) Any of the following occurs:

(i) Borrower commences any case, proceeding or other action under any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization, conservatorship or relief of debtors (A) seeking to have an order for relief entered with respect to it, or seeking to adjudicate it bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, winding-up, dissolution, composition or other relief with respect to it or its debt, or (B) seeking appointment of a receiver, trustee, custodian, conservator or other similar official for it or for all or any substantial part of its assets.

(ii) Any party other than Lender commences any case, proceeding or other action of a nature referred to in Section 8.01(1)(i) against Borrower which (A) results in the entry of an order

for relief or any such adjudication or appointment, or (B) has not been dismissed, discharged or bonded within a period of 90 days following commencement.

(iii)   Any case, proceeding or other action is commenced against Borrower seeking issuance of a warrant of attachment, execution, distraint or similar process against all or any substantial part of its assets which results in the entry of any order by a court of competent jurisdiction for any such relief which is not vacated, discharged, or stayed or bonded pending appeal within 90 days from the entry of such order.

(iv)   Borrower takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the acts set forth in Section 8.01(l)(i), (ii) or (iii).

(m)   If Borrower is a general partnership, any of the following occurs:

(i)   Any general partner of Borrower commences any case, proceeding or other action under any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization, conservatorship or relief of debtors (A) seeking to have an order for relief entered with respect to it, or seeking to adjudicate it bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other relief with respect to it or its debt, or (B) seeking appointment of a receiver, trustee, custodian, conservator or other similar official for it or for all or any substantial part of its assets.

(ii)   Any party other than Lender commences any case, proceeding, or other action of a nature referred to in Section 8.01(m)(i) against any general partner of Borrower which (A) results in the entry of an order for relief or any such adjudication or appointment, or (B) has not been dismissed, discharged, stayed, or bonded within a period of 90 days following commencement.

(iii)   Any case, proceeding or other action is commenced against any general partner of Borrower seeking issuance of a warrant of attachment, execution, distraint or similar process against all or any substantial part of its assets which results in the entry of any order by a court of competent jurisdiction for any such relief which is not vacated, discharged, stayed or bonded pending appeal within 90 days from the entry of such order.

(iv)   Any general partner of Borrower takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the acts set forth in Section 8.01(m)(i), (ii) or (iii).

(n)   A Guarantor files for bankruptcy protection under the Bankruptcy Code or a Guarantor voluntarily becomes subject to any reorganization, receivership, insolvency proceeding or other similar proceeding pursuant to any other federal or state law affecting debtor and creditor rights, or any creditor (other than Lender) of a Guarantor commences any involuntary case against a Guarantor pursuant to the Bankruptcy Code or other federal or state law affecting debtor and creditor rights, unless each of the following conditions is satisfied:

(i)   Borrower or Guarantor provides Notice of such action to Lender within 30 days after the filing of such action.

(ii)   Either (A) the case is dismissed or discharged within 90 days after filing, or (B) within 90 days following the date of such filing or commencement, the affected Guarantor is replaced with one or more other Persons acceptable to Lender, each of whom executes and delivers to Lender a replacement Guaranty in form and content acceptable to Lender; provided, however, that if Lender determines that any proposed replacement Guarantor is not acceptable, then the action will constitute a prohibited Transfer governed by Section 7.02.

(iii)    If Borrower must provide a replacement Guarantor pursuant to Section 8.01(n)(ii), Borrower pays the Transfer Processing Fee to Lender.

(o)    The dissolution of any Guarantor that is an entity, unless within 30 days following the dissolution of Guarantor, Borrower causes one or more Persons acceptable to Lender to execute and deliver to Lender a guaranty in a form acceptable to Lender and in substantially the same form as the Guaranty executed on the Effective Date, without any cost or expense to Lender.

(p)    The death of any Guarantor who is a natural person, unless Borrower satisfies one of the conditions set forth in Section 7.03(a)(iv).

(q)    If Guarantor is an entity whose term of existence expires prior to the Maturity Date, and such Guarantor does not comply with each of the requirements set forth in Section 14 of the Guaranty.

(r)    If a Process Agent is required by the Guaranty, either of the following circumstances occurs:

(i)    Guarantor fails to appoint a substitute Process Agent in accordance with the requirements of the Guaranty.

(ii)    Guarantor fails to maintain the Minimum U.S. Deposit in accordance with the requirements of the Guaranty.

(s)    Borrower fails to perform any of its obligations under this Loan Agreement (other than those Events of Default specified in Sections 8.01(a) through (r) or included on any exhibit, schedule, or rider attached to this Loan Agreement) as and when required, and that failure continues for a period of 30 days after Notice of the failure by Lender to Borrower.

However, if Borrower's failure to perform its obligations as described in this Section 8.01(s) is of the nature that it cannot be cured within the 30-day cure period after Notice from Lender but reasonably could be cured within 90 days, then Borrower will have additional time as determined by Lender (not to exceed an additional 60 days) in which to cure the default, provided that Borrower has diligently commenced to cure the default during the initial 30-day cure period and diligently pursues the cure of the default.

No Notice or cure periods will apply in the case of any failure which could, in Lender's judgment, absent immediate exercise by Lender of a right or remedy under this Loan Agreement, result in harm to Lender, danger to tenants or third parties, or impairment of the Note, the Security Instrument, this Loan Agreement, or any other security given under any other Loan Document.

(t)    Borrower fails to perform any of its obligations as and when required under any Loan Document other than this Loan Agreement and that failure continues beyond the applicable cure period, if any, specified in that Loan Document.

8.02    **Protection of Lender's Security; Security Instrument Secures Future Advances.**

(a)    If Borrower fails to perform any of its obligations under this Loan Agreement or any other Loan Document, or if any action or proceeding is commenced which purports to affect the Mortgaged Property, Lender's security or Lender's rights under this Loan Agreement, including eminent domain, insolvency, code enforcement, civil or criminal forfeiture, enforcement of Hazardous Materials Laws, fraudulent conveyance or reorganizations or proceedings involving a bankrupt or decedent, then Lender may make such appearances, file such documents, disburse such sums and take such actions as Lender reasonably deems necessary to perform such obligations of Borrower and to protect Lender's interest, including:  (i) payment of Attorneys' Fees and Costs, (ii) payment of fees and out-of-pocket expenses of accountants, inspectors and consultants, (iii) entry upon the Mortgaged Property to make Repairs or secure the Mortgaged Property, (iv)

procurement of the Insurance required by Section 6.10, (v) payment of amounts which Borrower has failed to pay under Section 6.08, (vi) performance of Borrower's obligations under Section 6.09, and (vii) advances made by Lender to pay, satisfy or discharge any obligation of Borrower for the payment of money that is secured by a Prior Lien.

(b)     Any amounts disbursed by Lender under this Section 8.02, or under any other provision of this Loan Agreement that treats such disbursement as being made under this Section 8.02, will be secured by the Security Instrument, will be added to, and become part of, the principal component of the Indebtedness, will be immediately due and payable and will bear interest from the date of disbursement until paid at the Default Rate.

(c)     Nothing in this Section 8.02 will require Lender to incur any expense or take any action.

**8.03    Remedies.**

(a)     Upon an Event of Default, Lender may exercise any or all of its rights and remedies provided under the Loan Documents and Borrower will pay all associated costs, including Attorneys' Fees and Costs.

(b)     Each right and remedy provided in this Loan Agreement is distinct from all other rights or remedies under this Loan Agreement or any other Loan Document or afforded by applicable law or equity, and each will be cumulative and may be exercised concurrently, independently or successively, in any order. Lender's exercise of any particular right or remedy will not in any way prevent Lender from exercising any other right or remedy available to Lender. Lender may exercise any such remedies from time to time and as often as Lender chooses.

(c)     Lender will have all remedies available to Lender under Revised Article 9 of the UCC of the Property Jurisdiction, the Loan Documents and under applicable law.

(d)     Lender may also retain all money in the Reserve Funds, including interest, and in Lender's discretion, may apply such amounts, without restriction and without any specific order of priority, to the payment of any and all Indebtedness.

(e)     If a claim or adjudication is made that Lender has acted unreasonably or unreasonably delayed acting in any case where, by law or under this Loan Agreement or the other Loan Documents, Lender has an obligation to act reasonably or promptly, then Lender will not be liable for any monetary damages, and Borrower's sole remedy will be limited to commencing an action seeking injunctive relief or declaratory judgment. Any action or proceeding to determine whether Lender has acted reasonably will be determined by an action seeking declaratory judgment.

**8.04    Forbearance.**

(a)     Lender may (but will not be obligated to) agree with Borrower, from time to time, and without giving Notice to, or obtaining the consent of, or having any effect upon the obligations of, any Guarantor or other third party obligor, to take any of the following actions:

  (i)     Extend the time for payment of all or any part of the Indebtedness.

  (ii)     Reduce the payments due under any of the Loan Documents.

  (iii)     Release anyone liable for the payment of any amounts due under any of the Loan Documents.

  (iv)     Accept a renewal of the Note.

  (v)     Modify the terms and time of payment of the Indebtedness.

  (vi)     Join in any extension or subordination agreement.

(vii)    Release any portion of the Mortgaged Property.

(viii)   Take or release other or additional security.

(ix)     Modify the rate of interest or period of amortization of the Note or change the amount of the monthly payments payable under the Note.

(x)      Otherwise modify this Loan Agreement, the Note or any other Loan Document.

(b)   Any forbearance by Lender in exercising any right or remedy under any of the Loan Documents, or otherwise afforded by applicable law will not be a waiver of or preclude the exercise of any other right or remedy, or the subsequent exercise of any right or remedy.  The acceptance by Lender of payment of all or any part of the Indebtedness after the due date of such payment, or in an amount which is less than the required payment, will not be a waiver of Lender's right to require prompt payment when due of all other payments on account of the Indebtedness or to exercise any remedies for any failure to make prompt payment.  Enforcement by Lender of any security for the Indebtedness will not constitute an election of remedies by Lender so as to preclude the exercise of any other right available to Lender.  Lender's receipt of any awards or proceeds under Sections 6.10 and 6.11 will not operate to cure or waive any Event of Default.

**8.05    Waiver of Marshalling.**  Notwithstanding the existence of any other security interests in the Mortgaged Property held by Lender or by any other party, Lender will have the right to determine the order in which any or all the Mortgaged Property will be subjected to the remedies provided in this Loan Agreement or any other Loan Document or applicable law. Lender will have the right to determine the order in which any or all portions of the Indebtedness are satisfied from the proceeds realized upon the exercise of such remedies.  Borrower and any party who now or in the future owns or acquires a security interest in the Mortgaged Property and who has actual or constructive notice of the Security Instrument waives any and all right to require the marshalling of assets or to require that any of the Mortgaged Property be sold in the inverse order of alienation or that any of the Mortgaged Property be sold in parcels or as an entirety in connection with the exercise of any of the remedies permitted by applicable law or provided in this Loan Agreement.

**ARTICLE IX    RELEASE; INDEMNITY.**

**9.01    Release.**   Borrower covenants and agrees that,  in  performing any of its  duties  under this  Loan Agreement, none of Lender, Loan Servicer or any of their respective agents or employees will be liable for any losses, claims, damages, liabilities, or expenses that may be incurred by any of them as a result of such performance, except that no party will be released from liability for any losses, claims, damages, liabilities or expenses arising out of the willful misconduct or gross negligence of such party.

**9.02    Indemnity.**

(a)    <u>General Indemnity.</u>    Borrower agrees to indemnify, hold harmless and defend Lender, including any custodian, trustee and other fiduciaries who hold or have held a full or partial interest in the Loan for the benefit of third parties, any prior owner or holder of the Note, the Loan Servicer, any prior Loan Servicer, the officers, directors, shareholders, partners, employees and trustees of each of the foregoing, and the heirs, legal representatives, successors and assigns of each of the foregoing (collectively,  **"Indemnitees"**) against any and all losses, claims, damages, liabilities, and expenses, including Attorneys' Fees and Costs, which may be imposed or incurred by any of them directly or indirectly arising out of, or in any way relating to, or as a result of:  (i) any failure of the Mortgaged Property to comply with the laws, regulations, ordinances, codes or decrees of any Governmental Authority, including those pertaining to the Americans with Disabilities Act, zoning, occupancy and subdivision of real property, (ii) failure of Borrower or any Borrower Principal to comply with the Economic Sanction Laws or AML Laws, (iii) any obligation of Borrower under any Lease, and (iv) any accident, injury or death to any natural person on the Mortgaged Property or any damage to personal property located on the Mortgaged Property,

except that no such party will be indemnified from liability for any losses, claims, damages, liabilities or expenses arising out of the willful misconduct or gross negligence of such party.

(b)  <u>Environmental Indemnity.</u>  Borrower agrees to indemnify, hold harmless and defend Indemnitees from and against all proceedings, claims, damages, penalties and costs (whether initiated or sought by Governmental Authorities or private parties), including Attorneys' Fees and Costs and remediation costs, whether incurred in connection with any judicial or administrative process or otherwise, arising directly or indirectly from any of the following:

(i)  Any breach of any representation or warranty of Borrower in Section 5.05.

(ii)  Any failure by Borrower to perform any of its obligations under Section 6.12.

(iii)  The existence or alleged existence of any Prohibited Activity or Condition.

(iv)  The presence or alleged presence of Hazardous Materials on or under the Mortgaged Property or in any of the Improvements.

(v)  The actual or alleged violation of any Hazardous Materials Law.

(c)  <u>Indemnification Regarding ERISA Covenants.</u>  **BORROWER WILL INDEMNIFY LENDER AND DEFEND AND HOLD LENDER HARMLESS FROM AND AGAINST ALL CIVIL PENALTIES, EXCISE TAXES, OR OTHER LOSS, COST, DAMAGE AND EXPENSE (INCLUDING REASONABLE ATTORNEYS' FEES AND COSTS INCURRED IN THE INVESTIGATION, DEFENSE AND SETTLEMENT OF CLAIMS AND LOSSES INCURRED IN CORRECTING ANY PROHIBITED TRANSACTION OR IN THE SALE OF A PROHIBITED LOAN, AND IN OBTAINING ANY INDIVIDUAL PROHIBITED TRANSACTION EXEMPTION UNDER ERISA THAT MAY BE REQUIRED, IN LENDER'S DISCRETION) THAT LENDER MAY INCUR, DIRECTLY OR INDIRECTLY, AS A RESULT OF DEFAULT UNDER SECTION 6.18. THIS INDEMNITY WILL SURVIVE ANY TERMINATION, SATISFACTION OR FORECLOSURE OF THE SECURITY INSTRUMENT.**

(d)  <u>Selection and Direction of Counsel.</u>  Counsel selected by Borrower to defend Indemnitees will be subject to the approval of those Indemnitees. In any circumstances in which the indemnity under this Article IX applies, Lender may employ its own legal counsel and consultants to prosecute, defend or negotiate any claim or legal or administrative proceeding and Lender, with the prior written consent of Borrower (which will not be unreasonably withheld, delayed or conditioned) may settle or compromise any action or legal or administrative proceeding. However, unless an Event of Default has occurred and is continuing, or the interests of Borrower and Lender are in conflict, as determined by Lender, Lender will permit Borrower to undertake the actions referenced in this Article IX so long as Lender approves such action, which approval will not be unreasonably withheld or delayed. Borrower will reimburse Lender upon demand for all costs and expenses incurred by Lender, including all costs of settlements entered into in good faith, consultants' fees and Attorneys' Fees and Costs.

(e)  <u>Settlement or Compromise of Claims.</u>  Borrower will not, without the prior written consent of those Indemnitees who are named as parties to a claim or legal or administrative proceeding **("Claim")**, settle or compromise the Claim if the settlement (i) results in the entry of any judgment that does not include as an unconditional term the delivery by the claimant or plaintiff to Lender of a written release of those Indemnitees, satisfactory in form and substance to Lender, or (ii) may materially and adversely affect Lender, as determined by Lender.

(f)  <u>Effect of Changes to Loan on Indemnification Obligations.</u>  Borrower's obligation to indemnify the Indemnitees will not be limited or impaired by any of the following, or by any failure of Borrower or any Guarantor to receive notice of or consideration for any of the following:

(i)  Any amendment or modification of any Loan Document.

(ii)     Any extensions of time for performance required by any Loan Document.

(iii)    Any provision in any of the Loan Documents limiting Lender's recourse to property securing the Indebtedness, or limiting the personal liability of Borrower or any other party for payment of all or any part of the Indebtedness.

(iv)     The accuracy or inaccuracy of any representations and warranties made by Borrower under any of the Loan Documents.

(v)      The release of Borrower or any other Person, by Lender or by operation of law, from performance of any obligation under any Loan Document.

(vi)     The release or substitution in whole or in part of any security for the Indebtedness.

(vii)    Lender's failure to properly perfect any Lien or security interest given as security for the Indebtedness.

(g)     <u>Payments by Borrower.</u>     Borrower will, at its own cost and expense, do all the following:

(i)      Pay or satisfy any judgment or decree that may be entered against any Indemnitee or Indemnitees in any legal or administrative proceeding arising out of any matters against which Indemnitees are entitled to be indemnified under this Article IX.

(ii)     Reimburse Indemnitees for any expenses paid or incurred in connection with any matters against which Indemnitees are entitled to be indemnified under this Article IX.

(iii)    Reimburse Indemnitees for any and all expenses, including Attorneys' Fees and Costs, paid or incurred in connection with the enforcement by Indemnitees of their rights under this Article IX, or in monitoring and participating in any legal or administrative proceeding.

(h)     <u>Other Obligations.</u>     The provisions of this Article IX will be in addition to any and all other obligations and liabilities that Borrower may have under applicable law or under other Loan Documents, and each Indemnitee will be entitled to indemnification under this Article IX without regard to whether Lender or that Indemnitee has exercised any rights against the Mortgaged Property or any other security, pursued any rights against any Guarantor, or pursued any other rights available under the Loan Documents or applicable law.  If Borrower consists of more than one Person, then the obligation of those Persons to indemnify the Indemnitees under this Article IX will be joint and several. The obligation of Borrower to indemnify the Indemnitees under this Article IX will survive any repayment or discharge of the Indebtedness, any foreclosure proceeding, any foreclosure sale, any delivery of any deed in lieu of foreclosure, and any release of record of the Lien of the Security Instrument. However, if Lender has never been a mortgagee-in-possession of, or held title to, the Mortgaged Property, Borrower will have no obligation to indemnify the Indemnitees under this Article IX after the date of the release of record of the Lien of the Security Instrument by payment in full at the Maturity Date or by voluntary prepayment in full.

## ARTICLE X     MISCELLANEOUS PROVISIONS.

**10.01  Waiver of Statute of Limitations, Offsets and Counterclaims.**  Borrower waives the right to assert any statute of limitations as a bar to the enforcement of this Loan Agreement or the Lien of the Security Instrument or to any action brought to enforce any Loan Document.  Borrower waives the right to assert a counterclaim, other than a compulsory counterclaim, in any action or proceeding brought against it by Lender or otherwise to offset any obligations to make the payments required by the Loan Documents.  No failure by Lender to perform any of its obligations under the Loan Documents will be a valid defense to, or result in any offset against, any payments that Borrower is obligated to make under any of the Loan Documents.

**10.02    Governing Law; Consent to Jurisdiction and Venue.**

(a)    This Loan Agreement, and any Loan Document which does not itself expressly identify the law that applies to it, will be governed by the laws of the Property Jurisdiction.

(b)    Borrower agrees that any controversy arising under or in relation to the Note, the Security Instrument, this Loan Agreement or any other Loan Document may be litigated in the Property Jurisdiction.    The state and federal courts and authorities with jurisdiction in the Property Jurisdiction will have jurisdiction over all controversies that may arise under or in relation to the Note, any security for the Indebtedness or any other Loan Document. Borrower irrevocably consents to service, jurisdiction and venue of such courts for any such litigation and waives any other venue to which it might be entitled by virtue of domicile, habitual residence or otherwise. However, nothing in this Section 10.02 is intended to limit Lender's right to bring any suit, action or proceeding relating to matters under this Loan Agreement in any court of any other jurisdiction.

**10.03    Notice.**

(a)    All Notices under or concerning this Loan Agreement will be in writing.    Each Notice will be deemed given on the earliest to occur of: (i) the date when the Notice is received by the addressee, (ii) the first Business Day after the Notice is delivered to a recognized overnight courier service, with arrangements made for payment of charges for next Business Day delivery, or (iii) the third Business Day after the Notice is deposited in the United States mail with postage prepaid, certified mail, return receipt requested. Addresses for Notice are as shown in Article I.

(b)    Any party to this Loan Agreement may change the address to which Notices intended for it are to be directed by means of Notice given to the other party in accordance with this Section 10.03. Each party agrees that it will not refuse or reject delivery of any Notice given in accordance with this Section 10.03, that it will acknowledge, in writing, the receipt of any Notice upon request by the other party and that any Notice that it rejects or refuses will be deemed for purposes of this Section 10.03 to have been received by the rejecting party on the date so refused or rejected, as conclusively established by the records of the U.S. Postal Service or the courier service.

(c)    Any Notice under any other Loan Document that does not specify how Notices are to be given will be given in accordance with this Section 10.03.

**10.04    Successors and Assigns Bound.**    This Loan Agreement will bind the respective successors and assigns of Borrower and Lender, and the rights granted by this Loan Agreement will inure to Lender's successors and assigns.

**10.05    Joint and Several (and Solidary) Liability.**    If more than one Person signs this Loan Agreement as Borrower, then the obligations of such Persons will be joint and several.    For a Mortgaged Property located in Louisiana, if more than one Person signs this Loan Agreement as Borrower, then the obligations of such Persons will be joint and several and solidary, and wherever the phrase "joint and several" appears in this Loan Agreement, the phrase is amended to read "joint, several, and solidary."

**10.06    Relationship of Parties; No Third Party Beneficiary.**

(a)    The relationship between Lender and Borrower will be solely that of creditor and debtor, respectively, and nothing contained in this Loan Agreement will create any other relationship between Lender and Borrower.  Nothing contained in this Loan Agreement will constitute Lender as a joint venturer, partner or agent of Borrower, or render Lender liable for any debts, obligations, acts, omissions, representations or contracts of Borrower.

(b)    No creditor of any party to this Loan Agreement and no other Person will be a third party beneficiary of this Loan Agreement or any other Loan Document. Any arrangement between Lender and any Loan Servicer for loss sharing or interim advancement of funds **("Servicing Arrangement")** will constitute a contractual obligation of such Loan Servicer that is independent of the obligation of Borrower for the payment of the Indebtedness. Borrower will not be a third

party beneficiary of any Servicing Arrangement. No payment by the Loan Servicer under any Servicing Arrangement will reduce the amount of the Indebtedness.

**10.07    Subrogation.**  If the proceeds of the Loan, or subsequent advances under Section 8.02, are used to pay, satisfy or discharge a Prior Lien, then such Loan proceeds or advances will be deemed to have been advanced by Lender at Borrower's request, and Lender will automatically, and without further action on its part, be subrogated to the rights, including Lien priority, of the owner or holder of the obligation secured by the Prior Lien, whether or not the Prior Lien is released.

**10.08    Severability.** The invalidity or unenforceability of any provision of this Loan Agreement will not affect the validity or enforceability of any other provision, and all other provisions will remain in full force and effect. This Loan Agreement contains the entire agreement among the parties as to the rights granted and the obligations assumed in this Loan Agreement.

**10.09    Amendments.** This Loan Agreement may not be amended or modified except by a writing signed by the party against whom enforcement is sought.

**10.10    Disclosure of Information; Authorization to Publicly Use Loan Information.**

(a)    Borrower acknowledges that Lender may provide to third parties with an existing or prospective interest in the servicing, enforcement, evaluation, performance, ownership, purchase, participation or Securitization (if applicable) of the Loan, including any of the Rating Agencies, any entity maintaining databases on the underwriting and performance of commercial mortgage loans, as well as governmental regulatory agencies having regulatory authority over Lender, any and all information which Lender now has or may hereafter acquire relating to the Loan, the Mortgaged Property, Borrower or any Guarantor, as Lender determines necessary or desirable and that such information may be included in disclosure documents in connection with a Securitization (if applicable) or syndication of participation interests, including a prospectus, prospectus supplement, offering memorandum, private placement memorandum or similar document (each, a **"Disclosure Document")** and also may be included in any filing with the Securities and Exchange Commission pursuant to the Securities Act or the Securities Exchange Act.  To the fullest extent permitted under applicable law, Borrower irrevocably waives all rights, if any, to prohibit such disclosure, including any right of privacy.

(b)    Borrower agrees that Lender may publicly use, at Lender's discretion, the name of the Mortgaged Property, photographs of the Mortgaged Property, and basic transaction information (for example, the number of units in the Mortgaged Property and the Loan Amount) relating to the Loan.

**10.11    Determinations by Lender.**  In any instance where the consent or approval of Lender may be given or is required, or where Lender is authorized to render any determination, judgment, or decision under this Loan Agreement, the granting, withholding or denial of such consent or approval and the rendering of such determination, judgment or decision will be made or exercised by Lender (or its designated representative) at its option and in its discretion.

**10.12    Sale of Note; Change in Loan Servicer; Loan Servicing.**  The Note or a partial interest in the Note (together with this Loan Agreement and the other Loan Documents) may be sold one or more times without prior Notice to Borrower.  A sale may result in a change of the Loan Servicer. There also may be one or more changes of the Loan Servicer unrelated to a sale of the Note.  If there is a change of the Loan Servicer, then Borrower will be given Notice of the change. The Loan Servicer may take all actions regarding the servicing of the Loan unless Borrower receives Notice to the contrary, including the collection of payments, the giving and receipt of Notice, inspections of the Mortgaged Property, inspections of Books and Records, and the granting of consents and approvals. If Borrower receives conflicting Notices regarding the identity of the Loan Servicer or any other subject, then any such Notice from Lender will govern.

**10.13    Subordinate Financing.**  Freddie Mac will not purchase, but may permit another lender to extend to Borrower, subordinate financing secured by the Mortgaged Property, provided that all of Lender's requirements are satisfied.

**10.14**  **Lender's Rights to Sell or Securitize.**   Borrower acknowledges that Lender, and each successor to Lender's interest,  may (without prior Notice to Borrower or Borrower's prior consent), sell or grant participations in the Loan (or any part of the Loan), sell or subcontract the servicing rights related to the Loan, securitize the Loan or place the Loan in a trust.  Borrower, at its expense, agrees to cooperate with all requests of Lender in connection with any of the foregoing including taking the following actions:

    (a)    Executing any financing statements or other documents deemed necessary by Lender or its transferee to create, perfect or preserve the rights and interest to be acquired by such transferee.

    (b)    Delivering revised organizational documents, counsel opinions and executed amendments to the Loan Documents satisfactory to the Rating Agencies.

    (c)    Providing updated financial information with appropriate verification through auditors' letters, if required by Lender.

    (d)    Providing updated information on all litigation proceedings affecting Borrower or any Borrower Principal as required in Section 6.16.

    (e)    Reviewing information contained in any Disclosure Document and providing a mortgagor estoppel certificate, written confirmation of Borrower's indemnification obligations under this Loan Agreement, and such other information about Borrower, any general partner of Borrower if Borrower is a general partnership, any Guarantor, any Property Manager, or the Mortgaged Property as Lender may require for Lender's offering materials.

Notwithstanding anything set forth in Sections 10.14(a) or 10.14(b), Borrower will not be required to execute any corrective amendment or modification of the Loan Documents that has the effect of (x) changing the essential economic terms of the Loan set forth in the Commitment Letter, or (y) imposing greater liability under the Loan Documents than that set forth in the terms of the Commitment Letter.

**10.15**  **Cooperation with Rating Agencies and Investors.**  If Lender decides to include the Loan as an asset of a Secondary Market Transaction, then Borrower will do all the following:

    (a)    At Lender's request, meet with representatives of the Rating Agencies and/or investors to discuss the business and operations of the Mortgaged Property.

    (b)    Permit Lender or its representatives to provide related information to the Rating Agencies and/or investors.

    (c)    Cooperate with the reasonable requests of the Rating Agencies and/or investors in connection with all the foregoing.

**10.16**  **Exhibits,  Schedules, and Riders.**   This  Loan Agreement incorporates all the attached exhibits, schedules, and riders that are listed in Article I or elsewhere in this Loan Agreement.

**10.17**  **State Specific Provisions.**

**If the Property Jurisdiction is Indiana:**
For purposes of Section 3.04(b)(ii), Attorneys' Fees and Costs means (i) fees and out-of-pocket costs of Lender's and Loan Servicer's attorneys, as applicable, including costs of Lender's and Loan Servicer's in-house counsel, support staff costs, costs of preparing for litigation, computerized research, telephone and facsimile transmission expenses, mileage, deposition costs, postage, duplicating, process service, videotaping, and similar costs and expenses; (ii) costs and fees of expert witnesses, including appraisers; and (iii) investigatory fees.

**If the Property Jurisdiction is Kansas:**
Pursuant to K.S.A. Section 16-118, the parties agree that:

**ORAL AGREEMENTS OR COMMITMENTS TO LOAN MONEY, EXTEND CREDIT, OR TO FOREBEAR FROM ENFORCING REPAYMENT OF A DEBT INCLUDING PROMISES TO EXTEND OR RENEW SUCH DEBT ARE NOT ENFORCEABLE REGARDLESS OF THE LEGAL THEORY UPON WHICH IT IS BASED, THAT IS IN ANY WAY RELATED TO THIS LOAN AGREEMENT. TO PROTECT BORROWER AND LENDER FROM MISUNDERSTANDING OR DISAPPOINTMENT, ANY AGREEMENTS REACHED BY THE PARTIES COVERING SUCH MATTERS ARE CONTAINED IN THIS WRITING, WHICH IS THE COMPLETE AND EXCLUSIVE STATEMENT OF THE AGREEMENT BETWEEN THE PARTIES, EXCEPT AS THEY MAY LATER AGREE IN WRITING TO MODIFY IT.**

**10.18    Time is of the Essence.**  Time is of the essence with respect to each covenant of this Loan Agreement.

**10.19    Construction; Interpretation.**

(a)     The captions and headings of the Articles and Sections of this Loan Agreement are for convenience only and will be disregarded in construing this Loan Agreement. Any reference in this Loan Agreement to an "Exhibit," an "Article" or a "Section" will, unless otherwise explicitly provided, be construed as referring, respectively, to an Exhibit attached to this Loan Agreement or to an Article or Section of this Loan Agreement.

(b)     Any reference in this Loan Agreement to a statute or regulation will be construed as referring to that statute or regulation as amended from time to time.

(c)     Use of the singular in this Loan Agreement includes the plural and use of the plural includes the singular.  The use of one gender includes the other gender, as the context may require.

(d)     As used in this Loan Agreement, the term "including" means "including, but not limited to" and the term "includes" means "includes without limitation."

(e)     Unless the context requires otherwise, (i) any definition of or reference to any agreement, instrument or other document in this Loan Agreement will be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth in this Loan Agreement), and (ii) any reference in this Loan Agreement to any Person will be construed to include such Person's successors and assigns.

(f)     Any reference in this Loan Agreement to "Lender's requirements," "as required by Lender," or similar references will  be construed, after Securitization, to mean Lender's requirements or standards as determined in accordance with Lender's and Loan Servicer's obligations under the terms of the Securitization documents.

**10.20    Reserved** [Tenants in Common]

**10.21    Reserved** [Condominium 100% Owned by Borrower]

**10.22    Reserved** [Tax Abatement]

**10.23    Reserved** [Ground Lease]

**10.24    Reserved.** [Co-Borrowers]

**10.25    Electronic Signatures. With respect to any E-Signed Document, the following provisions apply:**

(a)     An **"E-Signature"** is any form of signature provided on behalf of Borrower or a Borrower Principal other than an original handwritten signature, including any type of image created in any manner (whether electronically or otherwise) which image could reasonably be interpreted as an indication of the signer's intent to sign the document.

(b)    An **"E-Signed Document"** is any document received by Servicer or Lender in connection with the underwriting, origination, transfer, Securitization, or servicing of the Loan, or the correction or amendment of any such document, to which an E-Signature is affixed, attached, or otherwise logically associated.

(c)    Borrower represents and warrants that the intention of the natural Person signing on behalf of Borrower or Borrower Principal on each E-Signed Document was to attribute its respective signature to such E-Signed Document, and that the E-Signature represents the signer's signature to the E-Signed document.

(d)    Borrower understands and agrees that the E-Signatures on all E-Signed Documents are legally binding.

(e)    Borrower waives all rights to repudiate the authenticity or validity of any E-Signature on any E-Signed Document to the extent such repudiation is based in whole or in part on the fact that such signature is not in an original handwritten form.

(f)    Borrower agrees that the law governing E-Signatures will be the federal Electronic Signatures in Global and National Commerce Act of 2000 (15 U.S. Code, Chapter 96) (E-SIGN) and/or the Uniform Electronic Transactions Act of 1999 as promulgated by the U.S. Uniform Law Commission for consideration and enactment by the States (UETA), and that under no circumstances will E-Signatures be governed by the Uniform Computer Information Transactions Act (UCITA).

## ARTICLE XI    DEFINED TERMS.

Capitalized terms used but not otherwise defined in this Loan Agreement have the following definitions:

**"Affiliate"** of any Person means (i) any other individual or entity that is, directly or indirectly, (A) in Control of the applicable Person, **(B)** under the Control of the applicable Person or (C) under common Control with the applicable Person; (ii) any individual that is a director or officer of the applicable Person or (iii) any individual that is a director or officer of any entity described in clause (i) of this definition.

**"Aluminum Wiring Event"** is defined in Section 6.09(h).

**"AML Laws"** means applicable federal anti-money laundering laws and regulations including 18 U.S.C. §§ 1956 and 1957, as amended.

**"Attorneys' Fees and Costs"** means: (i) fees and out of pocket costs of Lender's and Loan Servicer's attorneys, as applicable, including costs of Lender's and Loan Servicer's in-house counsel, support staff costs, costs of preparing for litigation, computerized research, telephone and facsimile transmission expenses, mileage, deposition costs, postage, duplicating, process service, videotaping and similar costs and expenses; (ii) costs and fees of expert witnesses, including appraisers; (iii) investigatory fees; and (iv) costs for any opinion required by Lender pursuant to the terms of the Loan Documents.

**"Bankruptcy Code"** means the United States Bankruptcy Code, 11 U.S.C. Section 101 et seq., as amended from time to time.

**"Bankruptcy Event"** means the occurrence of any of the following:

(a)    Borrower voluntarily files for bankruptcy protection under the Bankruptcy Code.

(b)    Borrower voluntarily becomes subject to any reorganization, receivership, insolvency proceeding, or other similar proceeding pursuant to any other federal or state law affecting debtor and creditor rights.

(c)    The Mortgaged Property or any part of the Mortgaged Property becomes an asset in a voluntary bankruptcy or becomes subject to any voluntary reorganization, receivership, insolvency

proceeding, or other similar voluntary proceeding pursuant to any other federal or state law affecting debtor and creditor rights.

(d)    An order of relief is entered against Borrower pursuant to the Bankruptcy Code or other federal or state law affecting debtor and creditor rights in any involuntary bankruptcy proceeding initiated or joined in by a Related Party. If Borrower, any general partner of Borrower if Borrower is a general partnership, any Guarantor, or any Related Party has solicited creditors to initiate or participate in such a proceeding, regardless of whether any of the creditors solicited actually initiates or participates in the proceeding, then such proceeding will be considered as having been initiated by a Related Party.

(e)    An involuntary bankruptcy or other involuntary insolvency proceeding is commenced against Borrower (by a party other than Lender) but only if Borrower has failed to use commercially reasonable efforts to dismiss such proceeding or has consented to such proceeding. "Commercially reasonable efforts" will not require any direct or indirect interest holders in Borrower to contribute or cause the contribution of additional capital to Borrower.

(f)    If Borrower is a general partnership, any of the following occur:

(I)    Any general partner of Borrower voluntarily files for bankruptcy protection under the Bankruptcy Code.

(ii)    Any general partner of Borrower voluntarily becomes subject to any reorganization, receivership, insolvency proceeding, or other similar proceeding pursuant to any other federal or state law affecting debtor and creditor rights.

(iii)    An order of relief is entered against any general partner of Borrower pursuant to the Bankruptcy Code or other federal or state law affecting debtor and creditor rights in any involuntary bankruptcy proceeding initiated or joined in by a Related Party.

(iv)    An involuntary bankruptcy or other involuntary insolvency proceeding is commenced against any general partner of Borrower (by a party other than Lender) but only if Borrower or such general partner of Borrower has failed to use commercially reasonable efforts to dismiss such proceeding or has consented to such proceeding. "Commercially reasonable efforts" will not require any direct or indirect interest holders in Borrower or such general partner of Borrower to contribute or cause the contribution of additional capital to Borrower.

**"Books and Records"** is defined in Section 6.07(a).

**"Borrower"** means all Persons identified as "Borrower" on page 1 of this Loan Agreement, together with their successors and assigns.

**"Borrower Principal"** means any of the following:  (i)  any general partner of Borrower (if Borrower is a partnership), (ii) any manager or managing member of Borrower (if Borrower is a limited liability company), (iii) any Person (limited partner, member or shareholder) with a collective direct or indirect equity interest in Borrower equal to or greater than 25% (if Borrower is an entity) (iv) any trustee of Borrower (if Borrower is a trust), or (v) any Guarantor.

**"Business Day"** means any day other than a Saturday, a Sunday, or any other day on which Lender or the national banking associations are not open for business.

**"Claim"** is defined in Section 9.02(e).

**"Closing Date"** means the date on which Lender disburses the proceeds of the Loan to or for the account of Borrower.

**"Commitment Letter"** means the fully executed commitment letter or early rate lock application between Lender and Borrower issued in connection with the Loan.

**"Condemnation"** is defined in Section 6.11(a).

**"Control"** means to possess, directly or indirectly through one or more intermediate entities, the power to direct or cause the direction of the management, operation, or policies of a Person, whether through the ownership of voting securities, by contract or otherwise, including the power to elect a majority of the directors or trustees of a corporation or trust, as the case may be.

For example, a trustee of a trust is a Person that Controls that trust; a general partner in a limited partnership is a Person that Controls that limited partnership; a managing member or a non-member manager of a limited liability company is a Person that Controls that limited liability company; members of a limited liability company with a voting interest that permits them (individually or collectively) to direct or control the decisions of the limited liability company are Persons that Control that limited liability company; every general partner in a general partnership or member in a joint venture is a Person that Controls that entity; a shareholder of a corporation that holds 50% or more of the shares in the corporation (whether individually or in the aggregate with its Affiliates) is a Person that Controls that corporation.

**"Crowdfunding"** means the practice of funding a project or venture by raising capital by either of the following methods:

(I)  Via general solicitation (i.e., marketing directed to the public at large, whether via the internet or otherwise) that (A) names Freddie Mac, or (B) names or contains any information about the Mortgaged Property.

(ii)  From unaccredited investors in a public offering (e.g., under the related exemptions of Title III or Title IV of the Jumpstart Our Business Startups (JOBS) Act.

**"Default Rate"** is defined in the Note.

**"Disclosure Document"** is defined in Section 10.10.

**"Economic Sanctions Laws"** means the foreign assets control regulations, 31 C.F.R. Chapter V, as amended, and any amending federal legislation or executive order relating thereto, as administered by OFAC.

**"Eligible Account"** means an identifiable account which is separate from all other funds held by the holding institution that is either (i) an account or accounts maintained with the corporate trust department of a federal or state-chartered depository institution or trust company which complies with the definition of Eligible Institution, or (ii) a segregated trust account or accounts maintained with the corporate trust department of a federal or state chartered depository institution or trust company acting in its fiduciary capacity which, in the case of a state chartered depository institution or trust company is subject to regulations substantially similar to 12 C.F.R. §9.10(b), having in either case a combined capital and surplus of at least $50,000,000 and subject to supervision or examination by federal and state authority. An Eligible Account will not be evidenced by a certificate of deposit, passbook or other instrument

**"Eligible Institution"** means a federal or state chartered depository institution or trust company insured by the Federal Deposit Insurance Corporation, the short term unsecured debt obligations or commercial paper of which are rated at least A-1 by Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc., P-1 by Moody's Investors Service, Inc. and F-3 by Fitch, Inc. in the case of accounts in which funds are held for 30 days or less or, in the case of letters of credit or accounts in which funds are held for more than 30 days, the long term unsecured debt obligations of which are rated at least "A" by Fitch, Inc. and Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc., and "A2" by Moody's Investors Service, Inc. If at any time an Eligible Institution does not meet the required rating, then the Loan Servicer must move the Eligible Account within 30 days of such event to an appropriately rated Eligible Institution.

**"Environmental Permit"** means any permit, license, or other authorization issued under any Hazardous Materials Law with respect to any activities or businesses conducted on or in relation to the Mortgaged Property.

**"ERISA"** means the Employee Retirement Income Security Act of 1974, as amended, and any successor provision.

**"Fixtures"** is defined in the Security Instrument.

**"FHFA"** means the Federal Housing Finance Agency.

**"FHFA SCP List"** means the Suspended Counterparty List maintained by the FHFA which is currently published at https://www.fhfa.gov/SupervisionRegulation/LegalDocuments/suspendedcounterpartyprogram.

**"Freddie Mac"** means the Federal Home Loan Mortgage Corporation.

**"Galvanized SteelPB Piping Event"** is defined in Section 6.09(i).

**"Governmental Authority"** means any board, commission, department, agency or body of any municipal, county, state or federal governmental unit, or any subdivision of any of them, which has or acquires jurisdiction over the Mortgaged Property, or the use, operation or improvement of the Mortgaged Property, or over Borrower.

**"Guarantor"** means the Person(s) required by Lender to guaranty all or a portion of Borrower's obligations under the Loan Documents, as set forth in the Guaranty. The required Guarantors as of the Effective Date are set forth in Article I.

**"Guaranty"** means the Guaranty (whether one or more) executed by Guarantor and/or any replacement or supplemental guaranty executed pursuant to the terms of this Loan Agreement.

**"Hazardous Materials"** means petroleum and petroleum products and compounds containing them, including gasoline, diesel fuel and oil; explosives; flammable materials; radioactive materials; polychlorinated biphenyls (PCBs) and compounds containing them; lead and lead-based paint; asbestos or asbestos containing materials in any form that is or could become friable; underground or above-ground storage tanks, whether empty or containing any substance; any substance the presence of which on the Mortgaged Property is prohibited by any Governmental Authority; any substance that requires special handling and any other material or substance now or in the future that (i) is defined as a "hazardous substance," "hazardous material," "hazardous waste," "toxic substance," "toxic pollutant," "contaminant," or "pollutant" by or within the meaning of any Hazardous Materials Law, or (ii) is regulated in any way by or within the meaning of any Hazardous Materials Law.

**"Hazardous Materials Law"** and **"Hazardous Materials Laws"** means any and all federal, state and local laws, ordinances, regulations and standards, rules, policies and other governmental requirements, administrative rulings and court judgments and decrees in effect now or in the future, including all amendments, that relate to Hazardous Materials or the protection of human health or the environment and apply to Borrower or to the Mortgaged Property. Hazardous Materials Laws include the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. Section 9601, et seq., the Resource Conservation and Recovery Act of 1976, 42 U.S.C. Section 6901, et seq., the Toxic Substance Control Act, 15 U.S.C. Section 2601, et seq., the Clean Water Act, 33 U.S.C. Section 1251, et seq., and the Hazardous Materials Transportation Act, 49 U.S.C. Section 5101 et seq., and their state analogs.

**"Immediate Family Members"** means a Person's spouse, domestic partner, parent (including step-parent), child (including stepchild), grandchild (including step-grandchild) or sibling (including step-siblings).

**"Improvements"** is defined in the Security Instrument.

**"Indebtedness"** means (i) the principal of, (ii) interest at the fixed or variable rate set forth in the Note on the principal of, and (iii) all other amounts due at any time under, the Note, this Loan Agreement or any other Loan Document, including prepayment charges, late charges, default interest, and advances to protect the security of the Security Instrument as provided in Section 8.02.

**"Insurance"** means Property Insurance, liability insurance and all other insurance that Lender requires Borrower to maintain pursuant to this Loan Agreement.

**"Insurance Reserve Fund"** is defined in Section 4.02(a).

**"Land"** means the land described in <u>Exhibit A</u>  to the Security Instrument.

**"Leases"** is defined in the Security Instrument.

**"Lender"** means the entity identified as "Lender" on page 1 of this Loan Agreement, or any subsequent holder of the Note.

**"Lien"** means any mortgage, deed of trust, deed to secure debt, security interest or other lien or encumbrance on the Mortgaged Property.

**"Loan"** is defined on page 1 of this Loan Agreement.

**"Loan Documents"** means the Note, the Security Instrument, this Loan Agreement, the Guaranty, all other guaranties, all indemnity agreements, all collateral agreements, UCC filings, O&M Programs, the MMP and any other documents now or in the future executed by Borrower, any Guarantor or any other Person in connection with the Loan.

**"Loan Servicer"** means the entity that from time to time is designated by Lender to collect payments and deposits and receive Notices under the Note, the Security Instrument, this Loan Agreement and any other Loan Document, and otherwise to service the Loan for the benefit of Lender.

**"Manager"** or **"Managers"** means a Person who is named or designated as a manager or managing member or otherwise acts in the capacity of a manager or managing member of a limited liability company in a limited liability company agreement or similar instrument under which the limited liability company is formed or operated.

**"Material Adverse Effect"** means a significant detrimental effect on:  (i) the Mortgaged Property, (ii) the business, prospects, profits,  operations or condition (financial or otherwise) of Borrower, (iii) the enforceability, validity, perfection or priority of the Lien of any Loan Document, or (iv) the ability of Borrower to perform any obligations under any Loan Document.

**"Maturity Date"** is defined in the Note.

**"Minimum U.S. Deposit"** is defined in the Guaranty.

**"MMP"** means a moisture management plan to control water intrusion and prevent the development of Mold or moisture at the Mortgaged Property throughout the term of this Loan Agreement.

**"Mold"** means mold, fungus, microbial contamination or pathogenic organisms.

**"Mortgaged Property"** is defined in the Security Instrument.

**"Non-Residential Lease"**  is  a Lease of a portion of the Mortgaged Property to be used for non-residential purposes.

**"Non-U.S. Equity Holder"** means any Person with a collective equity interest (whether direct or indirect) of 10% or more in Borrower, and which is either (a) an individual who is not a citizen of the United States, or (b) an entity formed outside the United States.

**"Note"** means the Note (including any Amended and Restated Note, Consolidated, Amended and Restated Note, or Extended and Restated Note) evidencing the Indebtedness executed by Borrower in favor of Lender and dated as of the Effective Date, including all schedules, riders, alonges and addenda.

**"Notice"** or **"Notices"** means all notices, demands, Lender approvals, and other communication required under the Loan Documents, provided in accordance with the requirements of Section 10.03.

**"O&M Program"** is a written operations and maintenance program for certain Hazardous Materials.

**"OFAC"** means the U.S. Department of the Treasury's Office of Foreign Assets Control.

**"OFAC Lists"** means either one of the following:
    (i)      The OFAC Specially Designated Nationals and Blocked Persons List.
    (ii)     The OFAC Consolidated Sanctions List.

**"Operational Repairs"** are identified in the Physical Risk Report and consist of minor deficiencies, minor deferred maintenance, and handicap accessibility enhancements that Borrower must complete as part of its general Repairs and maintenance of the Mortgaged Property.

**"Permitted Property"** means, for a Borrower that is identified in Article I as a Restricted Multiple Asset Entity, real property other than the Mortgaged Property that Borrower has disclosed in writing to Lender it owns as of the Effective Date.

**"Person"** means any natural person, sole proprietorship, corporation, general partnership, limited partnership, limited liability company, limited liability partnership, limited liability limited partnership, joint venture, association, joint stock company, bank, trust, estate, unincorporated organization, any federal, state, county or municipal government (or any agency or political subdivision thereof), endowment fund or any other form of entity.

**"Personalty"** is defined in the Security Instrument.

**"Physical Risk Report"** means, collectively, any Physical Risk Report(s) (Form 1104) (i) prepared by the physical risk consultant engaged by Lender in conjunction with the underwriting of this Loan that Lender provided to Borrower prior to or in connection with the issuance of the Commitment Letter and, if applicable (ii) prepared by the physical risk consultant engaged by the Lender in conjunction with the underwriting of any proposed Transfer that Lender provided to Borrower prior to or in connection with the issuance of an approval letter for such Transfer. The Physical Risk Report identifies, among other items, necessary repairs at the Mortgaged Property such as Priority Repairs (including PR-90 Repairs) and Operational Repairs.

**"PR-90 Repairs"** are identified in the Physical Risk Report and are a subset of Priority Repairs.   These are imminent life safety hazards and matters that will cause substantive damage to the Mortgaged Property if left uncorrected.

**"Preapproved Intrafamily Transfer"** is defined in Section 7.04.

**"Prepayment"** is defined in the Note.

**"Principal"** is defined in the Note.

**"Prior Lien"** means a pre-existing mortgage, deed of trust or other Lien encumbering the Mortgaged Property.

**"Priority Repairs"** are identified in the Physical Risk Report and include PR-90 Repairs. With the exception of PR-90 Repairs, these are non-imminent life safety hazards, violations of federal, State, or local law, ordinance or code related to zoning, subdivision, and use, building and housing accessibility (including the Americans with Disabilities  and Fair Housing Acts), health matters, fire safety matters,  material deficiencies,  or significant deferred maintenance.

**"Process Agent"** is defined in the Guaranty.

**"Prohibited Activity or Condition"** means each of the following:   (i)  the presence, use, generation, release, treatment, processing, storage (including storage in above-ground and underground storage tanks), handling or disposal of any Hazardous Materials on or under the Mortgaged Property, (ii) the transportation of any Hazardous Materials to, from or across the Mortgaged Property, (iii) any occurrence or condition on the Mortgaged Property, which occurrence or condition is or may be in violation of Hazardous Materials Laws, (iv) any violation of or noncompliance with the terms of any Environmental Permit with respect to the Mortgaged Property and (v) any violation or noncompliance with the terms of any O&M Program.

However, the term "Prohibited Activity or Condition" does not include lawful conditions permitted by an O&M Program or the safe and lawful use and storage of quantities of:  (i) pre-packaged supplies, cleaning materials and petroleum products customarily used in the operation and maintenance of comparable multifamily properties, (ii) cleaning materials, personal grooming items and other items sold in pre-packaged containers for consumer use and used by tenants and occupants of residential units in the Mortgaged Property, and (iii) petroleum products used in the operation and maintenance of motor vehicles from time to time located on the Mortgaged Property's parking areas, so long as all the foregoing are used, stored, handled, transported and disposed of in compliance with Hazardous Materials Laws.

**"Prohibited Parties List"** means any one or more of the following:

      (i)      The OFAC Lists.

      (ii)     The FHFA SCP List.

**"Property Improvement"** is defined in Section 6.09(e)(v).

**"Property Jurisdiction"** means the jurisdiction in which the Land is located.

**"Property Manager"** means either the Person that manages the Mortgaged Property as of the Effective Date or another residential rental property manager approved by Lender that manages the Mortgaged Property.

**"Rating Agencies"** means Fitch, Inc., Moody's Investors Service, Inc., or Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc., or any successor entity of the foregoing, or any other nationally recognized statistical rating organization.

**"Regulatory Agreement"** means any recorded or unrecorded agreement with a Regulatory Agreement Agency that encumbers the Mortgaged Property and which imposes use, occupancy and/or rent restrictions on the Mortgaged Property and/or its operation.

**"Regulatory Agreement Agency"** means a Governmental Authority, acting through any authorized representative, or any quasi-governmental authority, that is entitled to enforce the provisions of a Regulatory Agreement that encumbers the Mortgaged Property.

**"Related Party"** means all the following:

      (a)     Borrower.

      (b)     Any general partner of Borrower if Borrower is a general partnership.

      (C)     Any Guarantor.

      (d)     Any Person that holds, directly or indirectly, any ownership interest (including any shareholder, member or partner) in Borrower, any general partner of Borrower if Borrower is a general partnership, any Guarantor, or any Person that has a right to manage Borrower, any general partner of Borrower if Borrower is a general partnership, or any Guarantor.

      (e)     Any Person in which Borrower, any general partner of Borrower if Borrower is a general partnership, or any Guarantor has any ownership interest (direct or indirect) or right to manage.

      (f)     Any Person in which any partner, shareholder, or member of Borrower, any general partner of Borrower if Borrower is a general partnership, or any Guarantor has an ownership interest or right to manage.

      (g)     Any Person in which any Person holding an interest in Borrower, any general partner of Borrower if Borrower is a general partnership, or any Guarantor also has any ownership interest.

      (h)     Any creditor of Borrower that is related by blood,  marriage or adoption to Borrower or any

Guarantor.

(i)     Any creditor of Borrower or any general partner of Borrower if Borrower is a general partnership that is related to any partner, shareholder or member of, or any other Person holding an interest in, Borrower, any general partner of Borrower if Borrower is a general partnership, or any Guarantor.

**"Remedial Work"** is defined in Section 6.12(f).

**"Rent(s)"** is defined in the Security Instrument.

**"Rent Schedule"** means a written schedule for the Mortgaged Property showing the name of each tenant, and for each tenant, the space occupied, the lease expiration date, the rent payable for the current month, the date through which rent has been paid, and any related information requested by Lender.

**"Repairs"** means all repairs made to the Mortgaged Property, including all Priority Repairs (including PR-9O Repairs) and Operational Repairs identified in the Physical Risk Report.

**"Replacement Cost"** means the estimated replacement cost of the Improvements, Fixtures, and Personalty (or, when used in reference to a property that is not the Mortgaged Property, all improvements, fixtures, and personalty located on such property), excluding any deduction for depreciation, all as determined annually by Borrower using customary methodology and sources of information acceptable to Lender. Replacement Cost will not include the cost to reconstruct foundations or site improvements, such as driveways, parking lots, sidewalks, and landscaping.

**"Reserve Fund"** means the Tax Reserve Fund, Insurance Reserve Fund, Special Purpose Reserve Fund, Capital Replacement and Repair Reserve Fund, and any other account established pursuant to Article IV.

**"Restoration"** is defined in Section 6.100).

**"Secondary Market Transaction"** means:  (i) any sale or assignment of this Loan Agreement, the Note and the other Loan Documents to one or more investors as a whole loan, (ii) a participation of the Loan to one or more investors, (iii) any deposit of the Loan Documents with a trust or other entity which may sell certificates or other instruments to investors evidencing an ownership interest in the assets of such trust or other entity, or (iv) any other sale, assignment or transfer of the Loan or any interest in the Loan to one or more investors.

**"Securitization"** means a transaction in which the Note or any portion of the Note is assigned to a REMIC or grantor trust.

**"Security Instrument"**  means the mortgage, deed of trust, deed to secure debt or other similar security instrument encumbering the Mortgaged Property and securing Borrower's performance of its Loan obligations, including Borrower's obligations under the Note and this Loan Agreement (including any Amended and Restated Security Instrument, Consolidation, Modification and Extension Agreement, Extension and Modification Agreement or similar agreement or instrument amending and restating existing security instruments).

**"Stab-Lok Event"** is defined in Section 6.09(j).

**"Tax Code"** means the Internal Revenue Code of the United States, 26 U.S.C. Section 1 et seq.

**"Tax Reserve Fund"** is defined in Section 4.02(a).

**"Taxes"**  means all taxes, assessments, vault rentals and other charges, if any, whether general, special or otherwise, including all assessments for schools, public betterments and general or local improvements, which are levied, assessed or imposed by any public authority or quasi-public authority, and which, if not paid, will become a Lien on the Land or the Improvements, including any payments made in lieu of Taxes.

**"Transfer"** means any of the following: (i) a sale, assignment, transfer or other disposition or divestment of any interest in Borrower, a Person that Controls Borrower, or the Mortgaged Property (whether voluntary, involuntary

or by operation of law), (ii) the granting, creating or attachment of a Lien, encumbrance or security interest (whether voluntary, involuntary or by operation of law), (iii) the issuance or other creation of an ownership interest in a legal entity, including a partnership interest, interest in a limited liability company or corporate stock, (iv) the withdrawal, retirement, removal or involuntary resignation of a partner in a partnership or a member or Manager in a limited liability company, (v) the merger, dissolution, division, liquidation, or consolidation of a legal entity or the reconstitution of one type of legal entity into another type of legal entity and (vi) a change of Guarantor.

For purposes of defining the term "Transfer," the term "partnership" means a general partnership, a limited partnership, a joint venture, a limited liability partnership, or a limited liability limited partnership and the term "partner" means a general partner, a limited partner, or a joint venturer.

"Transfer" does not include any of the following: (i) a conveyance of the Mortgaged Property at a judicial or non-judicial foreclosure sale under the Security Instrument, (ii) the Mortgaged Property becoming part of a bankruptcy estate by operation of law under the Bankruptcy Code or (iii) the filing or recording of a Lien against the Mortgaged Property for local taxes and/or assessments not then due and payable.

**"Transfer Fee"** means a fee paid when the Transfer is completed. Unless otherwise specified, the Transfer Fee will be 1% of the outstanding principal balance of the Indebtedness as of the date of the Transfer.

**"Transfer Processing Fee"**  means a nonrefundable fee of $2,500 for Lender's review of a proposed or completed Transfer.

"UCC" means the Uniform Commercial Code as promulgated in the applicable jurisdiction.

**"Work"** is defined in Section 6.14(b).


## REMAINDER OF PAGE INTENTIONALLY LEFT BLANK;
## SIGNATURES ON FOLLOWING PAGES

**BORROWER:**

**KUNBA   LLC,**  a   New   York   limited   liability
company

By: _____

Name:     Robed Khomari

Title:      Manager

SIGNATURES CONTINUE ON FOLLOWING PAGE

**LENDER:**

**CPC MORTGAGE COMPANY LLC,** a New York limited
liability company

By: _____

Name:    C rolyn A i

Title:    Senior V e President

| **Notices** | |
| Addresses for Notices as of the Effective Date are as follows *(See Section 10.03)* | |
| If to Lender: | **CPC MORTGAGE COMPANY LLC**<br>**c/o The Community Preservation Corporation**<br>**28 East 28th Street, 9th Floor**<br>**New York, New York 10016-7943**<br>**Attention: Loan Servicing** |
| If to Borrower: | **KUNBA LLC**<br>**36 West 37th Street**<br>**New York, New York 10018**<br>**Attention: Robert Khomari** |
| If to Guarantor: | **ROBERT KHOMARI**<br>**19 Hillside Avenue**<br>**Roslyn Heights, New York 11577** |

**EXHIBIT A**

**DISBURSEMENT REQUEST**

|  |  |
|---|---|
| **Freddie Mac Loan Number:** | _____ |
| **Property Name:** | _____ |

**Borrower:** _____

**Lender:** _____

**Date of Request:** _____

Borrower requests from Lender disbursement of funds in the amount of $ _____ from the Capital Replacement and Repair Reserve Fund to reimburse Borrower for Capital Replacements and/or Priority Repairs described in Section 1 below in accordance with the terms of the Loan Agreement **("Disbursement")**. Borrower represents and warrants to Lender that the following information is true and correct as of the Date of Request shown above:

1. Borrower is requesting Disbursement for the following completed Capital Replacements and/or Priority Repairs (collectively, **"Disbursement Request Work"**):

   _____

   _____

2. Borrower has not previously received a disbursement from the Capital Replacement and Repair Reserve Fund to pay for the Disbursement Request Work.

3. Borrower has obtained or caused to be obtained all licenses, permits, and approvals of any Governmental Authority required for the Disbursement Request Work, as completed or completed to the applicable stage.

4. All the Disbursement Request Work has been performed and/or installed on the Mortgaged Property in  a good and workmanlike manner with suitable materials in accordance with good building practices and all applicable laws, ordinances, rules and regulations, building setback lines and restrictions applicable to the Mortgaged Property.

5. The materials, supplies and equipment furnished or installed for the Disbursement Request Work are not subject to any Lien or security interest unless (i) the Disbursement is to be used to satisfy any such Lien or security interest or (ii) Borrower has properly provided bond or other security against loss in accordance with applicable law.

6. This Disbursement Request is accompanied by paid invoices or bills that show Borrower has paid for the Disbursement Request Work.

7. There is no Event of Default that has occurred and is continuing under the Loan Documents.

8. All capitalized terms used but not defined in this Disbursement Request will have the meanings given to them in the Loan Agreement.

**[BALANCE OF PAGE INTENTIONALLY LEFT BLANK]**

**EXHIBIT A**

**DISBURSEMENT REQUEST**

**BORROWER:**

_____ a
_____

By: _____
Name:
Title:

**EXHIBIT B**

| **Loan Agreement Modifications** |
| --- |
| None |

| **Special Purpose Reserve Fund Release Conditions** |
| --- |
| None |

| **Additional** Capital Replacements |
| --- |
| None |

# EXHIBIT C



**New York Consolidated, Amended and Restated Note – SBL**
(Revised 05-3-2016)

| | |
|---|---|
| **Freddie Mac Loan Number:** | **501841342** |
| **Property Name:** | **430 East 162nd Street** |

| | |
|---|---|
| **Borrower:** | **KUNBA LLC**, a New York limited liability company |
| **Lender:** | **CPC MORTGAGE COMPANY LLC**, a New York limited liability company |
| **Effective Date:** | **February 7, 2019** |

THIS NEW YORK CONSOLIDATED, AMENDED AND RESTATED NOTE ("**Note**") is entered into by Borrower (jointly and severally if more than one) for the benefit of Lender and is effective as of the Effective Date.

### PRELIMINARY STATEMENTS

A.   This Note consolidates the promissory notes described in Exhibit A to this Note (together the "**Existing Notes**"), without impairing the debt evidenced by the Existing Notes.  This Note does not create any new or additional indebtedness but evidences the outstanding indebtedness established by the Existing Notes so that this Note evidences a single consolidated debt in the principal amount of **$1,750,000.00**.

B.   This Note amends and restates in their entirety the terms, obligations, agreements, covenants and conditions set forth in the Existing Notes and all other agreements that previously consolidated, modified and extended the Existing Notes so that the terms of this Note supersede the terms, obligations, agreements, covenants and conditions of the Existing Notes.

NOW, THEREFORE, in consideration of these promises, the mutual covenants contained in this Note and other good and valuable consideration, the receipt and sufficiency of which are acknowledged, the parties agree that the Existing Notes are consolidated, amended and restated in this Note in their entirety as follows:

### [REMAINDER OF PAGE INTENTIONALLY BLANK]


**Freddie Mac**
**MULTIFAMILY**

Note Fixed Rate – SBL (Revised 10-01-18)

| | |
|---|---|
| **Freddie Mac Loan Number:** | **501841342** |
| **Property Name:** | **430 East 162nd Street** |

| | |
|---|---|
| **Borrower:** | **KUNBA LLC**, a New York limited liability company |
| **Lender:** | **CPC MORTGAGE COMPANY LLC**, a New York limited liability company |
| **Effective Date:** | **February 7, 2019** |

FOR VALUE RECEIVED, Borrower (jointly and severally if more than one), promises to pay to the order of Lender the Principal Amount shown below, plus interest, according to the terms provided in this Note ("**Note**").

### 1. Key Terms.

| | |
|---|---|
| **Principal Amount**: US **$1,750,000.00** | **Loan Term**: **60** months |
| **Fixed Annual Interest Rate**: **4.380%** | **Maturity Date**: **March 1, 2024** |
| **Amortization Period**: **360** months | **Prepayment Charge**: See Schedule 1 |
| **First Payment Date**: **April 1, 2019** | **Monthly Principal and Interest Payment Amount**: **$8,742.65** |

**Check here (☐) and complete the following for full or partial term interest-only loans:**

| |
|---|
| **Interest-Only Period:** ___ months |
| **Per Diem Interest-Only Payment Amount: $**_____ <br> *(expressed to the fifth decimal place)* |
| **First Principal and Interest Payment Date:** _____ |

| |
|---|
| **Lender Address for Payment:** <br> **CPC MORTGAGE COMPANY LLC** <br> **c/o The Community Preservation Corporation** <br> **28 East 28th Street, 9th Floor** <br> **New York, New York 10016-7943** |

| |
|---|
| **Property Jurisdiction (Location of the Mortgaged Property):** <br> **Borough and County of the Bronx, City and State of New York** |

### 2. Interest.

(a) **Interest Rate.** Interest will accrue on the outstanding principal balance of this Note at the Fixed Annual Interest Rate, subject to the provisions of Section 5 of this Note related to the Default Annual Interest Rate.

(b) **Interest Due for Partial Month.** Unless Lender disburses the Principal Amount to Borrower on the first day of a month, Borrower must pay interest for that partial first month.

(c) **Interest Calculation.**

(i) Lender will determine and allocate interest using an actual/360 interest schedule (interest is payable for the actual number of days in each month, and each month's interest is calculated by

multiplying the unpaid Principal Amount as of the 1st day of the month for which interest is being calculated by the Fixed Annual Interest Rate, dividing the product by 360, and multiplying the quotient by the number of days in the month for which interest is being calculated).  The amount of each payment attributable to principal and the amount attributable to interest will be based on an actual/360 interest schedule so it will vary based upon the number of days in the month for which such payment is paid.

(ii)    For convenience, to calculate the actual monthly principal and interest payment amounts, Lender will use a 30/360 interest calculation payment schedule (each year is treated as consisting of twelve 30-day months).

(iii)    If Lender receives any monthly payment before its Payment Date, Lender will be deemed to have received the payment on its Payment Date for the purpose of calculating interest due.

(iv)    Any accrued interest remaining past due for 30 days or more may be added to and become part of the unpaid Principal Amount and any reference to "**accrued interest**" will refer to accrued interest which has not yet become part of the unpaid Principal Amount.  Any amount added to the Principal Amount pursuant to the Loan Documents will bear interest at the applicable rate or rates specified in this Note and will be payable with such interest upon demand by Lender and, absent such demand, as provided in this Note for the payment of principal and interest.

3.  **Payments.**

(a)  **Time of Payments.**  Borrower will make a payment every month on the first day of each month (each, a "**Payment Date**") beginning on the First Payment Date. Borrower will make these payments every month until Borrower has paid the entire Principal Amount, accrued interest on the Principal Amount, and any other charges that Borrower may owe Lender, whether described in this Note or in any other Loan Document. Each payment will be applied as of its scheduled Payment Date, and, if the payment consists of both principal and interest, it will be applied to accrued interest before principal.  If, on the Maturity Date, Borrower still owes amounts under this Note or any other Loan Document, Borrower will pay those amounts in full on the Maturity Date.

(b)  **Payments if there is no Interest-Only Period.**  If Section 1 does not specify an Interest-Only Period, then beginning on the First Payment Date, each monthly payment will be equal to the Monthly Principal and Interest Payment Amount.

(c)  **Payments if there is an Interest-Only Period.**  If Section 1 specifies an Interest-Only Period, then beginning on the First Payment Date, each monthly payment during the Interest-Only Period will only be for the amount of interest due on the unpaid Principal Amount.  Each monthly payment during the Interest-Only Period will vary, and will equal the Per Diem Interest-Only Payment Amount multiplied by the number of days in the month prior to the Payment Date.  If the Interest-Only Period is less than the Loan Term, then beginning on the First Principal and Interest Payment Date, each monthly payment will be equal to the Monthly Principal and Interest Payment Amount.

(d)  **Manner and Place of Payment.** Borrower will authorize Lender to make arrangements so that all payments under this Note are transferred by automated clearinghouse transfer initiated by Lender directly from an account at a U.S. bank designated by Borrower to an account designated by Lender.

4.  **Borrower's Right to Prepay.**

(a)  **Prepayment**. If Lender receives any principal payment or other amounts before the Maturity Date other than the monthly payments specified in Sections 1 and 3, it will be considered a prepayment ("**Prepayment**").  Borrower may not make a partial Prepayment unless expressly permitted by the Loan Documents.  If Lender accepts and applies any partial Prepayment, Lender will not change the Payment Dates nor will it change the Monthly Principal and Interest Payment Amount.  Lender may apply any Prepayment to any amounts due under this Note as Lender determines, including to any accrued and

unpaid interest on the Principal Amount and the Prepayment Charge specified on Schedule 1, if applicable, before applying a Prepayment to reduce the Principal Amount.

(b) **Prepayment Charge.** Borrower must pay the Prepayment Charge specified on Schedule 1 in connection with any Prepayment under this Note, whether voluntary or involuntary or resulting from a default by Borrower, except any Prepayment (i) occurring as a result of the application of any Insurance proceeds or Condemnation award, (ii) required under the terms of the Loan Agreement in connection with a Condemnation proceeding, or (iii) made during the Window Period (as defined on Schedule 1).

(c) **Designation of Payment Date for Prepayment.** If Borrower gives at least 30 days' prior Notice to Lender, then Borrower may make a full Prepayment on a Payment Date. If the Payment Date is not a Business Day, then the "Payment Date" for this full Prepayment will mean the Business Day immediately before the Payment Date and the calculation of any required Prepayment Charge will be made as if the Prepayment had actually been made on the scheduled Payment Date. Borrower must pay to Lender (i) all principal, (ii) the Prepayment Charge, (iii) all accrued and unpaid interest and (iv) all other sums due to Lender at the time of such Prepayment.

(d) **Designation of Day other than a Payment Date for Prepayment.** If Borrower gives at least 30 days' prior Notice to Lender, then Borrower may make a full Prepayment on a Business Day that is not a Payment Date. However, Lender will only accept this Prepayment if Borrower pays to Lender all amounts due under Section 4(c), including all interest that would have been due if the Prepayment had actually been made on the Payment Date immediately after the designated Business Day.

(e) **Prepayment Charge NOT a Penalty.** Borrower recognizes that any Prepayment, whether voluntary or involuntary or resulting from a default by Borrower, will result in Lender's incurring loss, including reinvestment loss, additional expense and frustration or impairment of Lender's ability to meet its commitments to third parties. Borrower agrees to pay to Lender upon demand damages for the detriment caused by any Prepayment, and agrees that it is extremely difficult and impractical to ascertain the extent of such damages. Borrower agrees that the formula for calculating the Prepayment Charge in this Note represents a reasonable estimate of the damages that Lender will incur because of a Prepayment. Borrower further acknowledges that the Prepayment Charge set forth in this Note is a material part of the consideration for the Loan, and that the terms of this Note are in other respects more favorable to Borrower as a result of the Borrower's voluntary agreement to the Prepayment Charge.

5. **Borrower's Failure to Pay as Required; Defaults.**

(a) **Late Charge for Overdue Payments.** If Lender has not received the full amount of any monthly payment by the 10th day of any month or any amount due under any Loan Document within 9 days after it is due (unless applicable law requires a longer period of time before a late charge may be imposed), then Borrower must pay a late charge to Lender ("**Late Charge**"). The amount of the Late Charge will be 5% of any overdue payment or amount (unless applicable law requires a lower amount to be charged). Borrower will pay this Late Charge promptly but only once with respect to each late payment. If the Loan is not fully amortizing, no Late Charge will be due on the final payment of the unpaid Principal Amount owed on the Maturity Date.

(b) **Interest Rate after Default.** If Lender has not received the full amount of any monthly payment for 30 days or more after the Payment Date or any other Event of Default has occurred and is continuing, then the interest rate under this Note will increase to the Fixed Annual Interest Rate plus 4% ("**Default Annual Interest Rate**") beginning on that Payment Date or the date any other Event of Default commences. If Borrower has not paid the entire Principal Amount by the Maturity Date, the Default Annual Interest Rate will continue until and including the date on which the entire unpaid portion of the Principal Amount is paid in full.

(c) **Default.** If Borrower does not pay the full amount of each payment on the date it is due, or if any other Event of Default occurs and is continuing, Borrower will be in default.

(d) **Lender's Damages.**  Borrower acknowledges that its failure to make timely payments will increase Lender's expenses and that it is extremely difficult and impractical to determine those additional expenses.  Borrower agrees that the Late Charge and the Default Annual Interest Rate both represent fair and reasonable estimates of Lender's additional expenses.

(e) **Acceleration.**  If Borrower continues to be in default, the entire unpaid Principal Amount, any accrued interest, any Prepayment Charge, and all other amounts payable under this Note and any other Loan Document will immediately become due and payable, at the option of Lender, without any prior Notice to Borrower (unless applicable law requires Notice). Lender will calculate any Prepayment Charge as if Prepayment occurred on the date of acceleration. If Prepayment occurs thereafter, Lender will recalculate the Prepayment Charge as of the actual Prepayment date.

6.  **Notices and Written Modifications.**  All Notices required or permitted to be given under this Note must be given in accordance with Section 10.03 of the Loan Agreement.  Any modification or amendment to this Note will not be effective unless it is in writing and signed by Borrower and Lender.

7.  **Personal Liability.**  The provisions of Article III of the Loan Agreement are incorporated by reference into this Note to the same extent and with the same force as if fully set forth in this Note.

8.  **Security.**  The Indebtedness is secured by, among other things, the Security Instrument, and reference is made to the Security Instrument and the Loan Agreement for other rights with respect to collateral for the Indebtedness.

9.  **Payment of Lender's Costs and Expenses.**  Lender will have the right to be paid back by Borrower for Lender's entire costs and expenses, including Attorneys' Fees and Costs, resulting from any default under this Note or in connection with efforts to collect any amount due under this Note, or to enforce the provisions of any of the other Loan Documents, including those costs and expenses incurred in post-judgment collection efforts and in any bankruptcy proceeding (including any action for relief from the automatic stay) or judicial or nonjudicial foreclosure proceeding.  Borrower agrees that, in connection with each request by Borrower under this Note or any other Loan Document, Borrower must pay all Attorneys' Fees and Costs and expenses incurred by Lender, regardless of whether the matter is approved, denied or withdrawn.

10. **Waivers.**

(a) **Presentment and Notice of Dishonor.**  Borrower and all endorsers and Guarantors and all other third party obligors waive presentment, demand, notice of dishonor, protest, notice of acceleration, notice of intent to demand or accelerate payment or maturity, presentment for payment, notice of nonpayment, grace, and diligence in collecting the Indebtedness.

(b) **Forbearance.**  Any forbearance by Lender in exercising any right or remedy under this Note or any other Loan Document, or otherwise afforded by applicable law, will not be a waiver of or preclude the exercise of that or any other right or remedy.  The acceptance by Lender of any payment after the applicable Payment Date, or in an amount which is less than the required payment, will not be a waiver of Lender's right to require prompt payment when due of all other payments or to exercise any right or remedy with respect to any failure to make prompt payment. Application by Lender of any security for Borrower's obligations under this Note will not constitute an election of remedies by Lender so as to preclude the exercise of any other right or remedy available to Lender.

(c) **Waiver Of Trial By Jury. TO THE EXTENT PERMITTED BY APPLICABLE LAW, BORROWER AND LENDER EACH KNOWINGLY AND VOLUNTARILY, WITH THE BENEFIT OF, OR THE OPPORTUNITY TO CONSULT WITH, COMPETENT LEGAL COUNSEL, (i) AGREES NOT TO ELECT A TRIAL BY JURY WITH RESPECT TO ANY ISSUE ARISING OUT OF THIS NOTE OR THE RELATIONSHIP BETWEEN THE PARTIES AS LENDER AND BORROWER THAT IS TRIABLE OF RIGHT BY A JURY, AND (ii) WAIVES ANY RIGHT TO TRIAL BY JURY WITH RESPECT TO SUCH ISSUE TO THE EXTENT THAT ANY SUCH RIGHT EXISTS NOW OR IN THE FUTURE.**

11. **Commercial Purpose.** Borrower represents that Borrower is incurring the Indebtedness solely for the purpose of carrying on a business or commercial enterprise, and not for consumer, personal, family, household or agricultural purposes.

12. **Counting of Days.** Any reference in this Note to a period of "**days**" means calendar days, not Business Days, except where otherwise specifically provided.

13. **Captions.** The captions or headings of the Sections of this Note are for convenience only and will be disregarded in construing this Note.

14. **Governing Law.** This Note will be governed by the laws of the Property Jurisdiction.

15. **Defined Terms.** Capitalized terms used but not defined in this Note, including the Key Terms set forth in the table in Section 1 of this Note, will have the meanings given to such terms in the Loan Agreement. "**Loan Agreement**" means the Loan Agreement by and between Borrower and Lender, effective as of the Effective Date of this Note, as amended, modified or supplemented from time to time.

16. **Time of the Essence.** TIME IS OF THE ESSENCE as to each and every provision of this Note requiring payment.

17. **Successors and Assigns.** This Note will bind the respective successors and assigns of Borrower and Lender, and the rights granted by this Note will inure to Lender's successors and assigns. Borrower understands that Lender may transfer this Note. Anyone who takes this Note by transfer and who is entitled to receive payments under this Note will also be called "**Lender.**"

18. **Loan Charges.** Neither this Note nor any of the other Loan Documents will be construed to create a contract requiring payment of interest at a rate greater than the maximum amount of interest allowed by applicable law. If any applicable law limiting the amount of interest or other charges permitted to be collected from Borrower in connection with the Loan is interpreted so that any interest or other charge provided for in any Loan Document, whether considered separately or together with other charges provided for in any other Loan Document, violates that law, and Borrower is entitled to the benefit of that law, then: (a) any such Loan charge will be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be applied to Principal. For the purpose of determining whether any applicable law limiting the amount of interest or other charges permitted to be collected from Borrower has been violated, all Indebtedness that constitutes interest, as well as all other charges made in connection with the Indebtedness that constitute interest, will be deemed to be allocated and spread ratably over the stated term of this Note. Unless otherwise required by applicable law, such allocation and spreading will be effected in such a manner that the rate of interest so computed is uniform throughout the stated term of this Note.

19. **State-Specific Provisions.** State-specific provisions, if any, for the Property Jurisdiction identified in Section 1 are included on Schedule 2 to this Note.

20. **Community Property Provision (Non-Entity Borrower(s) Only).** If Borrower (or any Borrower, if more than one) is a married person, and the state of residence of Borrower or Borrower's spouse is a community property jurisdiction, Borrower (or each such married Borrower, if more than one) agrees that Lender may satisfy Borrower's obligations under this Note and all Loan Documents to the extent of all of Borrower's separate property and Borrower's interest in any community property.

21. **Attached Schedules, Riders and Exhibits.** The following Schedules, Riders, if any, and Exhibits, if any, are attached to, and incorporated fully into, this Note:

|X| Schedule 1 – Prepayment Charge

|X| Schedule 2 – State-Specific Provisions by Property Jurisdiction

**22. Sealed Instrument.** Where applicable law provides, Borrower intends that this Note will be deemed to be signed and delivered as a sealed instrument.

**REMAINDER OF PAGE INTENTIONALLY LEFT BLANK;
SIGNATURES ON FOLLOWING PAGES**

IN WITNESS WHEREOF, and in consideration of the Lender's agreement to lend Borrower the Principal amount set forth above, Borrower has signed and delivered this Note under seal or has caused this Note to be signed and delivered under seal by its duly authorized representative.

**BORROWER:**

**KUNBA LLC**, a New York limited liability company

By: _____

Name:    Robert Khomari
Title:     Manager

PAY TO THE ORDER OF **FEDERAL HOME LOAN MORTGAGE CORPORATION**
WITHOUT RECOURSE

**LENDER:**

**CPC MORTGAGE COMPANY LLC**, a New York limited
liability company

By: _____

Name:   Carolyn Au

Title:    Senior Vice President

## SCHEDULE 1

### Prepayment Charge

| 60 Month Loan Term Step-Down Prepayment Option #1 -- (5%, 4%, 3%, 2%, 1%) | |
|---|---|
| The Window Period is: | The 3 consecutive calendar month period prior to the Maturity Date. |
| The Prepayment Charge is: | (i)   5.0% of the principal being prepaid if the Prepayment occurs prior to the 12th Payment Date; <br><br> (ii)   4.0% of the principal being prepaid if the Prepayment occurs on or after the 12th Payment Date and prior to the 24th Payment Date; <br><br> (iii)   3.0% of the principal being prepaid if the Prepayment occurs on or after the 24th Payment Date and prior to the 36th Payment Date; <br><br> (iv)   2.0% of the principal being prepaid if the Prepayment occurs on or after the 36th Payment Date and prior to the 48th Payment Date; and <br><br> (v)   1.0% of the principal being prepaid if the Prepayment occurs on or after the 48th Payment Date and prior to the first day of the Window Period. |

## SCHEDULE 2

**State-Specific Provisions by Property Jurisdiction**

| Property Jurisdiction | State-Specific Provision(s) |
|---|---|
| New York | None |

**EXHIBIT A**

**LIST OF EXISTING NOTES**

A.   Substitute Note A in the original principal amount of $1,075,000.00 made by Kunba LLC to Signature Bank, dated February 7, 2019; and

B.   Gap Note Fixed Rate – SBL in the original principal amount of $675,000.00 made by Kunba LLC to CPC Mortgage Company LLC, dated February 7, 2019.

Freddie Mac Loan Number: 501841342
Loan Name: 430 East 162nd Street
M&O Ref.: 7578.124
Pool: SB-65

## ALLONGE TO NOTE

This Allonge is to be attached to and become part of that New York Consolidated, Amended and Restated Note dated February 7, 2019 made by KUNBA LLC, a New York limited liability company to CPC MORTGAGE COMPANY LLC, in the principal sum of $1,750,000.00.

Pay to the order of WILMINGTON TRUST, NATIONAL ASSOCIATION, AS TRUSTEE FOR THE REGISTERED HOLDERS OF WELLS FARGO COMMERCIAL MORTGAGE SECURITIES, INC., MULTIFAMILY MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2019-SB65, without recourse, representation or warranty, express or implied, except as provided in that certain Mortgage Loan Purchase Agreement, between Wells Fargo Commercial Mortgage Securities, Inc., as Depositor, and Federal Home Loan Mortgage Corporation, as Mortgage Loan Seller, dated as of August 1, 2019.

Dated this 23ʳᵈ day of August, 2019.

FEDERAL HOME LOAN MORTGAGE
CORPORATION, a corporation organized and
existing under the laws of the United States

By: _____

Name:  Mary Ellen Slavinskas
Title:   Director
         Multifamily Operations

Freddie Mac Loan Number:  501841342
Loan Name: 430 East 162nd Street
M&O Ref.: 7578.124
Pool: SB-65

## ALLONGE TO NOTE

This Allonge is to be attached to and become part of that Substitute Note A dated February 7, 2019 made by KUNBA LLC, a New York limited liability company to SIGNATURE BANK, in the principal sum of $1,075,000.00.

Pay to the order of WILMINGTON TRUST, NATIONAL ASSOCIATION, AS TRUSTEE FOR THE REGISTERED HOLDERS OF WELLS FARGO COMMERCIAL MORTGAGE SECURITIES, INC., MULTIFAMILY MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2019-SB65, without recourse, representation or warranty, express or implied, except as provided in that certain Mortgage Loan Purchase Agreement, between Wells Fargo Commercial Mortgage Securities, Inc., as Depositor, and Federal Home Loan Mortgage Corporation, as Mortgage Loan Seller, dated as of August 1, 2019.

Dated this 23rd day of August, 2019.

FEDERAL HOME LOAN MORTGAGE
CORPORATION, a corporation organized and
existing under the laws of the United States


By: _____
Name: Mary Ellen Slavinskas
Title:   Director
        Multifamily Operations

Freddie Mac Loan Number:  501841342
Loan Name: 430 East 162nd Street
M&O Ref.: 7578.124
Pool: SB-65

## ALLONGE TO NOTE

This Allonge is to be attached to and become part of that Gap Note dated February 7, 2019 made by KUNBA LLC, a New York limited liability company to CPC MORTGAGE COMPANY LLC, in the principal sum of $675,000.00.

Pay to the order of WILMINGTON TRUST, NATIONAL ASSOCIATION, AS TRUSTEE FOR THE REGISTERED HOLDERS OF WELLS FARGO COMMERCIAL MORTGAGE SECURITIES, INC., MULTIFAMILY MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2019-SB65, without recourse, representation or warranty, express or implied, except as provided in that certain Mortgage Loan Purchase Agreement, between Wells Fargo Commercial Mortgage Securities, Inc., as Depositor, and Federal Home Loan Mortgage Corporation, as Mortgage Loan Seller, dated as of August 1, 2019.

Dated this 23rd day of August, 2019.

                          FEDERAL HOME LOAN MORTGAGE
                          CORPORATION, a corporation organized and
                          existing under the laws of the United States


                          By:    _____
                          Name:  Mary Ellen Slavinskas
                          Title:   Director
                                  Multifamily Operations

# EXHIBIT D

**NYC DEPARTMENT OF FINANCE**
**OFFICE OF THE CITY REGISTER**

This page is part of the instrument. The City Register will rely on the information provided by you on this page for purposes of indexing this instrument.The information on this page will control for indexing purposes in the event of any conflict with the rest of the document.



2019021900976007001EB1A0

| **RECORDING AND ENDORSEMENT COVER PAGE** | | **PAGE 1 OF 37** |
|---|---|---|
| Document ID: **2019021900976007** | Document Date: 02-07-2019 | Preparation Date: 02-20-2019 |
| Document Type: AGREEMENT | | |
| Document Page Count: 35 | | |

| **PRESENTER:** | **RETURN TO:** |
|---|---|
| MADISON ABSTRACT, INC. ( BX 18 19597 )<br>670 WHITE PLAINS ROAD, SUITE 121<br>AS AGENT TO FIRST AMERICAN TITLE INSURANCE<br>COMPANY<br>SCARSDALE, NY 10583<br>914-725-7200 | MADISON ABSTRACT, INC. ( BX 18 19597 )<br>670 WHITE PLAINS ROAD, SUITE 121<br>AS AGENT TO FIRST AMERICAN TITLE INSURANCE<br>COMPANY<br>SCARSDALE, NY 10583<br>914-725-7200 |

### PROPERTY DATA

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| BRONX | 2383 | 18 | Entire Lot | 430 EAST 162 STREET |
| **Property Type:** | APARTMENT BUILDING | | | |

### CROSS REFERENCE DATA

Document ID:    2019021900976002
☒ Additional  Cross References on Continuation  Page

### PARTIES

| **PARTY 1:** | **PARTY 2:** |
|---|---|
| KUNBA LLC<br>36 WEST 37TH STREET<br>NEW YORK, NY 10018 | CPC MORTGAGE COMPANY LLC<br>C/O THE COMMUNITY PRESERVATION<br>CORPORATION, 28 EAST 28TH STREET, 9TH FLOOR<br>NEW YORK, NY 10016 |

### FEES AND TAXES

| Mortgage : | | | Filing Fee: | | |
|---|---|---|---|---|---|
| Mortgage Amount: | $ | 1,750,000.00 | | $ | 0.00 |
| Taxable Mortgage Amount: | $ | 0.00 | NYC Real Property Transfer Tax: | | |
| Exemption: | | 255 | | $ | 0.00 |
| TAXES:   County (Basic): | $ | 0.00 | NYS Real Estate Transfer Tax: | | |
| City (Additional): | $ | 0.00 | | $ | 0.00 |
| Spec (Additional): | $ | 0.00 | | | |
| TASF: | $ | 0.00 | | | |
| MTA: | $ | 0.00 | | | |
| NYCTA: | $ | 0.00 | | | |
| Additional MRT: | $ | 0.00 | | | |
| TOTAL: | $ | 0.00 | | | |
| Recording Fee: | $ | 212.00 | | | |
| Affidavit Fee: | $ | 8.00 | | | |

**RECORDED OR FILED IN THE OFFICE**
**OF THE CITY REGISTER OF THE**
**CITY OF NEW YORK**
Recorded/Filed         02-25-2019 16:25
City Register File No.(CRFN):
**2019000063497**

*Annette M. Hill*

**City Register Official Signature**



**NYC DEPARTMENT OF FINANCE**
**OFFICE OF THE CITY REGISTER**

2019021900976007001CB320

| RECORDING AND ENDORSEMENT COVER PAGE (CONTINUATION) | PAGE 2 OF 37 |
|---|---|

| Document ID: 2019021900976007 | Document Date: 02-07-2019 | Preparation Date: 02-20-2019 |
|---|---|---|

Document Type: AGREEMENT

**CROSS REFERENCE DATA**
**Document ID:** 2019021900976006

Record & Return To:
Madison Abstract Inc.
670 White Plains Road, Suite 121
Scarsdale, NY 10583
Title No. BX18 19597
County: BRONX
Block: 2383
Lot: 18

_____ *[Space Above This Line For Recording Data]*_____

Freddie Mac Loan Number: **501841342**
Property Name: **430 East 162nd Street**

### CONSOLIDATION, EXTENSION AND MODIFICATION AGREEMENT

### NEW YORK

### (Revised 3-22-2016)

THIS CONSOLIDATION, EXTENSION AND MODIFICATION AGREEMENT ("**Agreement**") is made effective as of the **7th** day of **February**, **2019**, between **KUNBA LLC**, a limited liability company organized and existing under the laws of New York ("**Borrower**") and **CPC MORTGAGE COMPANY LLC**, a limited liability company, organized and existing under the laws of New York ("**Lender**"). Borrower's address is 36 West 37th Street, New York, New York 10018, and Lender's address is c/o The Community Preservation Corporation, 28 East 28th Street, 9th Floor, New York, New York 10016-7943.

### RECITALS

A.     Borrower is indebted to Lender in the principal sum of **$1,750,000.00** and Borrower and Lender desire to secure (1) the repayment of that indebtedness, with interest, and all renewals, extensions and modifications of such indebtedness, and (2) the performance of all of Borrower's obligations, covenants and agreements stated in and consolidated by this Agreement.

B.     Borrower has a fee estate in the real property whose address is **430 East 162nd Street, Bronx, New York 10451**, and which is located at Block **2383**, Lot **18**, in the Borough of and County of the **Bronx**, City and State of **New York**, as more particularly described in Exhibit A to this Agreement ("**Property**").

{215/181/01244886}
**Consolidation, Extension and Modification Agreement –**
**New York**

## AGREEMENT

Borrower covenants and agrees with Lender as follows:

1.  **Assumption or Ratification of Obligations Under Existing Notes and Existing Mortgages.** Borrower assumes or ratifies all of the obligations and agreements under the mortgages ("**Existing Mortgages**") listed on Exhibit B to this Agreement. Borrower assumes or ratifies, as applicable, all of the obligations and agreements under the Notes ("**Existing Notes**") secured by the Existing Mortgages. The Existing Notes evidence the principal indebtedness described above and the Existing Mortgages are a lien on the Property securing the Existing Notes.

    Borrower also assumes or ratifies, as applicable, all of the obligations in all agreements, whether or not listed on Exhibit B, which consolidate, modify or extend the Existing Notes and Existing Mortgages, as modified by this Agreement. Borrower agrees that it will keep the agreements and perform the obligations in the Existing Notes and the Existing Mortgages and under all other agreements listed on Exhibit B, as modified by this Agreement, even if Borrower is not the person or entity that was originally obligated under the Existing Notes, Existing Mortgages or any other agreements listed on Exhibit B.

2.  **Agreement to Consolidate and Modify the Existing Notes.** Borrower agrees that this Agreement consolidates the rights and obligations under the Existing Notes (and under all other agreements which consolidated, modified or extended the rights and obligations under the Existing Notes).

    Borrower has concurrently executed and delivered to Lender a Consolidated, Amended and Restated Note in the principal amount of **$1,750,000.00** ("**Consolidated Note**") which extends the Existing Notes and amends and restates in their entirety the terms, obligations, agreements, covenants and conditions set forth in the Existing Notes. From the date of this Agreement, the Consolidated Note will evidence Borrower's indebtedness to Lender and Borrower agrees that it will keep the agreements and perform the obligations set forth in the Consolidated Note.

3.  **Agreement to Consolidate and Modify the Existing Mortgages.** Borrower agrees that this Agreement consolidates the rights and obligations under the Existing Mortgages (and under all other agreements which consolidated, modified or extended the rights and obligations under the Existing Mortgages). Borrower further agrees that Lender's rights in the Property are combined and spread so that Lender has a single real estate security interest ("**Consolidated Mortgage**") securing the Consolidated Note evidencing Borrower's indebtedness to Lender.

4.  **Terms of the Consolidated Mortgage.** Borrower and Lender agree that the covenants and agreements of the Consolidated Mortgage are the terms of the mortgage set forth in

Exhibit C to this Agreement. The Consolidated Mortgage amends and restates in their entirety the terms and provisions of the Existing Mortgages.

The maximum principal amount that is or under any contingency may be secured by this Consolidated Mortgage is **$1,750,000.00**.

For purposes of this Consolidated Mortgage, the Borrower's and Lender's addresses will be the addresses for each party set forth above.

5.  **Borrower's Warranties and Covenants.** Borrower warrants that (a) Borrower is lawfully seized of a fee estate or lawfully holds a leasehold estate in the Property, and (b) Borrower has the right to consolidate, modify and extend the Existing Notes and Existing Mortgages.

    Borrower covenants that it will defend generally the title to the Property against all claims and demands, liens or encumbrances, subject to any easements, restrictions and encumbrances listed in a schedule of exceptions to coverage in any title insurance policy insuring Lender's interest in the Property. Borrower also covenants and warrants that Borrower has no offsets, counterclaims or defenses against the indebtedness now unpaid or against the Consolidated Note or the Consolidated Mortgage.

6.  **Termination; Changes; Amendments.** This Agreement may not be terminated, changed or amended except by a written agreement signed by Borrower and Lender.

7.  **Incorporation of Exhibits.** The following Exhibits, if checked below, are incorporated into and made a part of this Agreement by this provision:

    | | | |
    |---|---|---|
    | ☒ | Exhibit A | Legal Description of the Property (required) |
    | ☒ | Exhibit B | List of Existing Mortgages (required) |
    | ☒ | Exhibit C | Consolidated Mortgage (required) |
    | ☐ | Exhibit D | Modifications to this Agreement |

**REMAINDER OF PAGE INTENTIONALLY LEFT BLANK;
SIGNATURES ON FOLLOWING PAGES**

IN WITNESS WHEREOF, Borrower and Lender have executed this Agreement or caused this Agreement to be executed by their duly authorized representatives as of the date set forth above.

**BORROWER:**

**KUNBA LLC**, a New York limited liability company

By: _____

Name:   Robert Khomari

Title:   Manager

## SIGNATURES CONTINUE ON FOLLOWING PAGE

**LENDER:**

**CPC MORTGAGE COMPANY LLC**, a New York limited liability company

By: _____

Name:   Carolyn Au

Title:    Senior Vice President

STATE OF NEW YORK         )
                            )ss.:
COUNTY OF _New York_     )

On the _6_ day of **February**, in the year **2019**, before me, the undersigned personally appeared **ROBERT KHOMARI**, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
**NOTARY PUBLIC**

JOEL SANDER
Notary Public, State of New York
Registration #01SA6332466
Qualified In Kings County
Commission Expires Nov. 2, 2019

SEAL

STATE OF NEW YORK          )
                          )ss.:
COUNTY OF NEW YORK        )

On the 7th day of **February**, in the year **2019**, before me, the undersigned personally appeared **CAROLYN AU**, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that she executed the same in her capacity, and that by her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.



Notary Public

Print Name: PATRICIA FADEL

My commission expires: August 03, 2019



PATRICIA FADEL
Notary Public, State of New York
No. 01FA6328763
Qualified in Richmond County
Commission Expires August 03, 20__19

**SEAL**

## EXHIBIT A

### LEGAL DESCRIPTION OF THE PROPERTY

**ALL** that certain plot, piece or parcel of land, situate, lying and being in the Borough and County of Bronx, City and State of New York, bounded and described as follows:

**BEGINNING** at a point on the southerly side of 162nd Street, distant 264.45 feet westerly at the corner formed by the intersection of the southerly side of 162nd Street with the westerly side of Elton Avenue;

**RUNNING THENCE** southerly at right angles to said southerly side of 162nd Street, 100 feet;

**THENCE** westerly parallel with the southerly side of 162nd Street, 25 feet;

**THENCE** northerly and again at right angles to the southerly side of 162nd Street and part of the distance through a party wall, 100 feet to the southerly side of 162nd Street;

**THENCE** easterly to said southerly side of 162nd Street, 25 feet to the point or place of **BEGINNING**.

**SAID** premises being known as 430 East 162nd Street, Bronx, New York.

## EXHIBIT B

### LIST OF EXISTING MORTGAGES

A.  Substitute Mortgage A in the original principal amount of $1,075,000.00 made by Kunba LLC to Signature Bank, dated as of February 7, 2019 and to be recorded in the Office of the Register of the City of New York, Borough and County of the Bronx, State of New York; DOCUMENT I.D. 2019021900976002

Which above mortgage A was assigned in the principal amount of $1,075,000.00 by Assignment of Mortgage made by Signature Bank to CPC Mortgage Company LLC, executed February 7, 2019, dated and effective as of February 7, 2019 and to be recorded in the Office of said Register; and

B.  Gap Multifamily Mortgage, Assignment of Rents and Security Agreement in the original principal amount of $675,000.00 made by Kunba LLC to CPC Mortgage Company LLC, dated as of February 7, 2019 and to be recorded in the Office of said Register. MTG TAX BEING PAID # 18,900.00

DOCUMENT I.D. 2019021900976006

PRIOR HISTORY OF MORTGAGES FOR INFORMATION ONLY: Consolidates Substitute MORTGAGE A AND GAP MORTGAGE B to form A Single Lien of $1,750,000.00

A.  First Mortgage, Spreader and Security Agreement in the original principal amount of $2,700,000.00 made by Double Salt LLC, 3rd Avenue Heights LLC and Kunba LLC to Signature Bank, dated as of November 15, 2013 and recorded January 6, 2014 as CRFN 2014000004114 in the Office of the Register of the City of New York, Borough and County of the Bronx, State of New York; UNPAID PRINCIPAL BALANCE $2,435,421.90

Which above mortgage A was severed and split by that certain Note and Mortgage Severance and Splitter Agreement made by and between Double Salt LLC, 3rd Avenue Heights LLC, Kunba LLC and Signature Bank, dated as of February 7, 2019 and to be recorded in the Office of said Register ("Agreement"); said Agreement severed and split the above mortgage into two separate and distinct liens in the amounts of:

(a) $1,075,000.00, encumbering the property known as 430 East 162nd Street, Bronx, New York, Block 2383 Lot 18 (Parcel I), which is evidenced by Substitute Mortgage A made by Kunba LLC to Signature Bank, dated as of February 7, 2019 and to be recorded in the Office of said Register; and

(b) $1,360,421.90, encumbering the properties known as 501 East 176th Street, Bronx, New York (Block 2924 Lot 1), 1170-1174 Shakespeare Avenue, Bronx, New York (Block 2506 Lot 5), 1285 Shakespeare Avenue, Bronx, New York (Block 2519 Lot 26) (collectively, Parcel II), which is evidenced by Substitute Mortgage B made by Double Salt LLC and 3rd Avenue Heights LLC to Signature Bank, dated as of February 7, 2019 and to be recorded in the Office of said Register.

# EXHIBIT C

CONSOLIDATED MORTGAGE

Prepared by, and after recording
return to:
**Abruzzo & Kinn LLP**
**170 Old Country Road, Suite 315**
**Mineola, New York 11501-4310**
**Attention: Nadia A. Popatia, Esq.**

Freddie Mac Loan Number: **501841342**
Property Name: **430 East 162nd Street**

**MULTIFAMILY MORTGAGE,**
**ASSIGNMENT OF RENTS**
**AND SECURITY AGREEMENT**

**NEW YORK**

**(Revised 3-1-2014)**

**THIS INSTRUMENT IS FOR USE**
**ONLY FOR MULTIFAMILY PROPERTIES**
**IMPROVED OR TO BE IMPROVED BY**
**MORE THAN 6 RESIDENTIAL DWELLING UNITS,**
**EACH HAVING THEIR OWN SEPARATE COOKING FACILITIES.**

{215/181/01244886}

NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED HEREIN, THE MAXIMUM PRINCIPAL INDEBTEDNESS SECURED UNDER ANY CONTINGENCY BY THIS SECURITY INSTRUMENT WILL IN NO EVENT EXCEED **$1,750,000.00**

## MULTIFAMILY MORTGAGE, ASSIGNMENT OF RENTS AND SECURITY AGREEMENT

### NEW YORK

### (Revised 3-1-2014)

THIS MULTIFAMILY MORTGAGE, ASSIGNMENT OF RENTS AND SECURITY AGREEMENT ("**Instrument**") is made to be effective as of the **7th** day of **February, 2019**, between **KUNBA LLC**, a limited liability company organized and existing under the laws of New York, whose office address is 36 West 37th Street, New York, New York 10018, as mortgagor ("**Borrower**"), and **CPC MORTGAGE COMPANY LLC**, a limited liability company organized and existing under the laws of New York, whose address is c/o The Community Preservation Corporation, 28 East 28th Street, 9th Floor, New York, New York 10016-7943 ("**Lender**"). Borrower's organizational identification number, if applicable, is **NOT APPLICABLE**.

### RECITAL

Borrower is indebted to Lender in the principal amount of **$1,750,000.00**, as evidenced by Borrower's Multifamily Note payable to Lender, dated as of the date of this Instrument, and maturing on **March 1, 2024** ("**Maturity Date**").

### AGREEMENT

TO SECURE TO LENDER the repayment of the Indebtedness, and all renewals, extensions and modifications of the Indebtedness, and the performance of the covenants and agreements of Borrower contained in the Loan Agreement or any other Loan Document, Borrower mortgages, warrants, grants, conveys and assigns to Lender the Mortgaged Property, including the Land located in the Borough and County of the **Bronx**, City and State of **New York** and described in Exhibit A attached to this Instrument.

Borrower represents and warrants that Borrower is lawfully seized of the Mortgaged Property and has the right, power and authority to mortgage, grant, convey and assign the Mortgaged Property, and that the Mortgaged Property is unencumbered, except as shown on the schedule of exceptions to coverage in the title policy issued to and accepted by Lender contemporaneously with the execution and recordation of this Instrument and insuring Lender's interest in the Mortgaged Property ("**Schedule of Title Exceptions**"). Borrower covenants that Borrower will

{215/181/01244886}

**New York**                                                                 **Page 1**
**Multifamily Mortgage, Assignment of Rents**
**and Security Agreement**

warrant and defend generally the title to the Mortgaged Property against all claims and demands, subject to any easements and restrictions listed in the Schedule of Title Exceptions.

## UNIFORM COVENANTS

### (Revised 05-31-2018)

**Covenants.** In consideration of the mutual promises set forth in this Instrument, Borrower and Lender covenant and agree as follows:

1. **Definitions.** The following terms, when used in this Instrument (including when used in the above recitals), will have the following meanings and any capitalized term not specifically defined in this Instrument will have the meaning ascribed to that term in the Loan Agreement:

   "**Attorneys' Fees and Costs**" means (a) fees and out-of-pocket costs of Lender's and Loan Servicer's attorneys, as applicable, including costs of Lender's and Loan Servicer's in-house counsel, support staff costs, costs of preparing for litigation, computerized research, telephone and facsimile transmission expenses, mileage, deposition costs, postage, duplicating, process service, videotaping and similar costs and expenses; (b) costs and fees of expert witnesses, including appraisers; (c) investigatory fees; and (d) the costs for any opinion required by Lender pursuant to the terms of the Loan Documents.

   "**Borrower**" means all Persons identified as "Borrower" in the first paragraph of this Instrument, together with their successors and assigns.

   "**Business Day**" means any day other than a Saturday, a Sunday or any other day on which Lender or the national banking associations are not open for business.

   "**Event of Default**" means the occurrence of any event described in Section 8.

   "**Fixtures**" means all property owned by Borrower which is attached to the Land or the Improvements so as to constitute a fixture under applicable law, including: machinery, equipment, engines, boilers, incinerators and installed building materials; systems and equipment for the purpose of supplying or distributing heating, cooling, electricity, gas, water, air or light; antennas, cable, wiring and conduits used in connection with radio, television, security, fire prevention or fire detection or otherwise used to carry electronic signals; telephone systems and equipment; elevators and related machinery and equipment; fire detection, prevention and extinguishing systems and apparatus; security and access control systems and apparatus; plumbing systems; water heaters, ranges, stoves, microwave ovens, refrigerators, dishwashers, garbage disposers, washers, dryers and other appliances; light fixtures, awnings, storm windows and storm doors; pictures, screens, blinds, shades, curtains and curtain rods; mirrors; cabinets, paneling, rugs and

{215/181/01244886}

floor and wall coverings; fences, trees and plants; swimming pools; and exercise equipment.

"**Governmental Authority**" means any board, commission, department, agency or body of any municipal, county, state or federal governmental unit, or any subdivision of any of them, that has or acquires jurisdiction over the Mortgaged Property, or the use, operation or improvement of the Mortgaged Property, or over Borrower.

"**Improvements**" means the buildings, structures and improvements now constructed or at any time in the future constructed or placed upon the Land, including any future alterations, replacements and additions.

"**Indebtedness**" means (i) the principal of, (ii) interest at the fixed or variable rate set forth in the Note on, and (iii) all other amounts due at any time under, the Note, the Loan Agreement, this Instrument or any other Loan Document, including prepayment charges, late charges, default interest and advances as provided in Section 7 to protect the security of this Instrument.

"**Land**" means the land described in <u>Exhibit A</u>.

"**Leases**" means all present and future leases, subleases, licenses, concessions or grants or other possessory interests now or hereafter in force, whether oral or written, covering or affecting the Mortgaged Property, or any portion of the Mortgaged Property (including proprietary leases or occupancy agreements if Borrower is a cooperative housing corporation), and all modifications, extensions or renewals.

"**Lender**" means the entity identified as "Lender" in the first paragraph of this Instrument, or any subsequent holder of the Note.

"**Loan Agreement**" means the Loan Agreement executed by Borrower and Lender and dated as of the date of this Instrument, as such agreement may be amended from time to time.

"**Loan Documents**" means the Note, this Instrument, the Loan Agreement, all guaranties, all indemnity agreements, all collateral agreements, UCC filings, O&M Programs, the MMP and any other documents now or in the future executed by Borrower, any Guarantor or any other Person in connection with the Loan evidenced by the Note, as such documents may be amended from time to time.

"**Loan Servicer**" means the entity that from time to time is designated by Lender or its designee to collect payments and deposits and receive Notices under the Note, this Instrument, the Loan Agreement and any other Loan Document, and otherwise to service the Loan evidenced by the Note for the benefit of Lender. Unless Borrower receives

Notice to the contrary, the Loan Servicer is the entity identified as "Lender" in the first paragraph of this Instrument.

"**Mortgaged Property**" means all of Borrower's present and future right, title and interest in and to all of the following:

(a)    The Land.

(b)    The Improvements.

(c)    The Fixtures.

(d)    The Personalty.

(e)    All current and future rights, including air rights, development rights, zoning rights and other similar rights or interests, easements, tenements, rights of way, strips and gores of land, streets, alleys, roads, sewer rights, waters, watercourses and appurtenances related to or benefiting the Land or the Improvements, or both, and all rights-of-way, streets, alleys and roads which may have been or may in the future be vacated.

(f)    All proceeds paid or to be paid by any insurer of the Land, the Improvements, the Fixtures, the Personalty or any other part of the Mortgaged Property, whether or not Borrower obtained the Insurance pursuant to Lender's requirement.

(g)    All awards, payments and other compensation made or to be made by any municipal, state or federal authority with respect to the Land, the Improvements, the Fixtures, the Personalty or any other part of the Mortgaged Property, including any awards or settlements resulting from Condemnation proceedings or the total or partial taking of the Land, the Improvements, the Fixtures, the Personalty or any other part of the Mortgaged Property under the power of eminent domain or otherwise and including any conveyance in lieu thereof.

(h)    All contracts, options and other agreements for the sale of the Land, the Improvements, the Fixtures, the Personalty or any other part of the Mortgaged Property entered into by Borrower now or in the future, including cash or securities deposited to secure performance by parties of their obligations.

(i)    All proceeds from the conversion, voluntary or involuntary, of any of the items described in subsections (a) through (h) inclusive into cash or liquidated claims, and the right to collect such proceeds.

(j)     All Rents and Leases.

(k)     All earnings, royalties, accounts receivable, issues and profits from the Land, the Improvements or any other part of the Mortgaged Property, and all undisbursed proceeds of the loan secured by this Instrument.

(l)     All deposits to a Reserve Fund, whether in cash or as a letter of credit.

(m)     All refunds or rebates of Taxes by a Governmental Authority (other than refunds applicable to periods before the real property tax year in which this Instrument is dated) or Insurance premiums by an insurance company.

(n)     All tenant security deposits which have not been forfeited by any tenant under any Lease and any bond or other security in lieu of such deposits.

(o)     All names under or by which any of the above Mortgaged Property may be operated or known, and all trademarks, trade names, and goodwill relating to any of the Mortgaged Property.

"**Note**" means the Note (including any Amended and Restated Note, Consolidated, Amended and Restated Note, or Extended and Restated Note) executed by Borrower in favor of Lender and dated as of the date of this Instrument, including all schedules, riders, allonges and addenda, as such Note may be amended, modified and/or restated from time to time.

"**Notice**" or "**Notices**" means all notices, demands, Lender approvals and other communication required under the Loan Documents, provided in accordance with the requirements of Section 10.03 of the Loan Agreement.

"**Person**" means any natural person, sole proprietorship, corporation, general partnership, limited partnership, limited liability company, limited liability partnership, limited liability limited partnership, joint venture, association, joint stock company, bank, trust, estate, unincorporated organization, any federal, state, county or municipal government (or any agency or political subdivision thereof), endowment fund or any other form of entity.

"**Personalty**" means all of the following:

(a)     Accounts (including deposit accounts) of Borrower related to the Mortgaged Property.

(b)     Equipment and inventory owned by Borrower, which are used now or in the future in connection with the ownership, management or operation of the Land or

Improvements or are located on the Land or Improvements, including furniture, furnishings, machinery, building materials, goods, supplies, tools, books, records (whether in written or electronic form) and computer equipment (hardware and software).

(c)     Other tangible personal property owned by Borrower which is used now or in the future in connection with the ownership, management or operation of the Land or Improvements or is located on the Land or in the Improvements, including ranges, stoves, microwave ovens, refrigerators, dishwashers, garbage disposers, washers, dryers and other appliances (other than Fixtures).

(d)     Any operating agreements relating to the Land or the Improvements.

(e)     Any surveys, plans and specifications and contracts for architectural, engineering and construction services relating to the Land or the Improvements.

(f)     All other intangible property, general intangibles and rights relating to the operation of, or used in connection with, the Land or the Improvements, including all governmental permits relating to any activities on the Land and including subsidy or similar payments received from any sources, including a Governmental Authority.

(g)     Any rights of Borrower in or under letters of credit.

"**Property Jurisdiction**" means the jurisdiction in which the Land is located.

"**Rents**" means all rents (whether from residential or non-residential space), revenues and other income of the Land or the Improvements, parking fees, laundry and vending machine income and fees and charges for food, health care and other services provided at the Mortgaged Property, whether now due, past due or to become due, and deposits forfeited by tenants, and, if Borrower is a cooperative housing corporation or association, maintenance fees, charges or assessments payable by shareholders or residents under proprietary leases or occupancy agreements, whether now due, past due, or to become due.

"**Reserve Fund**" means all amounts deposited by the Borrower with Lender in connection with the Loan for the payment of Taxes or insurance premiums or as otherwise required pursuant to the Loan Agreement.

"**Taxes**" means all taxes, assessments, vault rentals and other charges, if any, whether general, special or otherwise, including all assessments for schools, public betterments and general or local improvements, which are levied, assessed or imposed by any public authority or quasi-public authority, and which, if not paid, will become a Lien on the Land or the Improvements, including any payments made in lieu of Taxes.

"**UCC**" means the Uniform Commercial Code as promulgated in the applicable jurisdiction.

2.     **Uniform Commercial Code Security Agreement.**

(a)     This Instrument is also a security agreement under the UCC for any of the Mortgaged Property which, under applicable law, may be subjected to a security interest under the UCC, for the purpose of securing Borrower's obligations under this Instrument and to further secure Borrower's obligations under the Note, this Instrument and other Loan Documents, whether such Mortgaged Property is owned now or acquired in the future, and all products and cash and non-cash proceeds thereof (collectively, "**UCC Collateral**"), and by this Instrument, Borrower grants to Lender a security interest under the UCC in the UCC Collateral.   To the extent necessary under applicable law, Borrower hereby authorizes Lender to prepare and file financing statements, continuation statements and financing statement amendments in such form as Lender may require to perfect or continue the perfection of this security interest.

(b)     Unless Borrower gives Notice to Lender within 30 days after the occurrence of any of the following, and executes and delivers to Lender modifications or supplements of this Instrument (and any financing statement which may be filed in connection with this Instrument) as Lender may require, Borrower will not (i) change its name, identity, structure or jurisdiction of organization; (ii) change the location of its place of business (or chief executive office if more than one place of business); or (iii) add to or change any location at which any of the Mortgaged Property is stored, held or located.

(c)     If an Event of Default has occurred and is continuing, Lender will have the remedies of a secured party under the UCC, in addition to all remedies provided by this Instrument or existing under applicable law. In exercising any remedies, Lender may exercise its remedies against the UCC Collateral separately or together, and in any order, without in any way affecting the availability of Lender's other remedies.

(d)     This Instrument also constitutes a financing statement with respect to any part of the Mortgaged Property that is or may become a Fixture, if permitted by applicable law.

3.     **Assignment of Rents; Appointment of Receiver; Lender in Possession.**

(a)     As part of the consideration for the Indebtedness, Borrower absolutely and unconditionally assigns and transfers to Lender all Rents.

(i)     It is the intention of Borrower to establish a present, absolute and irrevocable transfer and assignment to Lender of all Rents and to authorize and empower Lender to collect and receive all Rents without the necessity of further action on the part of Borrower.

(ii)    Promptly upon request by Lender, Borrower agrees to execute and deliver such further assignments as Lender may from time to time require. Borrower and Lender intend this assignment of Rents to be immediately effective and to constitute an absolute present assignment and not an assignment for additional security only.

(iii)   For purposes of giving effect to this absolute assignment of Rents, and for no other purpose, Rents will not be deemed to be a part of the Mortgaged Property. However, if this present, absolute and unconditional assignment of Rents is not enforceable by its terms under the laws of the Property Jurisdiction, then the Rents will be included as a part of the Mortgaged Property and it is the intention of Borrower that in this circumstance this Instrument create and perfect a Lien on Rents in favor of Lender, which Lien will be effective as of the date of this Instrument.

(b)    (i)     Until the occurrence of an Event of Default, Lender hereby grants to Borrower a revocable license to collect and receive all Rents, to hold all Rents in trust for the benefit of Lender and to apply all Rents to pay the installments of interest and principal then due and payable under the Note and the other amounts then due and payable under the other Loan Documents, including Reserve Funds, and to pay the current costs and expenses of managing, operating and maintaining the Mortgaged Property, including utilities, Taxes and insurance premiums (to the extent not included in deposits to Reserve Funds), tenant improvements and other capital expenditures.

(ii)    So long as no Event of Default has occurred and is continuing, the Rents remaining after application pursuant to the preceding sentence may be retained by Borrower free and clear of, and released from, Lender's rights with respect to Rents under this Instrument.

(iii)   After the occurrence of an Event of Default, and during the continuance of such Event of Default, Borrower authorizes Lender to collect, sue for and compromise Rents and directs each tenant of the Mortgaged Property to pay all Rents to, or as directed by, Lender. From and after the occurrence of an Event of Default, and during the continuance of such Event of Default, and without the necessity of Lender entering upon and taking and maintaining control of the Mortgaged Property directly, or by a receiver,

Borrower's license to collect Rents will automatically terminate and Lender will without Notice be entitled to all Rents as they become due and payable, including Rents then due and unpaid. Borrower will pay to Lender upon demand all Rents to which Lender is entitled.

(iv)    At any time on or after the date of Lender's demand for Rents, Lender may give, and Borrower hereby irrevocably authorizes Lender to give, notice to all tenants of the Mortgaged Property instructing them to pay all Rents to Lender. No tenant will be obligated to inquire further as to the occurrence or continuance of an Event of Default. No tenant will be obligated to pay to Borrower any amounts which are actually paid to Lender in response to such a notice. Any such notice by Lender will be delivered to each tenant personally, by mail or by delivering such demand to each rental unit. Borrower will not interfere with and will cooperate with Lender's collection of such Rents.

(c)    If an Event of Default has occurred and is continuing, then Lender will have each of the following rights and may take any of the following actions:

(i)    Lender may, regardless of the adequacy of Lender's security or the solvency of Borrower and even in the absence of waste, enter upon and take and maintain full control of the Mortgaged Property in order to perform all acts that Lender in its discretion determines to be necessary or desirable for the operation and maintenance of the Mortgaged Property, including the execution, cancellation or modification of Leases, the collection of all Rents, the making of Repairs to the Mortgaged Property and the execution or termination of contracts providing for the management, operation or maintenance of the Mortgaged Property, for the purposes of enforcing the assignment of Rents pursuant to Section 3(a), protecting the Mortgaged Property or the security of this Instrument, or for such other purposes as Lender in its discretion may deem necessary or desirable.

(ii)    Alternatively, if an Event of Default has occurred and is continuing, regardless of the adequacy of Lender's security, without regard to Borrower's solvency and without the necessity of giving prior notice (oral or written) to Borrower, Lender may apply to any court having jurisdiction for the appointment of a receiver for the Mortgaged Property to take any or all of the actions set forth in the preceding sentence. If Lender elects to seek the appointment of a receiver for the Mortgaged Property at any time after an Event of Default has occurred and is continuing, Borrower, by its execution of this Instrument, expressly consents to the appointment of such receiver, including the appointment of a receiver *ex parte* if permitted by applicable law.

(iii)    If Borrower is a housing cooperative corporation or association, Borrower hereby agrees that if a receiver is appointed, the order appointing the receiver may contain a provision requiring the receiver to pay the installments of interest and principal then due and payable under the Note and the other amounts then due and payable under the other Loan Documents, including deposits to Reserve Funds, it being acknowledged and agreed that the Indebtedness is an obligation of Borrower and must be paid out of maintenance charges payable by Borrower's tenant shareholders under their proprietary leases or occupancy agreements.

(iv)    Lender or the receiver, as the case may be, will be entitled to receive a reasonable fee for managing the Mortgaged Property.

(v)    Immediately upon appointment of a receiver or immediately upon Lender's entering upon and taking possession and control of the Mortgaged Property, Borrower will surrender possession of the Mortgaged Property to Lender or the receiver, as the case may be, and will deliver to Lender or the receiver, as the case may be, all documents, records (including records on electronic or magnetic media), accounts, surveys, plans, and specifications relating to the Mortgaged Property and all security deposits and prepaid Rents.

(vi)    If Lender takes possession and control of the Mortgaged Property, then Lender may exclude Borrower and its representatives from the Mortgaged Property.

Borrower acknowledges and agrees that the exercise by Lender of any of the rights conferred under this Section 3 will not be construed to make Lender a mortgagee-in-possession of the Mortgaged Property so long as Lender has not itself entered into actual possession of the Land and Improvements.

(d)    If Lender enters the Mortgaged Property, Lender will be liable to account only to Borrower and only for those Rents actually received. Except to the extent of Lender's gross negligence or willful misconduct, Lender will not be liable to Borrower, anyone claiming under or through Borrower or anyone having an interest in the Mortgaged Property, by reason of any act or omission of Lender under Section 3(c), and Borrower hereby releases and discharges Lender from any such liability to the fullest extent permitted by law.

(e)    If the Rents are not sufficient to meet the costs of taking control of and managing the Mortgaged Property and collecting the Rents, any funds expended by Lender for such purposes will become an additional part of the Indebtedness as provided in Section 7.

(f)     Any entering upon and taking of control of the Mortgaged Property by Lender or the receiver, as the case may be, and any application of Rents as provided in this Instrument will not cure or waive any Event of Default or invalidate any other right or remedy of Lender under applicable law or provided for in this Instrument.

**4.     Assignment of Leases; Leases Affecting the Mortgaged Property.**

(a)     As part of the consideration for the Indebtedness, Borrower absolutely and unconditionally assigns and transfers to Lender all of Borrower's right, title and interest in, to and under the Leases, including Borrower's right, power and authority to modify the terms of any such Lease, or extend or terminate any such Lease.

(i)     It is the intention of Borrower to establish a present, absolute and irrevocable transfer and assignment to Lender of all of Borrower's right, title and interest in, to and under the Leases. Borrower and Lender intend this assignment of the Leases to be immediately effective and to constitute an absolute present assignment and not an assignment for additional security only.

(ii)     For purposes of giving effect to this absolute assignment of the Leases, and for no other purpose, the Leases will not be deemed to be a part of the Mortgaged Property.

(iii)     However, if this present, absolute and unconditional assignment of the Leases is not enforceable by its terms under the laws of the Property Jurisdiction, then the Leases will be included as a part of the Mortgaged Property and it is the intention of Borrower that in this circumstance this Instrument create and perfect a Lien on the Leases in favor of Lender, which Lien will be effective as of the date of this Instrument.

(b)     Until Lender gives Notice to Borrower of Lender's exercise of its rights under this Section 4, Borrower will have all rights, power and authority granted to Borrower under any Lease (except as otherwise limited by this Section or any other provision of this Instrument), including the right, power and authority to modify the terms of any Lease or extend or terminate any Lease. Upon the occurrence of an Event of Default, and during the continuance of such Event of Default, the permission given to Borrower pursuant to the preceding sentence to exercise all rights, power and authority under Leases will automatically terminate. Borrower will comply with and observe Borrower's obligations under all Leases, including Borrower's obligations pertaining to the maintenance and disposition of tenant security deposits.

(c)    (i)    Borrower acknowledges and agrees that the exercise by Lender, either directly or by a receiver, of any of the rights conferred under this Section 4 will not be construed to make Lender a mortgagee-in-possession of the Mortgaged Property so long as Lender has not itself entered into actual possession of the Land and the Improvements.

     (ii)    The acceptance by Lender of the assignment of the Leases pursuant to Section 4(a) will not at any time or in any event obligate Lender to take any action under this Instrument or to expend any money or to incur any expenses.

     (iii)    Except to the extent of Lender's gross negligence or willful misconduct, Lender will not be liable in any way for any injury or damage to person or property sustained by any Person in or about the Mortgaged Property.

     (iv)    Prior to Lender's actual entry into and taking possession of the Mortgaged Property, Lender will not be obligated for any of the following:

       (A)    Lender will not be obligated to perform any of the terms, covenants and conditions contained in any Lease (or otherwise have any obligation with respect to any Lease).

       (B)    Lender will not be obligated to appear in or defend any action or proceeding relating to the Lease or the Mortgaged Property.

       (C)    Lender will not be responsible for the operation, control, care, management or repair of the Mortgaged Property or any portion of the Mortgaged Property. The execution of this Instrument by Borrower will constitute conclusive evidence that all responsibility for the operation, control, care, management and repair of the Mortgaged Property is and will be that of Borrower, prior to such actual entry and taking of possession.

(d)    Upon delivery of Notice by Lender to Borrower of Lender's exercise of Lender's rights under this Section 4 at any time after the occurrence of an Event of Default, and during the continuance of such Event of Default, and without the necessity of Lender entering upon and taking and maintaining control of the Mortgaged Property directly, by a receiver, or by any other manner or proceeding permitted by the laws of the Property Jurisdiction, Lender immediately will have all rights, powers and authority granted to Borrower under any Lease, including the right, power and authority to modify the terms of any such Lease, or extend or terminate any such Lease.

(e)     Borrower will, promptly upon Lender's request, deliver to Lender an executed copy of each residential Lease then in effect.

(f)     If Borrower is a cooperative housing corporation or association, notwithstanding anything to the contrary contained in this Instrument, so long as Borrower remains a cooperative housing corporation or association and is not in breach of any covenant of this Instrument, Lender consents to the following:

    (i)     Borrower may execute leases of apartments for a term in excess of 2 years to a tenant shareholder of Borrower, so long as such leases, including proprietary leases, are and will remain subordinate to the Lien of this Instrument.

    (ii)    Borrower may surrender or terminate such leases of apartments where the surrendered or terminated lease is immediately replaced or where Borrower makes its best efforts to secure such immediate replacement by a newly-executed lease of the same apartment to a tenant shareholder of Borrower. However, no consent is given by Lender to any execution, surrender, termination or assignment of a lease under terms that would waive or reduce the obligation of the resulting tenant shareholder under such lease to pay cooperative assessments in full when due or the obligation of the former tenant shareholder to pay any unpaid portion of such assessments.

**5.     Prepayment Charge.**  Borrower will be required to pay a Prepayment charge in connection with certain prepayments of the Indebtedness, including a payment made after Lender's exercise of any right of acceleration of the Indebtedness, as provided in the Note.

**6.     Application of Payments.**  If at any time Lender receives, from Borrower or otherwise, any amount applicable to the Indebtedness which is less than all amounts due and payable at such time, then Lender may apply that payment to amounts then due and payable in any manner and in any order determined by Lender, in Lender's discretion. Neither Lender's acceptance of an amount that is less than all amounts then due and payable nor Lender's application of such payment in the manner authorized will constitute or be deemed to constitute either a waiver of the unpaid amounts or an accord and satisfaction. Notwithstanding the application of any such amount to the Indebtedness, Borrower's obligations under this Instrument, the Note and all other Loan Documents will remain unchanged.

**7.     Protection of Lender's Security; Instrument Secures Future Advances.**

(a)     If Borrower fails to perform any of its obligations under this Instrument or any other Loan Document, or if any action or proceeding is commenced which

purports to affect the Mortgaged Property, Lender's security or Lender's rights under this Instrument, including eminent domain, insolvency, code enforcement, civil or criminal forfeiture, enforcement of Hazardous Materials Laws, fraudulent conveyance or reorganizations or proceedings involving a bankrupt or decedent, then Lender at Lender's option may make such appearances, file such documents, disburse such sums and take such actions as Lender reasonably deems necessary to perform such obligations of Borrower and to protect Lender's interest, including all of the following:

(i)     Lender may pay Attorneys' Fees and Costs.

(ii)    Lender may pay fees and out-of-pocket expenses of accountants, inspectors and consultants.

(iii)   Lender may enter upon the Mortgaged Property to make Repairs or secure the Mortgaged Property.

(iv)    Lender may procure the Insurance required by the Loan Agreement.

(v)     Lender may pay any amounts which Borrower has failed to pay under the Loan Agreement.

(vi)    Lender may perform any of Borrower's obligations under the Loan Agreement.

(vii)   Lender may make advances to pay, satisfy or discharge any obligation of Borrower for the payment of money that is secured by a Prior Lien.

(b)     Any amounts disbursed by Lender under this Section 7, or under any other provision of this Instrument that treats such disbursement as being made under this Section 7, will be secured by this Instrument, will be added to, and become part of, the principal component of the Indebtedness, will be immediately due and payable and will bear interest from the date of disbursement until paid at the Default Annual Interest Rate.

(c)     Nothing in this Section 7 will require Lender to incur any expense or take any action.

**8.     Events of Default.** An Event of Default under the Loan Agreement will constitute an Event of Default under this Instrument.

**9.     Remedies Cumulative.** Each right and remedy provided in this Instrument is distinct from all other rights or remedies under this Instrument, the Loan Agreement or any other Loan Document or afforded by applicable law or equity, and each will be cumulative and

{215/181/01244886}
**New York**                                                              **Page 14**
**Multifamily Mortgage, Assignment of Rents**
**and Security Agreement**

may be exercised concurrently, independently or successively, in any order. Lender's exercise of any particular right or remedy will not in any way prevent Lender from exercising any other right or remedy available to Lender. Lender may exercise any such remedies from time to time and as often as Lender chooses.

10. **Waiver of Statute of Limitations, Offsets and Counterclaims.** Borrower waives the right to assert any statute of limitations as a bar to the enforcement of the Lien of this Instrument or to any action brought to enforce any Loan Document. Borrower hereby waives the right to assert a counterclaim, other than a compulsory counterclaim, in any action or proceeding brought against it by Lender or otherwise to offset any obligations to make the payments required by the Loan Documents. No failure by Lender to perform any of its obligations under this Instrument will be a valid defense to, or result in any offset against, any payments that Borrower is obligated to make under any of the Loan Documents.

11. **Waiver of Marshalling.**

    (a)    Notwithstanding the existence of any other security interests in the Mortgaged Property held by Lender or by any other party, Lender will have the right to determine the order in which any or all of the Mortgaged Property will be subjected to the remedies provided in this Instrument, the Note, the Loan Agreement or any other Loan Document or under applicable law. Lender will have the right to determine the order in which any or all portions of the Indebtedness are satisfied from the proceeds realized upon the exercise of such remedies.

    (b)    Borrower and any party who now or in the future acquires a security interest in the Mortgaged Property and who has actual or constructive notice of this Instrument waives any and all right to require the marshalling of assets or to require that any of the Mortgaged Property be sold in the inverse order of alienation or that any of the Mortgaged Property be sold in parcels or as an entirety in connection with the exercise of any of the remedies permitted by applicable law or provided in this Instrument.

12. **Reserved.**

13. **Governing Law; Consent to Jurisdiction and Venue.** This Instrument, and any Loan Document which does not itself expressly identify the law that is to apply to it, will be governed by the laws of the Property Jurisdiction. Borrower agrees that any controversy arising under or in relation to the Note, this Instrument or any other Loan Document may be litigated in the Property Jurisdiction. The state and federal courts and authorities with jurisdiction in the Property Jurisdiction will have jurisdiction over all controversies that may arise under or in relation to the Note, any security for the Indebtedness or any other Loan Document. Borrower irrevocably consents to service, jurisdiction and venue of such

courts for any such litigation and waives any other venue to which it might be entitled by virtue of domicile, habitual residence or otherwise. However, nothing in this Section 13 is intended to limit Lender's right to bring any suit, action or proceeding relating to matters under this Instrument in any court of any other jurisdiction.

14.     **Notice.**   All Notices, demands and other communications under or concerning this Instrument will be governed by the terms set forth in the Loan Agreement.

15.     **Successors and Assigns Bound.**  This Instrument will bind the respective successors and assigns of Borrower and Lender, and the rights granted by this Instrument will inure to Lender's successors and assigns.

16.     **Joint and Several Liability.**  If more than one Person signs this Instrument as Borrower, the obligations of such Persons will be joint and several.

17.     **Relationship of Parties; No Third Party Beneficiary.**

(a)     The relationship between Lender and Borrower will be solely that of creditor and debtor, respectively, and nothing contained in this Instrument will create any other relationship between Lender and Borrower. Nothing contained in this Instrument will constitute Lender as a joint venturer, partner or agent of Borrower, or render Lender liable for any debts, obligations, acts, omissions, representations or contracts of Borrower.

(b)     No creditor of any party to this Instrument and no other Person will be a third party beneficiary of this Instrument or any other Loan Document. Without limiting the generality of the preceding sentence, (i) any arrangement ("**Servicing Arrangement**") between Lender and any Loan Servicer for loss sharing or interim advancement of funds will constitute a contractual obligation of such Loan Servicer that is independent of the obligation of Borrower for the payment of the Indebtedness, (ii) Borrower will not be a third party beneficiary of any Servicing Arrangement, and (iii) no payment by the Loan Servicer under any Servicing Arrangement will reduce the amount of the Indebtedness.

18.     **Severability; Amendments.**

(a)     The invalidity or unenforceability of any provision of this Instrument will not affect the validity or enforceability of any other provision, and all other provisions will remain in full force and effect. This Instrument contains the entire agreement among the parties as to the rights granted and the obligations assumed in this Instrument.

(b)     This Instrument may not be amended or modified except by a writing signed by the party against whom enforcement is sought.

{215/181/01244886}
**New York**                                                                                    **Page 16**
**Multifamily Mortgage, Assignment of Rents**
**and Security Agreement**

19. **Construction.**

  (a)  The captions and headings of the Sections of this Instrument are for convenience only and will be disregarded in construing this Instrument. Any reference in this Instrument to a "Section" will, unless otherwise explicitly provided, be construed as referring to a Section of this Instrument.

  (b)  Any reference in this Instrument to a statute or regulation will be construed as referring to that statute or regulation as amended from time to time.

  (c)  Use of the singular in this Instrument includes the plural and use of the plural includes the singular. The use of one gender includes the other gender, as the context may require.

  (d)  As used in this Instrument, the term "including" means "including, but not limited to" and the term "includes" means "includes without limitation."

  (e)  Unless the context requires otherwise, (i) any definition of or reference to any agreement, instrument or other document in this Instrument will be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth in this Instrument), and (ii) any reference in this Instrument to any Person will be construed to include such Person's successors and assigns.

  (f)  Any reference in this Instrument to "Lender's requirements," "as required by Lender," or similar references will be construed, after Securitization, to mean Lender's requirements or standards as determined in accordance with Lender's and Loan Servicer's obligations under the terms of the Securitization documents.

20. **Subrogation.** If, and to the extent that, the proceeds of the Loan evidenced by the Note, or subsequent advances under Section 7, are used to pay, satisfy or discharge a Prior Lien, such loan proceeds or advances will be deemed to have been advanced by Lender at Borrower's request, and Lender will automatically, and without further action on its part, be subrogated to the rights, including Lien priority, of the owner or holder of the obligation secured by the Prior Lien, whether or not the Prior Lien is released.

**END OF UNIFORM COVENANTS; STATE-SPECIFIC PROVISIONS FOLLOW**

21-30. **Reserved.**

31. **Acceleration; Remedies.**

(a) At any time after the occurrence of an Event of Default, Lender, at Lender's option, may declare the Indebtedness to be immediately due and payable without further demand, and may foreclose this Instrument by judicial or nonjudicial proceedings, will be entitled to the appointment of a receiver, without notice, and may invoke any other remedies permitted by New York law or provided in this Instrument, the Loan Agreement or in any other Loan Document.

(b) Lender may, at Lender's option, also foreclose this Instrument for any portion of the Indebtedness which is then due and payable, subject to the continuing Lien of this Instrument for the balance of the Indebtedness.

(c) Lender will be entitled to collect all costs and expenses allowed by New York law, including Attorneys' Fees and Costs, costs of documentary evidence, abstracts, title reports, statutory costs and any additional allowance made pursuant to Section 8303 of the Civil Practice Law and Rules.

(d) The rights and remedies of Lender specified in this Instrument will be in addition to Lender's rights and remedies under New York law, specifically including Section 254 of the Real Property Law. In the event of any conflict between the provision of this Instrument, the Loan Agreement and the provisions of Section 254 of the Real Property Law, the provisions of this Instrument and the Loan Agreement will control. Notwithstanding anything contained in this Instrument, it is specifically acknowledged that the provisions of subsection 4 of Section 254 of the Real Property Law covering the insurance of buildings against loss by fire will not apply to this Instrument or the Loan Agreement.

**32.** **Satisfaction of Debt.** Upon payment of the Indebtedness, Lender will discharge this Instrument. If it is the practice of the industry at the time the Indebtedness is paid to assign, rather than discharge, a mortgage, then at Borrower's request, Lender will assign Lender's interest in this Instrument, together with the Note or notes secured by this Instrument, to a Person specified by Borrower in writing to Lender. Lender will make any such assignment without recourse to Lender, using Lender's then-current form of assignment. If any original note is lost or destroyed, Lender will provide a lost note affidavit, which will provide that Lender will have no liability for such loss or destruction. Borrower will pay Lender's reasonable costs incurred in discharging or assigning this Instrument, as applicable.

**33.** **Lien Law.** Borrower will receive advances under this Instrument subject to the trust fund provisions of Section 13 of the Lien Law.

**34.** **Maximum Principal Amount.** Notwithstanding any provision set forth in this Instrument to the contrary, the maximum amount of principal indebtedness secured by this Instrument at execution, or which under any contingency may become secured by this Instrument at any time hereafter, is **$1,750,000.00**, plus all interest payable under the

Note and all amounts expended by Lender after an Event of Default for all of the following:

(a)     For the payment of taxes, charges or assessments which may be imposed by legal requirements upon the Mortgaged Property.

(b)     To maintain the insurance required under the Loan Agreement.

(c)     For any expenses incurred in maintaining the Mortgaged Property and upholding the Lien of this Instrument, including the expense of any litigation to prosecute or defend the rights and Lien created by this Instrument.

(d)     For any amount, cost or charge to which Lender becomes subrogated, upon payment, whether under recognized principles of law or equity, or under express statutory authority, together with interest on all of the foregoing amounts at the Default Rate (as defined in the Note).

35.     **Section 291-F of the Real Property Law.** In addition to any other right or remedy contained in this Instrument, the Loan Agreement or in any other Loan Document, Lender will have all the rights against lessees of all or any part of the Mortgaged Property as are set forth in Section 291-f of the Real Property Law of New York.

36.     **Transfer Tax Provisions.** Borrower covenants and agrees to each of the following:

(a)     In the event of a sale of the Mortgaged Property or other Transfer, Borrower will duly complete, execute and deliver to Lender, contemporaneously with the submission to the applicable taxing authority or recording officer, all forms and supporting documentation required by such taxing authority or recording officer to estimate and fix any and all applicable state and local real estate transfer taxes (collectively "**Transfer Taxes**") assessable by reason of such sale or other Transfer or recording of the deed evidencing such sale or other Transfer.

(b)     Borrower will pay all Transfer Taxes that may hereafter become due and payable with respect to any Transfer, and if Borrower fails to pay any such Transfer Taxes, Lender may pay such Transfer Taxes and the amount of such payment will be added to the Indebtedness and, unless incurred in connection with a foreclosure of this Instrument, be secured by this Instrument.

The provisions of this Section will survive any Transfer and the delivery of the deed in connection with any Transfer.

37.     **WAIVER OF TRIAL BY JURY.**

{215/181/01244886}
**New York**
**Multifamily Mortgage, Assignment of Rents**
**and Security Agreement**

**Page 19**

    (a)       **BORROWER AND LENDER EACH COVENANTS AND AGREES NOT TO ELECT A TRIAL BY JURY WITH RESPECT TO ANY ISSUE ARISING OUT OF THIS INSTRUMENT OR THE RELATIONSHIP BETWEEN THE PARTIES AS BORROWER AND LENDER THAT IS TRIABLE OF RIGHT BY A JURY.**

    (b)       **BORROWER AND LENDER EACH WAIVES ANY RIGHT TO TRIAL BY JURY WITH RESPECT TO SUCH ISSUE TO THE EXTENT THAT ANY SUCH RIGHT EXISTS NOW OR IN THE FUTURE. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS SEPARATELY GIVEN BY EACH PARTY, KNOWINGLY AND VOLUNTARILY WITH THE BENEFIT OF COMPETENT LEGAL COUNSEL.**

**38.**    **Attached Riders.** The following Riders are attached to this Instrument: **NONE**

**39.**    **Attached Exhibits.** The following Exhibits, if marked with an "X" in the space provided, are attached to this Instrument:

☒    Exhibit A    Description of the Land (required)
☐    Exhibit B    Modifications to Instrument
☐    Exhibit C    Ground Lease Description (if applicable)

**REMAINDER OF PAGE INTENTIONALLY LEFT BLANK**

IN WITNESS WHEREOF, Borrower has signed and delivered this Instrument or has caused this Instrument to be signed and delivered by its duly authorized representative.

**BORROWER:**

**KUNBA LLC**, a New York limited liability company

By: _____
Name:    Robert Khomari
Title:    Manager

STATE OF NEW YORK         )
                                      )ss.:

COUNTY OF _____  )


      On the _____ day of **February**, in the year **2019**, before me, the undersigned personally appeared **ROBERT KHOMARI**, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

 

                                                     _____

                                                   **NOTARY PUBLIC**

# EXHIBIT A

## DESCRIPTION OF THE LAND

**ALL** that certain plot, piece or parcel of land, situate, lying and being in the Borough and County of Bronx, City and State of New York, bounded and described as follows:

**BEGINNING** at a point on the southerly side of 162nd Street, distant 264.45 feet westerly at the corner formed by the intersection of the southerly side of 162nd Street with the westerly side of Elton Avenue;

**RUNNING THENCE** southerly at right angles to said southerly side of 162nd Street, 100 feet;

**THENCE** westerly parallel with the southerly side of 162nd Street, 25 feet;

**THENCE** northerly and again at right angles to the southerly side of 162nd Street and part of the distance through a party wall, 100 feet to the southerly side of 162nd Street;

**THENCE** easterly to said southerly side of 162nd Street, 25 feet to the point or place of **BEGINNING**.

**SAID** premises being known as 430 East 162nd Street, Bronx, New York.

# CONSOLIDATION, EXTENSION
## AND
# MODIFICATION AGREEMENT

## NEW YORK

**(Revised 3-22-2016)**

**When Recorded, Return To:**

**Abruzzo & Kinn LLP**
**170 Old Country Road, Suite 315**
**Mineola, New York 11501-4310**
**Attention: Nadia A. Popatia, Esq.**

Record & Return To:
Madison Abstract Inc.
670 White Plains Road, Suite 121
Scarsdale, NY 10583
Title No. BX18 19597

{215/181/01244886}
**Consolidation, Extension and Modification Agreement**

| **NYC DEPARTMENT OF FINANCE** **OFFICE OF THE CITY REGISTER** |  |
|---|---|

2019021900976007001S7F21

| **SUPPORTING DOCUMENT COVER PAGE** | | **PAGE 1 OF 1** |
|---|---|---|
| **Document ID: 2019021900976007** Document Type: AGREEMENT | Document Date: 02-07-2019 | Preparation Date: 02-20-2019 |

**SUPPORTING DOCUMENTS SUBMITTED:**

Page Count

255 MORTGAGE TAX EXEMPT AFFIDAVIT                                    3

Freddie Mac Loan Number: **501841342**
Property Name: **430 East 162nd Street**

## 255 AFFIDAVIT

STATE OF NEW YORK    )
                          ) ss.:
COUNTY OF New York  )

     **ROBERT KHOMARI**, the manager of **KUNBA LLC**, a New York limited liability company (the "Mortgagor"), being duly sworn, deposes and says that I am familiar with the following facts:

          1.     That the mortgages set forth on **SCHEDULE A** hereto securing the aggregate principal amount of **$1,750,000.00** owned or held by **CPC MORTGAGE COMPANY LLC**, a limited liability company, organized and existing under the laws of New York ("Mortgagee"), were duly recorded and that all mortgage recording tax payable thereon has been paid.

          2.     That a Consolidation, Extension and Modification Agreement dated as of **February 7, 2019** by and between Mortgagor and Mortgagee is being tendered herewith for recording in the Office of the Register of the City of **New York**, Borough and County of the **Bronx**, State of **New York** and that no mortgage recording tax is payable thereon.

          3.     That the Consolidation, Extension and Modification Agreement herewith submitted for recording does not create or secure any new or further indebtedness other than the principal indebtedness or obligation secured by, or which under any contingency may be secured by the mortgages described in Paragraph 1 hereof.

          4.     That this affidavit is being made pursuant to Section 255 of the Tax Law of the State of New York for the purpose of claiming exemption from any additional tax on recording of the Consolidation, Extension and Modification Agreement being submitted herewith.

               **[BALANCE OF PAGE INTENTIONALLY LEFT BLANK]**

## SCHEDULE A

### SCHEDULE OF MORTGAGES

A.    Substitute Mortgage A in the original principal amount of $1,075,000.00 made by Kunba LLC to Signature Bank, dated as of February 7, 2019 and to be recorded in the Office of the Register of the City of New York, Borough and County of the Bronx, State of New York; *DOCUMENT I.O. 2019021900976002*

Which above mortgage A was assigned in the principal amount of $1,075,000.00 by Assignment of Mortgage made by Signature Bank to CPC Mortgage Company LLC, executed February 7, 2019, dated and effective as of February 7, 2019 and to be recorded in the Office of said Register; and

B.    Gap Multifamily Mortgage, Assignment of Rents and Security Agreement in the original principal amount of $675,000.00 made by Kunba LLC to CPC Mortgage Company LLC, dated as of February 7, 2019 and to be recorded in the Office of said Register.

*DOCUMENT I.D. 2019021900976006*    *TAX PAID $18,900.00*

PRIOR HISTORY OF MORTGAGES
FOR INFORMATION ONLY:

*Consolidates substitute Mortgage A AND GAP MORTGAGE B to form A single lien of $1,750,000.00*

A.    First Mortgage, Spreader and Security Agreement in the original principal amount of $2,700,000.00 made by Double Salt LLC, 3rd Avenue Heights LLC and Kunba LLC to Signature Bank, dated as of November 15, 2013 and recorded January 6, 2014 as CRFN 2014000004114 in the Office of the Register of the City of New York, Borough and County of the Bronx, State of New York;

Which above mortgage A was severed and split by that certain Note and Mortgage Severance and Splitter Agreement made by and between Double Salt LLC, 3rd Avenue Heights LLC, Kunba LLC and Signature Bank, dated as of February 7, 2019 and to be recorded in the Office of said Register ("Agreement"); said Agreement severed and split the above mortgage into two separate and distinct liens in the amounts of:

(a) $1,075,000.00, encumbering the property known as 430 East 162nd Street, Bronx, New York, Block 2383 Lot 18 (Parcel I), which is evidenced by Substitute Mortgage A made by Kunba LLC to Signature Bank, dated as of February 7, 2019 and to be recorded in the Office of said Register; and

(b) $1,360,421.90, encumbering the properties known as 501 East 176th Street, Bronx, New York (Block 2924 Lot 1), 1170-1174 Shakespeare Avenue, Bronx, New York (Block 2506 Lot 5), 1285 Shakespeare Avenue, Bronx, New York (Block 2519 Lot 26) (collectively, Parcel II), which is evidenced by Substitute Mortgage B made by Double Salt LLC and 3rd Avenue Heights LLC to Signature Bank, dated as of February 7, 2019 and to be recorded in the Office of said Register.

**ROBERT KHOMARI**, *MANAGER*

Sworn to before me this
6 day of February, 2019

**NOTARY PUBLIC**

JOEL SANDER
Notary Public, State of New York
Registration #01SA6332466
Qualified In Kings County
Commission Expires Nov. 2, 2019

SEAL

{215/181/01244881}
**Section 255 Affidavit**

**Page S-1**

Freddie Mac Loan Number: **501841342**
Property Name: **430 East 162nd Street**

## 255 AFFIDAVIT

STATE OF NEW YORK    )
                        ) ss.:
COUNTY OF *New York*  )

      **ROBERT KHOMARI**, the manager of **KUNBA LLC**, a New York limited liability company (the "Mortgagor"), being duly sworn, deposes and says that I am familiar with the following facts:

          1.     That the mortgages set forth on **SCHEDULE A** hereto securing the aggregate principal amount of **$1,750,000.00** owned or held by **CPC MORTGAGE COMPANY LLC**, a limited liability company, organized and existing under the laws of New York ("Mortgagee"), were duly recorded and that all mortgage recording tax payable thereon has been paid.

          2.     That a Consolidation, Extension and Modification Agreement dated as of **February 7, 2019** by and between Mortgagor and Mortgagee is being tendered herewith for recording in the Office of the Register of the City of **New York**, Borough and County of the **Bronx**, State of **New York** and that no mortgage recording tax is payable thereon.

          3.     That the Consolidation, Extension and Modification Agreement herewith submitted for recording does not create or secure any new or further indebtedness other than the principal indebtedness or obligation secured by, or which under any contingency may be secured by the mortgages described in Paragraph 1 hereof.

          4.     That this affidavit is being made pursuant to Section 255 of the Tax Law of the State of New York for the purpose of claiming exemption from any additional tax on recording of the Consolidation, Extension and Modification Agreement being submitted herewith.

**[BALANCE OF PAGE INTENTIONALLY LEFT BLANK]**

## SCHEDULE A

### SCHEDULE OF MORTGAGES

A.    Substitute Mortgage A in the original principal amount of $1,075,000.00 made by Kunba LLC to Signature Bank, dated as of February 7, 2019 and to be recorded in the Office of the Register of the City of New York, Borough and County of the Bronx, State of New York; *Document I.O. 2019021900976002*

Which above mortgage A was assigned in the principal amount of $1,075,000.00 by Assignment of Mortgage made by Signature Bank to CPC Mortgage Company LLC, executed February 7, 2019, dated and effective as of February 7, 2019 and to be recorded in the Office of said Register; and

B.    Gap Multifamily Mortgage, Assignment of Rents and Security Agreement in the original *Tax paid $18,900.00* principal amount of $675,000.00 made by Kunba LLC to CPC Mortgage Company LLC, *Document I.O. 2019021900976006* dated as of February 7, 2019 and to be recorded in the Office of said Register.

PRIOR HISTORY OF MORTGAGES
FOR INFORMATION ONLY:    *Consolidates Substitute Mortgage A and Gap Mortgage B to form a single lien of $1,750,000.00*

A.    First Mortgage, Spreader and Security Agreement in the original principal amount of $2,700,000.00 made by Double Salt LLC, 3rd Avenue Heights LLC and Kunba LLC to Signature Bank, dated as of November 15, 2013 and recorded January 6, 2014 as CRFN 2014000004114 in the Office of the Register of the City of New York, Borough and County of the Bronx, State of New York;

Which above mortgage A was severed and split by that certain Note and Mortgage Severance and Splitter Agreement made by and between Double Salt LLC, 3rd Avenue Heights LLC, Kunba LLC and Signature Bank, dated as of February 7, 2019 and to be recorded in the Office of said Register ("Agreement"); said Agreement severed and split the above mortgage into two separate and distinct liens in the amounts of:

(a) $1,075,000.00, encumbering the property known as 430 East 162nd Street, Bronx, New York, Block 2383 Lot 18 (Parcel I), which is evidenced by Substitute Mortgage A made by Kunba LLC to Signature Bank, dated as of February 7, 2019 and to be recorded in the Office of said Register; and

(b) $1,360,421.90, encumbering the properties known as 501 East 176th Street, Bronx, New York (Block 2924 Lot 1), 1170-1174 Shakespeare Avenue, Bronx, New York (Block 2506 Lot 5), 1285 Shakespeare Avenue, Bronx, New York (Block 2519 Lot 26) (collectively, Parcel II), which is evidenced by Substitute Mortgage B made by Double Salt LLC and 3rd Avenue Heights LLC to Signature Bank, dated as of February 7, 2019 and to be recorded in the Office of said Register.

ROBERT KHOMARI, MANAGER

Sworn to before me this
___ day of February, 2019

NOTARY PUBLIC

JOEL SANDER
Notary Public, State of New York
Registration #01SA6332466
Qualified In Kings County
Commission Expires Nov. 2, 2019

SEAL

EXHIBIT E



Guaranty - SBL (Revised 10-18-2018)

| | |
|---|---|
| **Freddie Mac Loan Number:** | **501841342** |
| **Property Name:** | **430 East 162nd Street** |

| | |
|---|---|
| **Guarantor:** | **ROBERT KHOMARI** |
| **Borrower:** | **KUNBA LLC**, a New York limited liability company |
| **Lender:** | **CPC MORTGAGE COMPANY LLC**, a New York limited liability company |
| **Effective Date:** | **February 7, 2019** |

| | |
|---|---|
| **Principal Amount:** | **$1,750,000.00** |
| **Property Jurisdiction (Location of the Mortgaged Property):** | **Borough and County of the Bronx, City and State of New York** |

This Guaranty ("**Guaranty**") is entered into by Guarantor (collectively, if more than one) for the benefit of Lender and is effective as of the Effective Date.

Borrower has requested a loan in the Principal Amount ("**Loan**") from Lender under a Loan Agreement dated as of the Effective Date ("**Loan Agreement**"). The Loan will be evidenced by a Note from Borrower to Lender dated as of the Effective Date ("**Note**"). The Note will be secured by a Security Instrument dated as of the Effective Date encumbering the Mortgaged Property described in the Loan Agreement.

Guarantor has a direct or indirect ownership or other financial interest in Borrower and/or will otherwise derive a material benefit from the making of the Loan.  Guarantor has reviewed the Loan Agreement, Note, and each of the other Loan Documents. As a condition to making the Loan to Borrower, Lender requires that Guarantor execute this Guaranty.

1.  **Schedules, Exhibits, and Riders**. The following marked schedules, exhibits, and riders are attached to and incorporated into this Guaranty:

    | ☒ | Schedule I – State Specific Provisions by Property Jurisdiction |
    |---|---|
    | ☐ | Exhibit A – Guaranty Modifications |
    | ☐ | Riders: [if checked, list] |

2.  **Defined Terms.** Capitalized terms used but not defined in this Guaranty have the meanings assigned to them in the Loan Agreement.

3.  **Scope of Guaranty.**

    (a)  Guarantor absolutely, unconditionally, and irrevocably guarantees to Lender each of the following:

      (i)  The full and prompt payment when due, whether at the Maturity Date or earlier, by reason of acceleration or otherwise, of all amounts for which Borrower is personally liable under Article III of the Loan Agreement.

      (ii)  The full and prompt payment and performance of, and/or compliance with, all of Borrower's obligations under Section 3.04(a) of the Loan Agreement.

      (iii)  The accuracy of Borrower's representations and warranties under Section 5.05 of the Loan Agreement.

     (iv)    All costs and expenses, including reasonable Attorneys' Fees and Costs, incurred by Lender in enforcing its rights under this Guaranty.

    (b)    If Guarantor is not liable for the entire Indebtedness, then all payments made by Borrower and all amounts received by Lender from the enforcement of its rights under the Loan Documents (except this Guaranty) will be applied first to the portion of the Indebtedness for which neither Borrower nor Guarantor has personal liability.

**4.**    **Financial Information and Litigation.** Within 25 days following a Notice from Lender including a request for such information, Guarantor will deliver the following to Lender:

    (a)    Guarantor's balance sheet and profit and loss statement as of the date specified by Lender.

    (b)    Other Guarantor financial statements as Lender may reasonably require.

    (c)    Written updates on the status of all litigation proceedings that Guarantor disclosed or should have disclosed to Lender as of the Effective Date of this Guaranty.

    (d)    If an Event of Default has occurred and is continuing, copies of Guarantor's state and federal tax returns, including current tax return extensions.

**5.**    **Guarantor's Obligations Survive Foreclosure.**  The obligations of Guarantor under this Guaranty will survive any foreclosure proceeding, any foreclosure sale, any delivery of any deed in lieu of foreclosure, and any release of record of the Security Instrument.  In addition, the obligations of Guarantor relating to Borrower's representations and warranties under Section 5.05 of the Loan Agreement, and Borrower's obligations under Sections 6.12 and 9.02(b) of the Loan Agreement will survive any repayment or discharge of the Indebtedness. Notwithstanding the foregoing, if Lender has never been a mortgagee-in-possession of or held title to the Mortgaged Property, Guarantor will have no obligation under this Guaranty relating to Borrower's representations and warranties under Section 5.05 of the Loan Agreement or Borrower's obligations relating to environmental matters under Sections 6.12 and 9.02(b) of the Loan Agreement after the date of the release of record of the lien of the Security Instrument as a result of the payment in full of the Indebtedness on the Maturity Date or by voluntary Prepayment in full.

**6.**    **Guaranty of Payment and Performance.** Guarantor's obligations under this Guaranty constitute an unconditional guaranty of payment and performance and not merely a guaranty of collection.

**7.**    **No Demand by Lender Necessary; Waivers by Guarantor.** The obligations of Guarantor under this Guaranty must be performed without demand by Lender and will be unconditional regardless of the genuineness, validity, regularity or enforceability of the Note, the Loan Agreement, the Security Instrument or any other Loan Document, and without regard to any other circumstance which might otherwise constitute a legal or equitable discharge of a surety, a guarantor, a borrower or a mortgagor. Guarantor waives, to the fullest extent permitted by applicable law, all of the following, and agrees that such waiver has the following consequences:

    (a)    The benefit of all principles or provisions of law, statutory or otherwise, which are or might be in conflict with the terms of this Guaranty; Guarantor agrees that Guarantor's obligations will not be affected by any circumstances, whether or not referred to in this Guaranty, which might otherwise constitute a legal or equitable discharge of a surety, a guarantor, a borrower or a mortgagor.

    (b)    The benefits of any right of discharge under any and all statutes or other laws relating to a guarantor, a surety, a borrower or a mortgagor, and any other rights of a surety, a guarantor, a borrower or a mortgagor under such statutes or laws.

    (c)    Diligence in collecting the Indebtedness, presentment, demand for payment, protest, all notices with respect to the Note and this Guaranty which may be required by statute, rule of law or

otherwise to preserve Lender's rights against Guarantor under this Guaranty, including notice of acceptance, notice of any amendment of the Loan Documents, notice of the occurrence of any default or Event of Default, notice of intent to accelerate, notice of acceleration, notice of dishonor, notice of foreclosure, notice of protest, and notice of the incurring by Borrower of any obligation or indebtedness.

(d)     All rights to cause a marshalling of the Borrower's assets or to require Lender to do any of the following:

(i)     Proceed against Borrower or any other guarantor of Borrower's payment or performance with respect to the Indebtedness ("**Other Guarantor**").

(ii)    Proceed against any general partner of Borrower or any Other Guarantor if Borrower or any Other Guarantor is a partnership.

(iii)   Proceed against or exhaust any collateral held by Lender to secure the repayment of the Indebtedness.

(iv)    Pursue any other remedy it may now or later have against Borrower, or, if Borrower is a partnership, any general partner of Borrower.

(e)     Any right to object to the timing, manner or conduct of Lender's enforcement of its rights under any of the Loan Documents.

(f)     Any right to revoke this Guaranty as to any future advances made by Lender under the terms of the Loan Documents to protect Lender's interest in the Mortgaged Property.

(g)     Any right to demand or require collateral security from Borrower, any Other Guarantor or any other Person as provided by applicable law or otherwise.

8.  **Modification of Loan Documents.** At any time or from time to time and any number of times, without Notice to Guarantor and without affecting the liability of Guarantor, all of the following will apply:

(a)     Lender may extend the time for payment of the Principal of or interest on the Indebtedness or renew the Indebtedness in whole or in part.

(b)     Lender may extend the time for Borrower's performance of or compliance with any covenant or agreement contained in the Loan Documents, whether presently existing or entered into after the Effective Date of this Guaranty, or waive such performance or compliance.

(c)     Lender may accelerate the Maturity Date.

(d)     Lender and Borrower may modify or amend any of the Loan Documents in any respect, including an increase in the Principal.

(e)     Lender may modify, exchange, surrender or otherwise deal with any security for the Indebtedness or accept additional security that is pledged or mortgaged for the Indebtedness.

9.  **Joint and Several Liability.** The obligations of Guarantor (and each party named as a Guarantor in this Guaranty) and any Other Guarantor will be joint and several. Lender, in its sole and absolute discretion, may take any of the following actions:

(a)     Bring suit against Guarantor, or any one or more of the parties named as a Guarantor in this Guaranty, and any Other Guarantor, jointly and severally, or against any one or more of them.

(b)    Compromise or settle with Guarantor, any one or more of the parties named as a Guarantor in this Guaranty, or any Other Guarantor, for such consideration as Lender may deem proper.

(c)    Release one or more of the parties named as a Guarantor in this Guaranty, or any Other Guarantor, from liability.

(d)    Otherwise deal with Guarantor and any Other Guarantor, or any one or more of them, in any manner.

No action of Lender described in this Section 9 will affect or impair the rights of Lender to collect from any one or more of the parties named as a Guarantor under this Guaranty any amount guaranteed by Guarantor under this Guaranty.

10.    **Subordination of Borrower's Indebtedness to Guarantor.** Any indebtedness of Borrower held by Guarantor now or in the future is and will be subordinated to the Indebtedness and Guarantor will collect, enforce and receive any such indebtedness of Borrower as trustee for Lender, but without reducing or affecting in any manner the liability of Guarantor under the other provisions of this Guaranty.

11.    **Waiver of Subrogation.** Guarantor will have no right of, and waives any claim for, subrogation or reimbursement against Borrower or any general partner of Borrower by reason of any payment by Guarantor under this Guaranty, whether such right or claim arises at law or in equity or under any contract or statute, until the Indebtedness has been paid in full and there has expired the maximum possible period thereafter during which any payment made by Borrower to Lender with respect to the Indebtedness could be deemed a preference under the Bankruptcy Code.

12.    **Preference.** If any payment by Borrower is held to constitute a preference under any bankruptcy, insolvency, or similar laws, or if for any other reason Lender is required to refund any sums to Borrower, such refund will not constitute a release of any liability of Guarantor under this Guaranty. It is the intention of Lender and Guarantor that Guarantor's obligations under this Guaranty will not be discharged except by Guarantor's performance of such obligations and then only to the extent of such performance.

13.    **Foreign Entity or Citizen Guarantor, or US Citizen Guarantor Residing Outside of the US.** This Section 13 will only apply to a Guarantor that is (i) an entity formed outside the United States, (ii) an individual who is not a citizen or permanent legal resident of the United States, or (iii) a citizen of the United States whose primary residence is outside the United States.

(a)    During the term of the Loan, Guarantor must maintain at all times a minimum balance of at least 5% of the Principal Amount of the Loan in a U.S. federally insured banking institution acceptable to Lender in its sole discretion ("**Minimum U.S. Deposit**"). Within 120 days after the end of each calendar year, Guarantor must provide Lender with copies of bank statements, and such other documentation as Lender may require, evidencing the Minimum U.S. Deposit.

(b)    Guarantor irrevocably consents to the service of process in any suit, action or other legal proceeding relating to this Guaranty and naming Guarantor by service to the process agent identified in Section 26 of this Guaranty ("**Process Agent**") at the address provided by Guarantor in Section 26. Guarantor irrevocably appoints Process Agent as its true and lawful agent and attorney-in-fact to accept such service of process on behalf of Guarantor.

(i)    Guarantor agrees that the failure of Process Agent to give notice to Guarantor of such service of process will not impair or affect the validity of such service or of any judgment based on such service.

(ii)    If Process Agent is no longer able to act as Guarantor's agent for service of process for any reason, Guarantor will (i) within 10 days after the existing Process Agent is no longer able to act as Guarantor's agent for service of process, appoint a substitute Process Agent acceptable to Lender; such substitute Process Agent will thereafter be deemed to

be the Process Agent under this Guaranty, and (ii) immediately provide Lender with Notice of the appointment of the substitute Process Agent along with the substitute Process Agent's Notice address.

(iii)   Nothing in this Section 13 will limit or affect the right of Lender to serve legal process to Guarantor in any other manner permitted by law or to bring any suit, action or proceeding against Guarantor or Guarantor's assets in the courts of any other jurisdiction.

**14.    Term of Existence.**

(a)   This Section 14 will only apply to a Guarantor that is an entity whose term of existence expires prior to the Maturity Date ("**Expiring Guarantor**").

(b)   At least 6 months prior to the expiration of its term of existence ("**Term**"), Expiring Guarantor must do one of the following:

(i)   Extend its Term to a date that is at least 6 months after the Maturity Date ("**Extension**") and provide Lender with Notice of the Extension and copies of the organizational document(s) which evidence the Extension.

(ii)   Cause one or more Persons who individually or collectively, as applicable, is/are acceptable to Lender, in Lender's discretion, to execute and deliver to Lender a guaranty in the same form as this Guaranty, without any cost or expense to Lender.

(iii)   Deliver to Lender a letter of credit ("**Term Extension Letter of Credit**"), or other collateral acceptable to Lender, in Lender's discretion, as collateral security for the Loan ("**Guaranty Collateral**"). If Guarantor delivers the Term Extension Letter of Credit, it must be in an amount equal to five times the Principal Amount and must be acceptable to Lender in its discretion.

(c)   If Guarantor provides the Term Extension Letter of Credit, Guarantor must ensure that the Term Extension Letter of Credit remains in force and effect until the Maturity Date. Guarantor must renew the Term Extension Letter of Credit no less than 30 days prior to each applicable expiration date; if Guarantor fails to so renew the Term Extension Letter of Credit, Lender may draw upon the Term Extension Letter of Credit and hold the proceeds of the Term Extension Letter of Credit as Guaranty Collateral.

(d)   Following a claim against Guarantor under this Guaranty, Lender may draw on the Term Extension Letter of Credit or the Guaranty Collateral and apply the proceeds to satisfy the portion of such claim that is covered by the amount of the proceeds. Guarantor will remain fully liable for any portion of the claim that exceeds the amount of the Term Extension Letter of Credit or the Guaranty Collateral.

(e)   After the Indebtedness is paid in full, Lender will release the Term Extension Letter of Credit or the Guaranty Collateral, as applicable, to Expiring Guarantor or its designee, or if no designee was identified and Expiring Guarantor is no longer in existence, to Borrower.

**15.    Community Property.** If Guarantor (or any Guarantor, if more than one) is a married person, and the state of residence of Guarantor or Guarantor's spouse ("**Guarantor Spouse**") is a community property jurisdiction, then each of the following apply:

(a)   Guarantor (or each such married Guarantor, if more than one) agrees that Lender may satisfy Guarantor's obligations under this Guaranty to the extent of all Guarantor's separate property and against the marital community property of Guarantor and Guarantor Spouse.

(b)    If Guarantor Spouse is not also a Guarantor of the Loan, Guarantor certifies that none of the assets shown on his or her financial statements submitted to Lender for purposes of underwriting the Loan were either (i) Guarantor Spouse's individual property, or (ii) community property under the sole management, control, and disposition of Guarantor Spouse.

(c)    If Guarantor Spouse is not also a Guarantor of this loan and Guarantor or Guarantor Spouse's state of residence is Alaska, Arizona, Idaho, Louisiana, Nevada, New Mexico, Washington, or Wisconsin, Guarantor has caused Guarantor Spouse to acknowledge this Guaranty as required on the signature page of this Guaranty.

16.    **Assignment.** Lender may assign its rights under this Guaranty in whole or in part and upon any such assignment, all of the terms and provisions of this Guaranty will inure to the benefit of such assignee to the extent so assigned. The terms used to designate any of the parties in this Guaranty will be deemed to include the heirs, legal representatives, successors and assigns of such parties, and the term "Lender" will also include any lawful owner, holder or pledgee of the Note.

17.    **Complete and Final Agreement.** This Guaranty and the other Loan Documents represent the final agreement between the parties and may not be contradicted by evidence of prior, contemporaneous or subsequent oral agreements. There are no unwritten oral agreements between the parties. All prior or contemporaneous agreements, understandings, representations, and statements, oral or written, are merged into this Guaranty and the other Loan Documents. Guarantor acknowledges that Guarantor has received a copy of the Note and all other Loan Documents. Neither this Guaranty nor any of its provisions may be waived, modified, amended, discharged or terminated except by a writing signed by the party against which the enforcement of the waiver, modification, amendment, discharge or termination is sought, and then only to the extent set forth in that writing.

18.    **Governing Law.** This Guaranty will be governed by and enforced in accordance with the laws of the Property Jurisdiction, without giving effect to the choice of law principles of the Property Jurisdiction that would require the application of the laws of a jurisdiction other than the Property Jurisdiction.

19.    **Jurisdiction; Venue.** Guarantor agrees that any controversy arising under or in relation to this Guaranty may be litigated in the Property Jurisdiction, and that the state and federal courts and authorities with jurisdiction in the Property Jurisdiction will have jurisdiction over all controversies which will arise under or in relation to this Guaranty. Guarantor irrevocably consents to service, jurisdiction and venue of such courts for any such litigation and waives any other venue to which it might be entitled by virtue of domicile, habitual residence or otherwise. However, nothing in this Guaranty is intended to limit Lender's right to bring any suit, action or proceeding relating to matters arising under this Guaranty against Guarantor or any of Guarantor's assets in any court of any other jurisdiction.

20.    **Guarantor's Interest in Borrower.** Guarantor represents to Lender that Guarantor has a direct or indirect ownership or other financial interest in Borrower and/or will otherwise derive a material financial benefit from the making of the Loan.

21.    **State-Specific Provisions.** State-specific provisions, if any, for the Property Jurisdiction identified on Page 1 of this Guaranty are included on Schedule 1 to this Guaranty.

22.    **WAIVER OF TRIAL BY JURY.**

(a)    **GUARANTOR AND LENDER EACH COVENANTS AND AGREES NOT TO ELECT A TRIAL BY JURY WITH RESPECT TO ANY ISSUE ARISING OUT OF THIS GUARANTY OR THE RELATIONSHIP BETWEEN THE PARTIES AS GUARANTOR AND LENDER THAT IS TRIABLE OF RIGHT BY A JURY.**

(b)    **GUARANTOR AND LENDER EACH WAIVES ANY RIGHT TO TRIAL BY JURY WITH RESPECT TO SUCH ISSUE TO THE EXTENT THAT ANY SUCH RIGHT EXISTS NOW OR IN THE FUTURE. EACH PARTY SEPARATELY GIVES THIS WAIVER OF RIGHT TO TRIAL BY**

JURY KNOWINGLY AND VOLUNTARILY WITH THE BENEFIT OF COMPETENT LEGAL COUNSEL.

23.    **Construction; Interpretation.**

(a)    The captions and headings of the Sections of this Guaranty are for convenience only and will be disregarded in construing this Guaranty.

(b)    Any reference in this Guaranty to a statute or regulation will be construed as referring to that statute or regulation as amended from time to time.

(c)    Use of the singular in this Guaranty includes the plural and use of the plural includes the singular. The use of one gender includes the other gender, as the context may require.

(d)    As used in this Guaranty, the term "including" means "including, but not limited to" and the term "includes" means "includes without limitation."

(e)    Unless the context requires otherwise, (i) any definition of or reference to any agreement, instrument or other document in this Guaranty will be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth in this Guaranty), and (ii) any reference in this Guaranty to any Person will be construed to include such Person's successors and assigns.

(f)    Any reference in this Guaranty to "Lender's requirements," "as required by Lender," or similar references will be construed, after Securitization, to mean Lender's requirements or standards as determined in accordance with Lender's and Loan Servicer's obligations under the terms of the Securitization documents.

24.    **Notices.** All Notices required under this Guaranty will be provided in accordance with the requirements of Section 10.03 of the Loan Agreement. Guarantor's address for Notices is as set forth on the signature page of the Loan Agreement unless changed in accordance with this Section 24.

25.    **Sealed Instrument.** Where applicable law provides, Guarantor intends that this Guaranty will be deemed to be signed and delivered as a sealed instrument.

**[REMAINDER OF PAGE IS INTENTIONALLY BLANK]**

**26.** **Term of Existence, Community Property, Formation, Citizenship and Residence Status.** Guarantor represents and warrants that Guarantor is:

*(Repeat this Section 26 for each Guarantor if more than one Guarantor executes this Guaranty.)*

NAME OF GUARANTOR IF MORE THAN ONE: _____

| ITEM #1 – FORMATION, CITIZENSHIP, AND RESIDENCE STATUS |
|---|

☒ (i) an entity formed in the United States, (ii) a US citizen residing in the United States, or (iii) a permanent legal resident of the United States.

☐ (i) an entity formed outside the United States, (ii) an individual who is not a citizen or permanent legal resident of the United States, or (iii) a citizen of the United States whose primary residence is outside the United States. Guarantor acknowledges that Guarantor is bound by Section 13 of this Guaranty and confirms that as of the Effective Date, the name and Notice address for Guarantor's Process Agent is as follows:

Process Agent's Name: _____

Process Agent's Notice Address: _____
_____

| ITEM #2 – ENTITY TERM OF EXISTENCE AND INDIVIDUAL COMMUNITY PROPERTY |
|---|

☐ an entity and its term of existence
   ☐ does not expire prior to the Maturity Date of this Loan.
   ☐ expires prior to the Maturity Date of this Loan and the expiration date is _____.
   Guarantor acknowledges that Section 14 of this Guaranty applies to Guarantor.

☐ an unmarried individual.

☒ a married individual.
Guarantor's state of residence is **NEW YORK**.
Guarantor Spouse's state of residence is **NEW YORK**.
*If Guarantor or Guarantor Spouse's state of residence is one of the states listed below, then Guarantor must cause Guarantor Spouse to sign this Guaranty below in accordance with Section 15 of this Guaranty.*

*Any person signing this Guaranty solely as a Guarantor Spouse will bind only Guarantor Spouse's marital community property to the payment and performance of the Guarantor's obligations under this Guaranty and will not bind Guarantor Spouse's separate property.*

-     Alaska
-     Arizona
-     Idaho
-     Louisiana
-     Nevada
-     New Mexico
-     Washington
-     Wisconsin

Guarantor Spouse's Signature: _____

Guarantor Spouse's Printed Name: _____

Guarantor Spouse's Notice Address: _____
_____

GUARANTOR:

_____

**ROBERT KHOMARI**

STATE OF NEW YORK      )
                                )ss.:
COUNTY OF _New York_     )

On the _6_ day of **February**, in the year **2019**, before me, the undersigned personally appeared **ROBERT KHOMARI**, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____

**NOTARY PUBLIC**

JOEL SANDER
Notary Public, State of New York
Registration #01SA6332466
Qualified In Kings County
Commission Expires Nov. 2, 2019

## SCHEDULE 1

**State-Specific Provisions by Property Jurisdiction**

| Property Jurisdiction | State-Specific Provision(s) |
|---|---|
| New York | None |

# EXHIBIT F

**NYC DEPARTMENT OF FINANCE**
**OFFICE OF THE CITY REGISTER**

This page is part of the instrument. The City Register will rely on the information provided by you on this page for purposes of indexing this instrument.The information on this page will control for indexing purposes in the event of any conflict with the rest of the document.



2019022200486002001E33A5

| RECORDING AND ENDORSEMENT COVER PAGE | | PAGE 1 OF 8 |
|---|---|---|
| Document ID: **2019022200486002** | Document Date: 02-07-2019 | Preparation Date: 02-22-2019 |
| Document Type: INITIAL UCC1 | | FIXTURE FILING |
| Document Page Count: 6 | | |

| PRESENTER: | RETURN TO: |
|---|---|
| MADISON ABSTRACT, INC. ( BX 18 19597 )<br>670 WHITE PLAINS ROAD, SUITE 121<br>AS AGENT TO FIRST AMERICAN TITLE INSURANCE COMPANY<br>SCARSDALE, NY 10583<br>914-725-7200 | MADISON ABSTRACT, INC. ( BX 18 19597 )<br>670 WHITE PLAINS ROAD, SUITE 121<br>AS AGENT TO FIRST AMERICAN TITLE INSURANCE COMPANY<br>SCARSDALE, NY 10583<br>914-725-7200 |

**PROPERTY DATA**

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| BRONX | 2383 | 18 Partial Lot | | 430 EAST 162 STREET |
| | **Property Type:** | APARTMENT BUILDING | | |

**CROSS REFERENCE DATA**

CRFN_____ *or* DocumentID_____ *or* _____ Year_____ Reel____ Page_____ *or* File Number_____

**PARTIES**

| DEBTOR: | SECURED PARTY: |
|---|---|
| KUNBA LLC<br>36 WEST 37TH STREET<br>NEW YORK, NY 10018 | FEDERAL HOME LOAN MORTGAGE CORPORATION<br>8200 JONES BRANCH DRIVE<br>MCLEAN, VA 22102 |

☒ Additional Parties Listed on Continuation Page

**FEES AND TAXES**

| Mortgage : | | | Filing Fee: | | |
|---|---|---|---|---|---|
| Mortgage Amount: | $ | 0.00 | | $ | 0.00 |
| Taxable Mortgage Amount: | $ | 0.00 | NYC Real Property Transfer Tax: | | |
| Exemption: | | | | $ | 0.00 |
| TAXES: County (Basic): | $ | 0.00 | NYS Real Estate Transfer Tax: | | |
| City (Additional): | $ | 0.00 | | $ | 0.00 |
| Spec (Additional): | $ | 0.00 | | | |
| TASF: | $ | 0.00 | | | |
| MTA: | $ | 0.00 | | | |
| NYCTA: | $ | 0.00 | | | |
| Additional MRT: | $ | 0.00 | | | |
| TOTAL: | $ | 0.00 | | | |
| Recording Fee: | $ | 40.00 | | | |
| Affidavit Fee: | $ | 0.00 | | | |

**RECORDED OR FILED IN THE OFFICE**
**OF THE CITY REGISTER OF THE**
**CITY OF NEW YORK**
Recorded/Filed      03-07-2019 15:07
City Register File No.(CRFN):
**2019000076023**

*Annette M Hill*

***City Register Official Signature***

**NYC DEPARTMENT OF FINANCE**
**OFFICE OF THE CITY REGISTER**



2019022200486002001C3125

| RECORDING AND ENDORSEMENT COVER PAGE  (CONTINUATION) | PAGE 2 OF 8 |
|---|---|

| Document ID: 2019022200486002 | Document Date: 02-07-2019 | Preparation Date: 02-22-2019 |
|---|---|---|
| Document Type: INITIAL UCC1 | | |

**PARTIES**
**ASSIGNEE:**
CPC MORTGAGE COMPANY LLC
C/O THE COMMUNITY PRESERVATION
CORPORATION, 28 EAST 28TH STREET, 9TH FLOOR
NEW YORK, NY 10016

**UCC FINANCING STATEMENT**
FOLLOW INSTRUCTIONS (front and back) CAREFULLY

| A. NAME & PHONE OF CONTACT AT FILER [optional] |
| --- |

BX18 19597

B. SEND ACKNOWLEDGMENT TO:   (Name and Address)

> **Abruzzo & Kinn LLP**
> **170 Old Country Road, Suite 315**
> **Mineola, New York 11501-4312**
> **Attention: Nadia A. Popatia, Esq.**

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**1. DEBTOR'S EXACT FULL LEGAL NAME** - insert only *one* debtor name (1a or 1b) - do not abbreviate or combine names

| 1a. ORGANIZATION'S NAME | | | | | |
| --- | --- | --- | --- | --- | --- |
| **KUNBA LLC** | | | | | |
| 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | | MIDDLE NAME | | SUFFIX |
| 1c. MAILING ADDRESS | CITY | | STATE | POSTAL CODE | COUNTRY |
| **36 West 37th Street** | **New York** | | **NY** | **10018** | **USA** |
| 1d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | 1g. ORGANIZATIONAL ID #, if any | |
| Not Applicable | | **Limited Liability Company** | **New York** | | ☑ NONE |

**2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME** - insert only *one* debtor name (2a or 2b) - do not abbreviate or combine names

| 2a. ORGANIZATION'S NAME | | | | | |
| --- | --- | --- | --- | --- | --- |
| 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | | MIDDLE NAME | | SUFFIX |
| 2c. MAILING ADDRESS | CITY | | STATE | POSTAL CODE | COUNTRY |
| 2d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID #, if any | |
| Not Applicable | | | | | ☐ NONE |

**3. SECURED PARTY'S NAME** (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only *one* secured party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | | |
| --- | --- | --- | --- | --- | --- |
| **FEDERAL HOME LOAN MORTGAGE CORPORATION** | | | | | |
| 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | | MIDDLE NAME | | SUFFIX |
| 3c. MAILING ADDRESS | CITY | | STATE | POSTAL CODE | COUNTRY |
| **8200 Jones Branch Drive** | **McLean** | | **VA** | **22102** | **USA** |

4. This FINANCING STATEMENT covers the following collateral:

**See Exhibit A and Exhibit B annexed hereto and made a part hereof.**

| 5. ALTERNATIVE DESIGNATION (if applicable): | ☐ LESSEE/LESSOR | ☐ CONSIGNEE/CONSIGNOR | ☐ BAILEE/BAILOR | ☐ SELLER/BUYER | ☐ AG. LIEN | ☐ NON-UCC FILING |
| --- | --- | --- | --- | --- | --- | --- |

6. ☑ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS.   Attach Addendum   [if applicable]   |   7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE]   [optional]   |   ☐ All Debtors   ☐ Debtor 1   ☐ Debtor 2

8. OPTIONAL FILER REFERENCE DATA

FILE IN THE OFFICE OF THE REGISTER OF THE CITY OF NEW YORK, BOROUGH AND COUNTY OF THE BRONX, STATE OF NEW YORK (FHLMC #501841342)

**FILING OFFICE COPY — UCC FINANCING STATEMENT (FORM UCC1) (REV. 05/22/02)**

# UCC FINANCING STATEMENT ADDENDUM

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

**9. NAME OF FIRST DEBTOR (1a or 1b) ON RELATED FINANCING STATEMENT**

| | |
|---|---|
| 9a. ORGANIZATION'S NAME | |
| OR | **KUNBA LLC** |

| 9b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME,SUFFIX |
|---|---|---|
| | | |

**10.MISCELLANEOUS:**

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**11. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME** - insert only one name (11a or 11b) - do not abbreviate or combine names

| | 11a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| OR | | | | |

| 11b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 11c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

| 11d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 11e. TYPE OF ORGANIZATION | 11f. JURISDICTION OF ORGANIZATION | 11g. ORGANIZATIONAL ID #, if any |
|---|---|---|---|---|
| Not Applicable | | | | ☐ NONE |

**12.** ☐ ADDITIONAL SECURED PARTY'S or ☑ ASSIGNOR S/P'S NAME - insert only one name (12a or 12b)

| | 12a. ORGANIZATION'S NAME |
|---|---|
| OR | **CPC MORTGAGE COMPANY LLC** |

| 12b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 12c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| c/o The Community Preservation Corporation 28 East 28th Street, 9th Floor | New York | NY | 10016 | USA |

**13.** This FINANCING STATEMENT covers ☐ timber to be cut or ☐ as-extracted collateral, or is filed as a ☑ fixture filing.

**16.** Additional collateral description:

**14.** Description of real estate:

**See Exhibit A and Exhibit B  annexed hereto and made a part hereof.**

**15.** Name and address of a RECORD OWNER of above-described real estate (if Debtor does not have a record interest):

**17.** Check only if applicable and check only one box.

Debtor is a ☐ Trust  or ☐ Trustee acting with respect to property held in trust  or ☐ Decedent's Estate

**18.** Check only if applicable and check only one box.

☐ Debtor is a TRANSMITTING UTILITY

☐ Filed in connection with a Manufactured-Home Transaction — effective 30 years

☐ Filed in connection with a Public-Finance Transaction — effective 30 years



**Financing Statement Exhibit A – SBL
(Revised 11-02-2015)**

## EXHIBIT A

## DESCRIPTION OF LAND

**ALL** that certain plot, piece or parcel of land, situate, lying and being in the Borough and County of Bronx, City and State of New York, bounded and described as follows:

**BEGINNING** at a point on the southerly side of 162nd Street, distant 264.45 feet westerly at the corner formed by the intersection of the southerly side of 162nd Street with the westerly side of Elton Avenue;

**RUNNING THENCE** southerly at right angles to said southerly side of 162nd Street, 100 feet;

**THENCE** westerly parallel with the southerly side of 162nd Street, 25 feet;

**THENCE** northerly and again at right angles to the southerly side of 162nd Street and part of the distance through a party wall, 100 feet to the southerly side of 162nd Street;

**THENCE** easterly to said southerly side of 162nd Street, 25 feet to the point or place of **BEGINNING**.

**SAID** premises being known as 430 East 162nd Street, Bronx, New York.

**Freddie Mac**
**MULTIFAMILY**

Financing Statement Exhibit B – SBL
(Revised 11-02-2015)

## EXHIBIT B

All of Debtor's present and future right, title, and interest in and to all of the following:

(1)     **"Fixtures,"** which means all property owned by Debtor which is attached to the real property described in Exhibit A ("**Land**") and/or the improvements located on the Land ("**Improvements**") ("**Property**" means the Land and/or the Improvements) so as to constitute a fixture under applicable law, including: machinery, equipment, engines, boilers, incinerators and installed building materials; systems and equipment for the purpose of supplying or distributing heating, cooling, electricity, gas, water, air or light; antennas, cable, wiring and conduits used in connection with radio, television, security, fire prevention or fire detection or otherwise used to carry electronic signals; telephone systems and equipment; elevators and related machinery and equipment; fire detection, prevention and extinguishing systems and apparatus; security and access control systems and apparatus; plumbing systems; water heaters, ranges, stoves, microwave ovens, refrigerators, dishwashers, garbage disposers, washers, dryers and other appliances; light fixtures, awnings, storm windows and storm doors; pictures, screens, blinds, shades, curtains and curtain rods; mirrors; cabinets, paneling, rugs and floor and wall coverings; fences, trees and plants; swimming pools; and exercise equipment.

(2)     **"Personalty,"** which means all of the following:

(i)     Accounts (including deposit accounts) of Debtor related to the Property.

(ii)     Equipment and inventory owned by Debtor, which are used now or in the future in connection with the ownership, management or operation of the Land or Improvements or are located on the Land or Improvements, including furniture, furnishings, machinery, building materials, goods, supplies, tools, books, records (whether in written or electronic form) and computer equipment (hardware and software).

(iii)     Other tangible personal property owned by Debtor which is used now or in the future in connection with the ownership, management or operation of the Land or Improvements or is located on the Land or in the Improvements, including ranges, stoves, microwave ovens, refrigerators, dishwashers, garbage disposers, washers, dryers and other appliances (other than Fixtures).

(iv)     Any operating agreements relating to the Land or the Improvements.

(v)     Any surveys, plans and specifications and contracts for architectural, engineering and construction services relating to the Land or the Improvements.

(vi)     All other intangible property, general intangibles and rights relating to the operation of, or used in connection with, the Land or the Improvements, including

all governmental permits relating to any activities on the Land and including subsidy or similar payments received from any sources, including a **"Governmental Authority"** (defined as any board, commission, department, agency or body of any municipal, county, state or federal governmental unit, or any subdivision of any of them, that has or acquires jurisdiction over the Property, or the use, operation or improvement of the Property, or over Debtor).

(vii)      Any rights of Debtor in or under any letter of credit required under the terms of the Loan Agreement evidencing and securing the loan (**"Loan"**) secured by this financing statement (**"Loan Agreement"**).

(3)      All current and future rights, including air rights, development rights, zoning rights and other similar rights or interests, easements, tenements, rights of way, strips and gores of land, streets, alleys, roads, sewer rights, waters, watercourses and appurtenances related to or benefiting the Land or the Improvements, or both, and all rights-of-way, streets, alleys and roads which may have been or may in the future be vacated.

(4)      All proceeds paid or to be paid by any insurer of the Land, the Improvements, the Fixtures, the Personalty or any other part of the Property, whether or not Debtor obtained the insurance pursuant to Secured Party's requirement.

(5)      All awards, payments and other compensation made or to be made by any Governmental Authority with respect to the Land, or if Debtor's interest in the Land is pursuant to a ground lease, the ground lease and the leasehold estate created by such ground lease (**"Leasehold Estate"**), the Improvements, the Fixtures, the Personalty or any other part of the Property, including any awards or settlements resulting from condemnation proceedings or the total or partial taking of the Land, the Improvements, the Fixtures, the Personalty or any other part of the Property under the power of eminent domain or otherwise and including any conveyance in lieu thereof.

(6)      All contracts, options and other agreements for the sale of the Land, or the Leasehold Estate, as applicable, the Improvements, the Fixtures, the Personalty or any other part of the Property entered into by Debtor now or in the future, including cash or securities deposited to secure performance by parties of their obligations.

(7)      All **"Rents,"** which means all rents (whether from residential or non-residential space), revenues and other income of the Land or the Improvements, parking fees, laundry and vending machine income and fees and charges for food, health care and other services provided at the Property, whether now due, past due or to become due, and deposits forfeited by tenants, and, if Debtor is a cooperative housing corporation or association, maintenance fees, charges or assessments payable by shareholders or residents under proprietary leases or occupancy agreements, whether now due, past due or to become due.

(8)      All **"Leases,"** which means all present and future leases, subleases, licenses, concessions or grants or other possessory interests in force now or hereafter, whether oral or written,

covering or affecting the Property, or any portion of the Property (including proprietary leases or occupancy agreements if Debtor is a cooperative housing corporation), and all modifications, extensions or renewals.

(9)     All earnings, royalties, accounts receivable, issues and profits from the Land, the Improvements or any other part of the Property, and all undisbursed proceeds of the Loan.

(10)     All deposits to a "**Reserve Fund**" (defined as all amounts deposited by the Debtor with Secured Party in connection with the Loan for the payment of taxes or insurance premiums or as otherwise required pursuant to the Loan Agreement), whether in cash or as a letter of credit.

(11)     All refunds or rebates of taxes by a Governmental Authority (other than refunds applicable to periods before the real property tax year in which this financing statement is recorded or filed) or insurance premiums by an insurance company.

(12)     All tenant security deposits which have not been forfeited by any tenant under any Lease and any bond or other security in lieu of such deposits.

(13)     All names under or by which the Property or any part of it may be operated or known, and all trademarks, trade names, and goodwill relating to any of the Property.

(14)     All proceeds from the conversion, voluntary or involuntary, of any of the above into cash or liquidated claims, and the right to collect such proceeds.

# EXHIBIT G

**NYC DEPARTMENT OF FINANCE**
**OFFICE OF THE CITY REGISTER**

This page is part of the instrument. The City Register will rely on the information provided by you on this page for purposes of indexing this instrument. The information on this page will control for indexing purposes in the event of any conflict with the rest of the document.



2019021900976008001EB0F4

| RECORDING AND ENDORSEMENT COVER PAGE | PAGE 1 OF 6 |
|---|---|

| | | |
|---|---|---|
| **Document ID: 2019021900976008** | Document Date: 02-07-2019 | Preparation Date: 02-20-2019 |
| Document Type: ASSIGNMENT, MORTGAGE | | |
| Document Page Count: 4 | | |

| PRESENTER: | RETURN TO: |
|---|---|
| MADISON ABSTRACT, INC. ( BX 18 19597 )<br>670 WHITE PLAINS ROAD, SUITE 121<br>AS AGENT TO FIRST AMERICAN TITLE INSURANCE<br>COMPANY<br>SCARSDALE, NY 10583<br>914-725-7200 | MADISON ABSTRACT, INC. ( BX 18 19597 )<br>670 WHITE PLAINS ROAD, SUITE 121<br>AS AGENT TO FIRST AMERICAN TITLE INSURANCE<br>COMPANY<br>SCARSDALE, NY 10583<br>914-725-7200 |

**PROPERTY DATA**

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| BRONX | 2383 | 18 | Entire Lot | 430 EAST 162 STREET |
| | **Property Type:** | APARTMENT BUILDING | | |

**CROSS REFERENCE DATA**

Document ID:    2019021900976002
☒ Additional  Cross References on Continuation  Page

**PARTIES**

| ASSIGNOR/OLD LENDER: | ASSIGNEE/NEW LENDER: |
|---|---|
| CPC MORTGAGE COMPANY LLC<br>C/O THE COMMUNITY PRESERVATION<br>CORPORATION, 28 EAST 28TH STREET, 9TH FLOOR<br>NEW YORK, NY 10016 | FEDERAL HOME LOAN MORTGAGE CORPORATION<br>8200 JONES BRANCH DRIVE<br>MCLEAN, VA 22102 |

**FEES AND TAXES**

| Mortgage : | | | Filing Fee: | | |
|---|---|---|---|---|---|
| Mortgage Amount: | $ | 0.00 | | | |
| Taxable Mortgage Amount: | $ | 0.00 | NYC Real Property Transfer Tax: | | |
| Exemption: | | | | $ | 0.00 |
| TAXES:   County (Basic): | $ | 0.00 | NYS Real Estate Transfer Tax: | | |
| City (Additional): | $ | 0.00 | | $ | 0.00 |
| Spec (Additional): | $ | 0.00 | | | |
| TASF: | $ | 0.00 | | | |
| MTA: | $ | 0.00 | | | |
| NYCTA: | $ | 0.00 | | | |
| Additional MRT: | $ | 0.00 | | | |
| TOTAL: | $ | 0.00 | | | |
| Recording Fee: | $ | 60.00 | | | |
| Affidavit Fee: | $ | 0.00 | | | |

**RECORDED OR FILED IN THE OFFICE**
**OF THE CITY REGISTER OF THE**
**CITY OF NEW YORK**
Recorded/Filed        02-25-2019 16:25
City Register File No.(CRFN):
**2019000063498**

*Annette M Hill*

***City Register Official Signature***

**NYC DEPARTMENT OF FINANCE**
**OFFICE OF THE CITY REGISTER**



2019021900976008001CB274

| RECORDING AND ENDORSEMENT COVER PAGE (CONTINUATION) | | PAGE 2 OF 6 |
|---|---|---|
| **Document ID:** 2019021900976008 | Document Date: 02-07-2019 | Preparation Date: 02-20-2019 |
| Document Type: ASSIGNMENT, MORTGAGE | | |

**CROSS REFERENCE DATA**
**Document ID:** 2019021900976006
**Document ID:** 2019021900976007

Record & Return To:
Madison Abstract Inc.
670 White Plains Road, Suite 121
Scarsdale, NY 10583
Title No. BX18 19597

COUNTY: BRONX
BLOCK: 2383
LOT: 18

Prepared by, and after recording
return to:

**Abruzzo & Kinn LLP**
**170 Old Country Road, Suite 315**
**Mineola, New York 11501-4312**
**Attention: Nadia A. Popatia, Esq.**

Freddie Mac Loan Number: **501841342**
Property Name: **430 East 162nd Street**

### ASSIGNMENT OF CONSOLIDATED SECURITY INSTRUMENTS

### (Revised 3-1-2014)

FOR VALUABLE CONSIDERATION, **CPC MORTGAGE COMPANY LLC**, a limited liability company organized and existing under the laws of New York (**"Assignor"**), having its principal place of business at c/o The Community Preservation Corporation, 28 East 28th Street, 9th Floor, New York, New York 10016-7943, hereby assigns, grants, sells and transfers to the **FEDERAL HOME LOAN MORTGAGE CORPORATION**, a corporation organized and existing under the laws of the United States (**"Assignee"**), having its principal place of business at 8200 Jones Branch Drive, McLean, Virginia 22102, and Assignee's successors, transferees and assigns forever, all of the right, title and interest of Assignor in and to the following documents:

(1)     Consolidation, Extension and Modification Agreement (**"Consolidation Agreement"**) dated as of **February 7, 2019**, entered into by **KUNBA LLC**, a limited liability company organized and existing under the laws of New York (**"Borrower"**), and Assignor to consolidate (a) Borrower's indebtedness to Assignor in the principal amount of **$1,750,000.00**, which indebtedness is secured by the property described in Exhibit A to this Assignment and incorporated into it by this reference; and (b) the security for such indebtedness, as evidenced by the mortgages listed on Exhibit B to this Assignment, which Consolidation Agreement is recorded, or intended to be recorded, in the Office of the Register of the City of **New York**, Borough and County of the **Bronx**, State of **New York**.

(2)     Each mortgage listed on the attached Exhibit B.

Together with the Note or other obligation described in the Consolidation Agreement and all obligations secured by the mortgages listed on the attached Exhibit B now or in the future.

This Assignment is not subject to the requirements of Section 275 of the Real Property Law because it is an assignment within the secondary mortgage market.

### [BALANCE OF PAGE INTENTIONALLY LEFT BLANK]

{215/181/01244885}
**Assignment of Consolidated Security Instruments**

IN WITNESS WHEREOF, Assignor has executed this Assignment as of **February** $\underline{7}$ **, 2019**.

ASSIGNOR:

**CPC MORTGAGE COMPANY LLC**, a New
York limited liability company



By: _____
Name:    Carolyn Au
Title:      Senior Vice President

STATE OF NEW YORK              )
                                             )ss.:
COUNTY OF NEW YORK        )

On the __7th__ day of **February**, in the year **2019**, before me, the undersigned personally appeared **CAROLYN AU**, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that she executed the same in her capacity, and that by her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.



_____
NOTARY PUBLIC

PATRICIA FADEL
Notary Public, State of New York
No. 01FA6328763
Qualified in Richmond County
Commission Expires August 03, 20__19__

SEAL

## EXHIBIT A

### DESCRIPTION OF THE PROPERTY

**ALL** that certain plot, piece or parcel of land, situate, lying and being in the Borough and County of Bronx, City and State of New York, bounded and described as follows:

**BEGINNING** at a point on the southerly side of 162nd Street, distant 264.45 feet westerly at the corner formed by the intersection of the southerly side of 162nd Street with the westerly side of Elton Avenue;

**RUNNING THENCE** southerly at right angles to said southerly side of 162nd Street, 100 feet;

**THENCE** westerly parallel with the southerly side of 162nd Street, 25 feet;

**THENCE** northerly and again at right angles to the southerly side of 162nd Street and part of the distance through a party wall, 100 feet to the southerly side of 162nd Street;

**THENCE** easterly to said southerly side of 162nd Street, 25 feet to the point or place of **BEGINNING**.

**SAID** premises being known as 430 East 162nd Street, Bronx, New York.

**EXHIBIT B**

LIST OF MORTGAGES ASSIGNED

A.    Substitute Mortgage A in the original principal amount of $1,075,000.00 made by Kunba LLC to Signature Bank, dated as of February 7, 2019 and to be recorded in the Office of the Register of the City of New York, Borough and County of the Bronx, State of New York; *DOCUMENT I.D. 2019021900976002*

Which above mortgage A was assigned in the principal amount of $1,075,000.00 by Assignment of Mortgage made by Signature Bank to CPC Mortgage Company LLC, executed February 7, 2019, dated and effective as of February 7, 2019 and to be recorded in the Office of said Register; and

B.    Gap Multifamily Mortgage, Assignment of Rents and Security Agreement in the original *DOCUMENT I.D.* principal amount of $675,000.00 made by Kunba LLC to CPC Mortgage Company LLC, *2019021900976006* dated as of February 7, 2019 and to be recorded in the Office of said Register. *TAX PAID #18,900.00*

PRIOR HISTORY OF MORTGAGES
FOR INFORMATION ONLY:

A.    First Mortgage, Spreader and Security Agreement in the original principal amount of $2,700,000.00 made by Double Salt LLC, 3rd Avenue Heights LLC and Kunba LLC to Signature Bank, dated as of November 15, 2013 and recorded January 6, 2014 as CRFN 2014000004114 in the Office of the Register of the City of New York, Borough and County of the Bronx, State of New York;

Which above mortgage A was severed and split by that certain Note and Mortgage Severance and Splitter Agreement made by and between Double Salt LLC, 3rd Avenue Heights LLC, Kunba LLC and Signature Bank, dated as of February 7, 2019 and to be recorded in the Office of said Register ("Agreement"); said Agreement severed and split the above mortgage into two separate and distinct liens in the amounts of:

(a) $1,075,000.00, encumbering the property known as 430 East 162nd Street, Bronx, New York, Block 2383 Lot 18 (Parcel I), which is evidenced by Substitute Mortgage A made by Kunba LLC to Signature Bank, dated as of February 7, 2019 and to be recorded in the Office of said Register; and

(b) $1,360,421.90, encumbering the properties known as 501 East 176th Street, Bronx, New York (Block 2924 Lot 1), 1170-1174 Shakespeare Avenue, Bronx, New York (Block 2506 Lot 5), 1285 Shakespeare Avenue, Bronx, New York (Block 2519 Lot 26) (collectively, Parcel II), which is evidenced by Substitute Mortgage B made by Double Salt LLC and 3rd Avenue Heights LLC to Signature Bank, dated as of February 7, 2019 and to be recorded in the Office of said Register.

*Consolidates Substitute Mortgage A and Gap Mortgage B to form a single lien of $1,750,000.00, said Consolidation to be Recorded simultaneously In Document I.D. 2019021900976007*

{215/181/01244885}
**Assignment of Consolidated Security Instruments**    **Page B-1**



**Freddie Mac**
MULTIFAMILY

Omnibus Assignment - SBL (Revised 11-02-2015)

| Freddie Mac Loan Number: | 501841342 |
|---|---|
| Property Name: | 430 East 162nd Street |

| | |
|---|---|
| **Borrower:** | **KUNBA LLC**, a New York limited liability company |
| **Lender:** | **CPC MORTGAGE COMPANY LLC**, a New York limited liability company |
| **Effective Date:** | **February 7, 2019** |
| **Loan Amount:** | **$1,750,000.00** |

Lender assigns and transfers to the Federal Home Loan Mortgage Corporation, a corporation organized and existing under the laws of the United States, all of its right, title, and interest in each document set forth below in the "List of Documents Being Assigned" relating to the loan described above.

**List of Documents Being Assigned**

1.  Loan Agreement
2.  Guaranty

[BALANCE OF PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, Assignor has executed this Assignment as of **February** 7 **, 2019**.

**LENDER:**

**CPC MORTGAGE COMPANY LLC**, a New York limited
liability company

By: _____
Name:     Carolyn Au
Title:     Senior Vice President

**NYC DEPARTMENT OF FINANCE**
**OFFICE OF THE CITY REGISTER**

This page is part of the instrument. The City Register will rely on the information provided by you on this page for purposes of indexing this instrument.The information on this page will control for indexing purposes in the event of any conflict with the rest of the document.



2019082700959002001E1BAA

| RECORDING AND ENDORSEMENT COVER PAGE | | PAGE 1 OF 3 |
|---|---|---|
| Document ID: **2019082700959002** | Document Date: 08-07-2019 | Preparation Date: 08-27-2019 |
| Document Type:  UCC3 ASSIGNMENT | | FIXTURE FILING |
| Document Page Count: 1 | | |

| PRESENTER: | RETURN TO: |
|---|---|
| MCCOY & ORTA, P.C. | MCCOY & ORTA, PC |
| 100 N. BROADWAY, SUITE 2600 | 100 N. BROADWAY, 26TH FLOOR |
| OKLAHOMA CITY, OK 73102 | OKLAHOMA CITY, OK 73102 |
| SUPPORT@SIMPLIFILE.COM | SUPPORT@SIMPLIFILE.COM |

### PROPERTY DATA

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| BRONX | 2383 | 18 | Entire Lot | 430 EAST 162 STREET |
| **Property Type:** | APARTMENT BUILDING | | | |

### CROSS REFERENCE DATA

CRFN:   2019000076023

### PARTIES

| DEBTOR: | SECURED PARTY: |
|---|---|
| KUNBA LLC | FEDERAL HOME LOAN MORTGAGE CORPORATION |
| 36 WEST 37TH STREET | 8200 JONES BRANCH DRIVE |
| NEW YORK, NY 10018 | MCLEAN, VA 22102 |

⊠  Additional  Parties  Listed on Continuation  Page

### FEES AND TAXES

| Mortgage : | | | Filing Fee: | | |
|---|---|---|---|---|---|
| Mortgage Amount: | $ | 0.00 | | $ | 0.00 |
| Taxable Mortgage Amount: | $ | 0.00 | NYC Real Property Transfer Tax: | | |
| Exemption: | | | | $ | 0.00 |
| TAXES:   County (Basic): | $ | 0.00 | NYS Real Estate Transfer Tax: | | |
| City (Additional): | $ | 0.00 | | $ | 0.00 |
| Spec (Additional): | $ | 0.00 | | | |
| TASF: | $ | 0.00 | | | |
| MTA: | $ | 0.00 | | | |
| NYCTA: | $ | 0.00 | | | |
| Additional MRT: | $ | 0.00 | | | |
| TOTAL: | $ | 0.00 | | | |
| Recording Fee: | $ | 20.00 | | | |
| Affidavit Fee: | $ | 0.00 | | | |

**RECORDED OR FILED IN THE OFFICE**
**OF THE CITY REGISTER OF THE**
**CITY OF NEW YORK**
Recorded/Filed        08-29-2019 09:33
City Register File No.(CRFN):
**2019000277127**

*Annette M. Hill*
*City Register Official Signature*

**NYC DEPARTMENT OF FINANCE**
**OFFICE OF THE CITY REGISTER**



2019082700959002001C192A

| RECORDING AND ENDORSEMENT COVER PAGE  (CONTINUATION) | PAGE 2 OF 3 |
|---|---|

**Document ID: 2019082700959002**     Document Date: 08-07-2019     Preparation Date: 08-27-2019
Document Type: UCC3 ASSIGNMENT

---

**PARTIES**
**NEW SECURED PARTY:**
WILMINGTON TRUST, NATIONAL ASSOCIATION, AS
TRUSTEE
1100 NORTH MARKET STREET
WILMINGTON, DE 19890

## UCC FINANCING STATEMENT AMENDMENT

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

**A. NAME & PHONE OF CONTACT AT FILER [optional]**
Nick Barzellone 405-236-0003

**B. SEND ACKNOWLEDGMENT TO:  (Name and Address)**

McCoy & Orta, P.C.
100 North Broadway, 26th Floor
Oklahoma City, OK 73102

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

| 1a. INITIAL FINANCING STATEMENT FILE # | 1b.  This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. |
|---|---|
| # 2019000076023 filed 3/7/19 | ☑ |

**2.** ☐ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to security interest(s) of the Secured Party authorizing this Termination Statement.

**3.** ☐ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to security interest(s) of the Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law.

**4.** ☑ **ASSIGNMENT** (full or partial):  Give name of assignee in item 7a or 7b and address of assignee in item 7c; and also give name of assignor in item 9.

**5. AMENDMENT (PARTY INFORMATION):** This Amendment affects ☐ Debtor  or ☐ Secured Party of record.  Check only one of these two boxes.
Also check one of the following three boxes and provide appropriate information in items 6 and/or 7.

☐ CHANGE name and/or address: Please refer to the detailed instructions in regards to changing the name/address of a party. ☐ DELETE name: Give record name to be deleted in item 6a or 6b. ☐ ADD name: Complete item 7a or 7b, and also item 7c; also complete items 7e-7g (if applicable).

**6. CURRENT RECORD INFORMATION:**

| | 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| OR | KUNBA LLC, having an address at 36 West 37th Street, New York, NY 10018 | | | |
| | 6b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |

**7. CHANGED (NEW) OR ADDED INFORMATION:**

| | 7a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| OR | WILMINGTON TRUST, NATIONAL ASSOCIATION, AS TRUSTEE* | | | |
| | 7b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 1100 North Market Street | Wilmington | DE | 19890 | USA |

| 7d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 7e. TYPE OF ORGANIZATION | 7f. JURISDICTION OF ORGANIZATION | 7g. ORGANIZATIONAL ID #, if any |
|---|---|---|---|---|
| | | | | ☒ NONE |

**8. AMENDMENT (COLLATERAL CHANGE):** check only one box.

Describe collateral ☐ deleted or ☐ added, or give entire ☐ restated collateral description, or describe collateral ☐ assigned.

\* FOR THE REGISTERED HOLDERS OF WELLS FARGO COMMERCIAL MORTGAGE SECURITIES, INC., MULTIFAMILY MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2019-SB65

Block 2383, Lot 18, Borough of Bronx
Property Address: 430 East 162nd Street, Bronx, NY

**9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT** (name of assignor, if this is an Assignment).  If this is an Amendment authorized by a Debtor which adds collateral or adds the authorizing Debtor, or if this is a Termination authorized by a Debtor, check here ☐ and enter name of DEBTOR authorizing this Amendment.

| | 9a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| OR | FEDERAL HOME LOAN MORTGAGE CORPORATION | | | |
| | 9b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |

**10.** OPTIONAL FILER REFERENCE DATA
M&O Ref.: 7578.124 430 East 162nd Street (Loan No. 501841342) FILE WITH BRONX COUNTY, NY

FILING OFFICE COPY — UCC FINANCING STATEMENT AMENDMENT (FORM UCC3) (REV. 05/22/02)

**NYC DEPARTMENT OF FINANCE**
**OFFICE OF THE CITY REGISTER**

This page is part of the instrument. The City Register will rely on the information provided by you on this page for purposes of indexing this instrument.The information on this page will control for indexing purposes in the event of any conflict with the rest of the document.



2019082700959002001E1BAA

| RECORDING AND ENDORSEMENT COVER PAGE | PAGE 1 OF 3 |
|---|---|

**Document ID:** 2019082700959002
**Document Type:** UCC3 ASSIGNMENT
**Document Page Count:** 1

Document Date: 08-07-2019

Preparation Date: 08-27-2019
FIXTURE FILING

**PRESENTER:**
MCCOY & ORTA, P.C.
100 N. BROADWAY, SUITE 2600
OKLAHOMA CITY, OK 73102
SUPPORT@SIMPLIFILE.COM

**RETURN TO:**
MCCOY & ORTA, PC
100 N. BROADWAY, 26TH FLOOR
OKLAHOMA CITY, OK 73102
SUPPORT@SIMPLIFILE.COM

**PROPERTY DATA**

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| BRONX | 2383 | 18 | Entire Lot | 430 EAST 162 STREET |

**Property Type:** APARTMENT BUILDING

**CROSS REFERENCE DATA**

**CRFN:** 2019000076023

**PARTIES**

**DEBTOR:**
KUNBA LLC
36 WEST 37TH STREET
NEW YORK, NY 10018

**SECURED PARTY:**
FEDERAL HOME LOAN MORTGAGE CORPORATION
8200 JONES BRANCH DRIVE
MCLEAN, VA 22102

☒ Additional Parties Listed on Continuation Page

**FEES AND TAXES**

| Mortgage : | | | Filing Fee: | | |
|---|---|---|---|---|---|
| Mortgage Amount: | $ | 0.00 | | $ | 0.00 |
| Taxable Mortgage Amount: | $ | 0.00 | NYC Real Property Transfer Tax: | | |
| Exemption: | | | | $ | 0.00 |
| TAXES:   County (Basic): | $ | 0.00 | NYS Real Estate Transfer Tax: | | |
| City (Additional): | $ | 0.00 | | $ | 0.00 |
| Spec (Additional): | $ | 0.00 | | | |
| TASF: | $ | 0.00 | | | |
| MTA: | $ | 0.00 | | | |
| NYCTA: | $ | 0.00 | | | |
| Additional MRT: | $ | 0.00 | | | |
| TOTAL: | $ | 0.00 | | | |
| Recording Fee: | $ | 20.00 | | | |
| Affidavit Fee: | $ | 0.00 | | | |

**RECORDED OR FILED IN THE OFFICE**
**OF THE CITY REGISTER OF THE**
**CITY OF NEW YORK**
Recorded/Filed          08-29-2019 09:33
City Register File No.(CRFN):
**2019000277127**

*Annette M Hill*

**City Register Official Signature**

**NYC DEPARTMENT OF FINANCE**
**OFFICE OF THE CITY REGISTER**



2019082700959002001C192A

| RECORDING AND ENDORSEMENT COVER PAGE  (CONTINUATION) | PAGE 2 OF 3 |
|---|---|

**Document ID: 2019082700959002**  Document Date: 08-07-2019  Preparation Date: 08-27-2019
Document Type: UCC3 ASSIGNMENT

---

**PARTIES**
**NEW SECURED PARTY:**
WILMINGTON TRUST, NATIONAL ASSOCIATION, AS
TRUSTEE
1100 NORTH MARKET STREET
WILMINGTON, DE 19890

## UCC FINANCING STATEMENT AMENDMENT

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

**A. NAME & PHONE OF CONTACT AT FILER** [optional]
Nick Barzellone 405-236-0003

**B. SEND ACKNOWLEDGMENT TO:** (Name and Address)

McCoy & Orta, P.C.
100 North Broadway, 26th Floor
Oklahoma City, OK 73102

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**1a. INITIAL FINANCING STATEMENT FILE #**
# 2019000076023 filed 3/7/19

**1b.** This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the ☑ REAL ESTATE RECORDS.

**2.** ☐ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to security interest(s) of the Secured Party authorizing this Termination Statement.

**3.** ☐ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to security interest(s) of the Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law.

**4.** ☑ **ASSIGNMENT** (full or partial): Give name of assignee in item 7a or 7b and address of assignee in item 7c; and also give name of assignor in item 9.

**5. AMENDMENT (PARTY INFORMATION):** This Amendment affects ☐ Debtor or ☐ Secured Party of record. Check only one of these two boxes.
Also check one of the following three boxes and provide appropriate information in items 6 and/or 7.

☐ CHANGE name and/or address: Please refer to the detailed instructions in regards to changing the name/address of a party. | ☐ DELETE name: Give record name to be deleted in item 6a or 6b. | ☐ ADD name: Complete item 7a or 7b, and also item 7c; also complete items 7e-7g (if applicable).

**6. CURRENT RECORD INFORMATION:**

| | | | |
|---|---|---|---|
| **6a. ORGANIZATION'S NAME** KUNBA LLC, having an address at 36 West 37th Street, New York, NY 10018 | | | |
| OR **6b. INDIVIDUAL'S LAST NAME** | FIRST NAME | MIDDLE NAME | SUFFIX |

**7. CHANGED (NEW) OR ADDED INFORMATION:**

| | | | |
|---|---|---|---|
| **7a. ORGANIZATION'S NAME** WILMINGTON TRUST, NATIONAL ASSOCIATION, AS TRUSTEE* | | | |
| OR **7b. INDIVIDUAL'S LAST NAME** | FIRST NAME | MIDDLE NAME | SUFFIX |
| **7c. MAILING ADDRESS** 1100 North Market Street | **CITY** Wilmington | **STATE** DE **POSTAL CODE** 19890 | **COUNTRY** USA |
| **7d. SEE INSTRUCTIONS** | ADD'L INFO RE ORGANIZATION DEBTOR | **7e. TYPE OF ORGANIZATION** | **7f. JURISDICTION OF ORGANIZATION** | **7g. ORGANIZATIONAL ID #, if any** ☒ NONE |

**8. AMENDMENT (COLLATERAL CHANGE):** check only one box.

Describe collateral ☐ deleted or ☐ added, or give entire ☐ restated collateral description, or describe collateral ☐ assigned.

\* FOR THE REGISTERED HOLDERS OF WELLS FARGO COMMERCIAL MORTGAGE SECURITIES, INC., MULTIFAMILY MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2019-SB65

Block 2383, Lot 18, Borough of Bronx
Property Address: 430 East 162nd Street, Bronx, NY

**9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT** (name of assignor, if this is an Assignment). If this is an Amendment authorized by a Debtor which adds collateral or adds the authorizing Debtor, or if this is a Termination authorized by a Debtor, check here ☐ and enter name of DEBTOR authorizing this Amendment.

| | | | |
|---|---|---|---|
| **9a. ORGANIZATION'S NAME** FEDERAL HOME LOAN MORTGAGE CORPORATION | | | |
| OR **9b. INDIVIDUAL'S LAST NAME** | FIRST NAME | MIDDLE NAME | SUFFIX |

**10. OPTIONAL FILER REFERENCE DATA**
M&O Ref.: 7578.124 430 East 162nd Street (Loan No. 501841342) FILE WITH BRONX COUNTY, NY

**FILING OFFICE COPY** — UCC FINANCING STATEMENT AMENDMENT (FORM UCC3) (REV. 05/22/02)



Omnibus Assignment - SBL (Revised 11-02-2015)

| Freddie Mac Loan Number: | 501841342 |
|---|---|
| Property Name: | 430 East 162nd Street |

| Borrower: | **KUNBA LLC**, a New York limited liability company |
|---|---|
| Lender: | **CPC MORTGAGE COMPANY LLC**, a New York limited liability company |
| Effective Date: | **February 7, 2019** |
| Loan Amount: | **$1,750,000.00** |

Lender assigns and transfers to the Federal Home Loan Mortgage Corporation, a corporation organized and existing under the laws of the United States, all of its right, title, and interest in each document set forth below in the "List of Documents Being Assigned" relating to the loan described above.

**List of Documents Being Assigned**

1. Loan Agreement
2. Guaranty

[BALANCE OF PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, Assignor has executed this Assignment as of **February** 7 **, 2019**.

**LENDER:**

**CPC MORTGAGE COMPANY LLC**, a New York limited liability company

By: _____
Name:    Carolyn Au
Title:    Senior Vice President

# EXHIBIT H

**NYC DEPARTMENT OF FINANCE**
**OFFICE OF THE CITY REGISTER**

This page is part of the instrument. The City Register will rely on the information provided by you on this page for purposes of indexing this instrument.The information on this page will control for indexing purposes in the event of any conflict with the rest of the document.



2019082700959001001E1BEE

| **RECORDING AND ENDORSEMENT COVER PAGE** | | **PAGE 1 OF 7** |
|---|---|---|
| Document ID: **2019082700959001** | Document Date: 08-07-2019 | Preparation Date: 08-27-2019 |
| Document Type: ASSIGNMENT, MORTGAGE | | |
| Document Page Count: 5 | | |

| **PRESENTER:** | **RETURN TO:** |
|---|---|
| MCCOY & ORTA, P.C.<br>100 N. BROADWAY, SUITE 2600<br>OKLAHOMA CITY, OK 73102<br>SUPPORT@SIMPLIFILE.COM | MCCOY & ORTA, PC<br>100 N. BROADWAY, 26TH FLOOR<br>OKLAHOMA CITY, OK 73102<br>SUPPORT@SIMPLIFILE.COM |

### PROPERTY DATA

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| BRONX | 2383 | 18 | Entire Lot | 430 EAST 162 STREET |

Property Type: APARTMENT BUILDING

### CROSS REFERENCE DATA

CRFN: 2019000063492
☒ Additional Cross References on Continuation Page

### PARTIES

| **ASSIGNOR/OLD LENDER:** | **ASSIGNEE/NEW LENDER:** |
|---|---|
| FEDERAL HOME LOAN MORTGAGE CORPORATION<br>8200 JONES BRANCH DRIVE<br>MCLEAN, VA 22102 | WILMINGTON TRUST, NATIONAL ASSOCIATION, AS TRUSTEE<br>1100 NORTH MARKET STREET<br>WILMINGTON, DE 19890 |

### FEES AND TAXES

| Mortgage : | | | Filing Fee: | | |
|---|---|---|---|---|---|
| Mortgage Amount: | $ | 0.00 | | $ | 0.00 |
| Taxable Mortgage Amount: | $ | 0.00 | NYC Real Property Transfer Tax: | | |
| Exemption: | | | | $ | 0.00 |
| TAXES:   County (Basic): | $ | 0.00 | NYS Real Estate Transfer Tax: | | |
| City (Additional): | $ | 0.00 | | $ | 0.00 |
| Spec (Additional): | $ | 0.00 | | | |
| TASF: | $ | 0.00 | | | |
| MTA: | $ | 0.00 | | | |
| NYCTA: | $ | 0.00 | | | |
| Additional MRT: | $ | 0.00 | | | |
| TOTAL: | $ | 0.00 | | | |
| Recording Fee: | $ | 65.00 | | | |
| Affidavit Fee: | $ | 0.00 | | | |

**RECORDED OR FILED IN THE OFFICE OF THE CITY REGISTER OF THE CITY OF NEW YORK**

Recorded/Filed    08-29-2019 09:33
City Register File No.(CRFN):
**2019000277126**

*Annette M Hill*

*City Register Official Signature*

**NYC DEPARTMENT OF FINANCE**
**OFFICE OF THE CITY REGISTER**



2019082700959001001C196E

| RECORDING AND ENDORSEMENT COVER PAGE  (CONTINUATION) | PAGE 2 OF 7 |
|---|---|

**Document ID: 2019082700959001**    Document Date: 08-07-2019    Preparation Date: 08-27-2019
Document  Type: ASSIGNMENT, MORTGAGE

**CROSS REFERENCE DATA**
**CRFN:** 2019000063496
**CRFN:** 2019000063497

This instrument was prepared by and
after recordation return to:

McCoy & Orta, P.C.
100 North Broadway, 26th Floor
Oklahoma City, OK 73102
Telephone: (888) 236-0007

| | |
|---|---|
| Jurisdiction: | Bronx County |
| State: | New York |
| Loan No.: | 501841342 |
| M&O Ref.: | 7578.124 |
| Loan Name: | 430 East 162nd Street |

**Block 2383, Lot 18, Borough of Bronx**
**Property Address: 430 East 162nd Street, Bronx, NY**

**This assignment is not subject to the requirements of Section 275 of the Real Property Law of the State of New York because it is an assignment within the secondary mortgage market.**

ASSIGNMENT OF MORTGAGE

FOR VALUE RECEIVED, **FEDERAL HOME LOAN MORTGAGE CORPORATION,** whose address is 8200 Jones Branch Drive, McLean, VA 22102 ("Assignor"), conveys, assigns, transfers, and sets over unto **WILMINGTON TRUST, NATIONAL ASSOCIATION, AS TRUSTEE FOR THE REGISTERED HOLDERS OF WELLS FARGO COMMERCIAL MORTGAGE SECURITIES, INC., MULTIFAMILY MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2019-SB65,** ("Assignee"), whose address is 1100 North Market Street, Wilmington, DE 19890 without recourse, representation or warranty, express or implied, except as set forth in that certain related Mortgage Loan Purchase Agreement, all the right, title and interest of Assignor in and to the Mortgage and other documents, if any, described in <u>Schedule A</u> attached hereto and incorporated herein, together with the note or notes described therein, and all other documents and instruments relating to or securing said Mortgage or note or notes described therein, encumbering, among other things, the premises described in <u>Exhibit A</u> attached hereto and incorporated herein and the improvements thereon.

TO HAVE AND TO HOLD the same unto Assignee, its successors and assigns forever.

Dated this 7 day of August, 2019, to be effective as of the 23 day of August, 2019.

FEDERAL HOME LOAN MORTGAGE CORPORATION, a corporation organized and existing under the laws of the United States

By: _____

Name: Mary Ellen Slavinskas

Title:   Director
          Multifamily Operations

STATE OF VIRGINIA           §
                            §
COUNTY OF FAIRFAX           §

On the 7 day of August, 2019, before me, the undersigned, a Notary Public in and for said State, personally appeared Mary Ellen Slavinskas, Director, Multifamily Operations, of Federal Home Loan Mortgage Corporation, personally known to me or proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that she executed the same in her authorized capacity, and that by her signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument, and that such individual made such appearance before the undersigned, in Fairfax County, Virginia.

WITNESS my hand and official seal.

_____
Name of Notary Public

[ S E A L ]
My Commission Expires:

PRATIMA JAGERDEO
NOTARY PUBLIC
REG. #7526232
MY COMMISSION EXPIRES
June 30, 2020
COMMONWEALTH OF VIRGINIA

Loan No.: 501841342
M&O File No.: 7578.124
Loan Name: 430 East 162nd Street
Pool: SB-65

## SCHEDULE A
### LIST OF MORTGAGES ASSIGNED

1.  Substitute Mortgage A in the original principal amount of $1,075,000.00 made by Kunba LLC to Signature Bank, dated as of February 7, 2019 and recorded February 25, 2019 as CRFN 2019000063492 in the Office of the Register of the City of New York, Borough and County of Bronx, State of New York;

    Which above mortgage 1 was assigned by Assignment of Mortgage made by Signature Bank to CPC Mortgage Company LLC, executed February 5, 2019, dated and effective as of February 7, 2019 and recorded February 25, 2019 as CRFN 2019000063495 in the Office of said Register;

2.  Gap Multifamily Mortgage, Assignment of Rents and Security Agreement in the original principal amount of $675,000.00 made by Kunba LLC to CPC Mortgage Company LLC, dated as of February 7, 2019 and recorded February 25, 2019 as CRFN 2019000063496 in the Office of said Register; (Tax Paid: $18,900.00)

    Which above mortgages 1 and 2 were consolidated to form a single lien in the original principal amount of $1,750,000.00 and extended and modified by Consolidation, Extension and Modification Agreement made by and between Kunba LLC and CPC Mortgage Company LLC, dated as of February 7, 2019 and recorded February 25, 2019 as CRFN 2019000063497 in the Office of said Register; and

    Which above mortgages 1 and 2, as consolidated, extended and modified, were assigned by Assignment of Consolidated Security Instruments made by CPC Mortgage Company LLC to Federal Home Loan Mortgage Corporation, dated as of February 7, 2019 and recorded February 25, 2019 as CRFN 2019000063498 in the Office of said Register.

PRIOR HISTORY OF MORTGAGES
FOR INFORMATION ONLY:

A.  First Mortgage, Spreader and Security Agreement in the original principal amount of $2,700,000.00 made by Double Salt LLC, 3rd Avenue Heights LLC and Kunba LLC to Signature Bank, dated as of November 15, 2013 and recorded January 6, 2014 as CRFN 2014000004114 in the Office of the Register of the City of New York, Borough and County of the Bronx, State of New York;

    Which above mortgage A was severed and split by that certain Note and Mortgage Severance and Splitter Agreement made by and between Double Salt LLC, 3rd Avenue Heights LLC, Kunba LLC and Signature Bank, dated as of February 7, 2019 and recorded February 25, 2019 as CRFN 2019000063491 in the Office of said Register ("Agreement"); said Agreement severed and split the above mortgage into two separate and distinct liens in the amounts of:

Loan No.: 501841342
M&O File No.: 7578.124
Loan Name: 430 East 162nd Street
Pool: SB-65

(a) $1,075,000.00, encumbering the property known as 430 East 162nd Street, Bronx, New York (Block 2383, Lot 18) (Parcel I), which is evidenced by Substitute Mortgage A made by Kunba LLC to Signature Bank, dated as of February 7, 2019 and recorded February 25, 2019 as CRFN 2019000063492 in the Office of said Register; and

(b) $1,360,421.90, encumbering the properties known as 501 East 176th Street, Bronx, New York (Block 2924, Lot 1), 1170-1174 Shakespeare Avenue, Bronx, New York (Block 2506, Lot 5), and 1285 Shakespeare Avenue, Bronx, New York (Block 2519, Lot 26) (collectively, Parcel II), which is evidenced by Substitute Mortgage B made by Double Salt LLC and 3rd Avenue Heights LLC to Signature Bank, dated as of February 7, 2019 and recorded February 25, 2019 as CRFN 2019000063493 in the Office of said Register.

.

**EXHIBIT A**
LEGAL DESCRIPTION

ALL that certain plot, piece or parcel of land, situate, lying and being in the Borough and County of Bronx, City and State of New York, bounded and described as follows:

BEGINNING at a point on the southerly side of 162nd Street, distant 264.45 feet westerly at the corner formed by the intersection of the southerly side of 162nd Street with the westerly side of Elton Avenue;

RUNNING THENCE southerly at right angles to said southerly side of 162nd Street, 100 feet;

THENCE westerly parallel with the southerly side of 162nd Street, 25 feet;

THENCE northerly and again at right angles to the southerly side of 162nd Street and part of the distance through a party wall, 100 feet to the southerly side of 162nd Street;

THENCE easterly to said southerly side of 162nd Street, 25 feet to the point or place of BEGINNING.

SAID premises being known as 430 East 162nd Street, Bronx, New York.

Loan No.: 501841342
M&O File No.: 7578.124
Loan Name: 430 East 162nd Street
Pool: SB-65

# EXHIBIT I



KEYBANK REAL ESTATE CAPITAL

08/07/2024

Via Overnight Delivery & Email

KUNBA LLC
Attn: Robert Khomari
36 West 37th Street, 2nd Floor
New York, New York 10018

RE:    Trust/Lender:         Wilmington Trust National Association, as Trustee, for the benefit of
holders of Wells Fargo Commercial Mortgage Securities, Inc., Multifamily Mortgage Pass-Through
Certificates, Series 2019-SB65
         Borrower Name:       KUNBA LLC
         Loan:                $1,750,000 loan originally made by CPC Mortgage Company LLC, and
                              currently held in the trust.
         Loan No.:            10213588 | 501841342

Dear Borrower:

KeyBank National Association dba KeyBank Real Estate Capital acts as servicer to Wells Fargo Commercial
Mortgage Securities, Inc., Multifamily Mortgage Pass-Through Certificates, Series 2019-SB65 ("Lender").
Lender is the holder and owner of among other things: that certain Promissory Note, dated as of February 7,
2019, in the principal amount of $1,750,000, the maker of which KUNBA LLC ("Borrower") payable to the
order of CPC Mortgage Company LLC ("Original Lender") (as amended, restated, replaced, supplemented or
otherwise modified from time to time, the "Note"). The Note is secured by, among other things, those certain
Mortgages, dated as of February 7, 2019, granted by KUNBA LLC ("Mortgagor") on the real and personal
property located at 430 East 162nd Street, Bronx, NY ("Property"), granted by Mortgagor on the Property in
favor of Original Lender (the "Security Instrument"). The Note, the Security Instrument, and any other
document or agreement evidencing, securing or executed in connection with the Loan shall hereinafter be
collectively referred to as the "Loan Documents." Capitalized terms contained herein, but not defined herein,
shall have the meanings set forth in the Security Instrument.

Under the Loan Documents, Borrower is obligated to pay the Loan in full on the Maturity Date. Borrower has
failed to pay the Loan in full on the Maturity date of the Loan. Lender has accepted payments after 3/1/2024 as
partial payments of the amounts due and payable under the documents evidencing, securing or otherwise
relating to the Loan (the "Loan Documents").

Demand is hereby made for immediate payment in full of the amounts due and owed under the Loan
Documents on or before Friday, March 12, 2021.  As of March 1, 2021, the amounts necessary to cure the
above-referenced maturity default are as follows:

Principal Due:                              $618,357.43

KUNBA LLC
August 7th, 2024

Page 2

| | |
|---|---|
| Accrued Note Interest: | $35,109.92 |
| Default Interest Due 04/01/2020- 3/1/2021: | $22,947.93 |
| Late Charges: | $3,850.41 |
| Misc Fees: | $8,000.00 |
| **Total:** | **$688,265.69** |

Note that the sum of these amounts is subject to increase as default interest, late charges, fees and costs, including attorney's fees, and additional Lender advances continue to accrue. Payment of the amounts will not cure the default related to Borrower's failure to maintain insurance on the collateral described in the Mortgage. Please contact the undersigned for an exact amount owed as of the time you intend to bring the loan current.

If the maturity default is not cured as demanded herein, Lender may pursue any and all available rights and remedies under the Loan Documents or at law or in equity, without further notice or demand. Such rights and remedies include but are not limited to acceleration of the indebtedness evidenced by the Note, the appointment of a receiver at the Property, the direct collection of all rents, income and profits arising from the operation of the Property and foreclosure of the Property and of any other property that secures the indebtedness owed under the Loan Documents.

Please note that payments made by Borrower to date constitute only a partial payment of the defaulted indebtedness, and Lender's acceptance or application of such partial payment is not, and shall not be considered to be, a waiver of Lender's rights, remedies or recourse with respect to the unpaid balance of the debt. All of Lender's rights, remedies and recourse under the Loan Documents, under law, in equity are hereby expressly reserved. Further, the enumeration of any specific default herein is not intended, and shall not be considered, to waive other defaults that may currently exist under the Loan Documents.

Any past or future partial payment made by Borrower, or acceptance of any partial payment by Lender or any of its representatives or loan servicing agents, of any amount that is not sufficient to pay the debt in full under the Loan Documents is not intended, and shall not be deemed, to constitute a waiver of Lender's rights, remedies or recourse under the Loan Documents or at law or in equity. Any application of any such payment is not intended, and shall not be deemed, to be a modification, rearrangement, reinstatement or extension of the existing Loan Documents. Any such payment shall be applied in such order as Lender may elect in its sole discretion, without any waiver by Lender of its right to pursue any of its rights and remedies under the Loan Documents or at law or in equity.

Lender, or Lender's servicer or other agents, may, from time to time, generate automated billing statements or other statements that are forwarded to Borrower or to other persons or entities on a monthly or other periodic basis. The forwarding to you of any billing statement, including any billing statement that purports to state amounts due and owing by Borrower that are different from the matured indebtedness owed, may not be relied upon by Borrower, do not act to extend the maturity date or to reinstate the debt in any manner, and do not result in any waiver of Lender's rights as set forth herein, all of which are reserved in their entirety.

Any past or future negotiation between you or your representatives or agents on the one hand and Lender and its representatives or agents on the other do not and shall not constitute a waiver of Lender's rights to exercise its rights and remedies under the Loan Documents or at law or in equity. Any alleged waiver of any of Lender's rights shall not be effective unless in writing duly executed by an authorized representative of Lender. Neither Borrower nor any other obligor for the indebtedness owed under the Loan Documents shall be entitled to rely

KUNBA LLC
August 7th, 2024

Page 3

upon any oral statements made or purported to be made by or on behalf of Lender or its agents in connection with any alleged agreement by or on behalf of Lender to refrain from exercising any of Lender's rights under the Loan Documents or otherwise at law or in equity.

Nothing set forth herein is intended, nor shall it be deemed, to modify, limit, release, reduce or waive any of Lender's rights, remedies, and/or privileges under the Loan Documents, or at law or in equity, all of which are hereby specifically reserved. Furthermore, the enumeration of any specific default herein is not intended, nor shall it be deemed, to waive other defaults that may currently exist under the Loan Documents. If you need additional information regarding your obligation to cure, please contact Isaac Judge at KeyBank Real Estate Capital, at 913-218-2757.

Thank you for your cooperation and prompt attention to this request.


Sincerely,

KeyBank National Association (successor by
merger to KeyCorp Real Estate Capital Markets,
Inc., an Ohio corporation), as Authorized Agent for
Wilmington Trust National Association, as Trustee,
for the benefit of holders of Wells Fargo Commercial Mortgage Securities, Inc.,
Multifamily Mortgage Pass-Through Certificates, Series 2019-SB65



By: _____
Name:  Isaac Judge
Title:    Asset Manager
Phone:  913-218-2757
Email:  Isaac_S_Judge@keybank.com

**NYC DEPARTMENT OF FINANCE**
**OFFICE OF THE CITY REGISTER**

This page is part of the instrument. The City
Register will rely on the information provided
by you on this page for purposes of indexing
this instrument. The information on this page
will control for indexing purposes in the event
of any conflict with the rest of the document.



2019082700959001001E1BEE

| **RECORDING AND ENDORSEMENT COVER PAGE** | | **PAGE 1 OF 7** |
|---|---|---|
| Document ID: **2019082700959001** | Document Date: 08-07-2019 | Preparation Date: 08-27-2019 |
| Document Type: ASSIGNMENT, MORTGAGE | | |
| Document Page Count: 5 | | |

| **PRESENTER:** | **RETURN TO:** |
|---|---|
| MCCOY & ORTA, P.C.<br>100 N. BROADWAY, SUITE 2600<br>OKLAHOMA CITY, OK 73102<br>SUPPORT@SIMPLIFILE.COM | MCCOY & ORTA, PC<br>100 N. BROADWAY, 26TH FLOOR<br>OKLAHOMA CITY, OK 73102<br>SUPPORT@SIMPLIFILE.COM |

**PROPERTY DATA**

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| BRONX | 2383 | 18 | Entire Lot | 430 EAST 162 STREET |
| | Property Type: | APARTMENT BUILDING | | |

**CROSS REFERENCE DATA**

CRFN: 2019000063492
☒ Additional Cross References on Continuation Page

**PARTIES**

| **ASSIGNOR/OLD LENDER:** | **ASSIGNEE/NEW LENDER:** |
|---|---|
| FEDERAL HOME LOAN MORTGAGE CORPORATION<br>8200 JONES BRANCH DRIVE<br>MCLEAN, VA 22102 | WILMINGTON TRUST, NATIONAL ASSOCIATION, AS TRUSTEE<br>1100 NORTH MARKET STREET<br>WILMINGTON, DE 19890 |

**FEES AND TAXES**

| Mortgage : | | | Filing Fee: | | |
|---|---|---|---|---|---|
| Mortgage Amount: | $ | 0.00 | | $ | 0.00 |
| Taxable Mortgage Amount: | $ | 0.00 | NYC Real Property Transfer Tax: | | |
| Exemption: | | | | $ | 0.00 |
| TAXES: County (Basic): | $ | 0.00 | NYS Real Estate Transfer Tax: | | |
| City (Additional): | $ | 0.00 | | $ | 0.00 |
| Spec (Additional): | $ | 0.00 | | | |
| TASF: | $ | 0.00 | | | |
| MTA: | $ | 0.00 | | | |
| NYCTA: | $ | 0.00 | | | |
| Additional MRT: | $ | 0.00 | | | |
| TOTAL: | $ | 0.00 | | | |
| Recording Fee: | $ | 65.00 | | | |
| Affidavit Fee: | $ | 0.00 | | | |

**RECORDED OR FILED IN THE OFFICE**
**OF THE CITY REGISTER OF THE**
**CITY OF NEW YORK**

Recorded/Filed        08-29-2019 09:33
City Register File No.(CRFN):
**2019000277126**

*Annette M Hill*

***City Register Official Signature***

**NYC DEPARTMENT OF FINANCE**
**OFFICE OF THE CITY REGISTER**



2019082700959001001C196E

| RECORDING AND ENDORSEMENT COVER PAGE  (CONTINUATION) | PAGE 2 OF 7 |
|---|---|

**Document  ID: 2019082700959001**    Document Date: 08-07-2019    Preparation Date: 08-27-2019
Document  Type: ASSIGNMENT, MORTGAGE

**CROSS REFERENCE DATA**
**CRFN:**  2019000063496
**CRFN:**  2019000063497

This instrument was prepared by and
after recordation return to:

McCoy & Orta, P.C.
100 North Broadway, 26th Floor
Oklahoma City, OK 73102
Telephone: (888) 236-0007

| | |
|---|---|
| Jurisdiction: | Bronx County |
| State: | New York |
| Loan No.: | 501841342 |
| M&O Ref.: | 7578.124 |
| Loan Name: | 430 East 162nd Street |

**Block 2383, Lot 18, Borough of Bronx**
**Property Address: 430 East 162nd Street, Bronx, NY**

**This assignment is not subject to the requirements of Section 275 of the Real Property
Law of the State of New York because it is an assignment within the secondary
mortgage market.**

## ASSIGNMENT OF MORTGAGE

FOR VALUE RECEIVED, **FEDERAL HOME LOAN MORTGAGE CORPORATION,**
whose address is 8200 Jones Branch Drive, McLean, VA 22102 ("Assignor"), conveys,
assigns, transfers, and sets over unto **WILMINGTON TRUST, NATIONAL
ASSOCIATION, AS TRUSTEE FOR THE REGISTERED HOLDERS OF WELLS
FARGO COMMERCIAL MORTGAGE SECURITIES, INC., MULTIFAMILY
MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2019-SB65,** ("Assignee"),
whose address is 1100 North Market Street, Wilmington, DE 19890 without recourse,
representation or warranty, express or implied, except as set forth in that certain related
Mortgage Loan Purchase Agreement, all the right, title and interest of Assignor in and to the
Mortgage and other documents, if any, described in <u>Schedule A</u> attached hereto and
incorporated herein, together with the note or notes described therein, and all other
documents and instruments relating to or securing said Mortgage or note or notes described
therein, encumbering, among other things, the premises described in <u>Exhibit A</u> attached
hereto and incorporated herein and the improvements thereon.

TO HAVE AND TO HOLD the same unto Assignee, its successors and assigns forever.

Dated this _7_ day of August, 2019, to be effective as of the _23_ day of August, 2019.

FEDERAL HOME LOAN MORTGAGE CORPORATION, a corporation organized and existing under the laws of the United States

By: _____

Name: Mary Ellen Slavinskas

Title:  Director
      Multifamily Operations


STATE OF VIRGINIA        §
                          §
COUNTY OF FAIRFAX    §

On the _7_ day of August, 2019, before me, the undersigned, a Notary Public in and for said State, personally appeared Mary Ellen Slavinskas, Director, Multifamily Operations, of Federal Home Loan Mortgage Corporation, personally known to me or proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that she executed the same in her authorized capacity, and that by her signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument, and that such individual made such appearance before the undersigned, in Fairfax County, Virginia.

WITNESS my hand and official seal.

_____
Name of Notary Public

[ S E A L ]
My Commission Expires:

PRATIMA JAGERDEO
NOTARY PUBLIC
REG. #7526232
MY COMMISSION
EXPIRES
June 30, 2020
COMMONWEALTH OF VIRGINIA

Loan No.: 501841342
M&O File No.: 7578.124
Loan Name: 430 East 162nd Street
Pool: SB-65

## SCHEDULE A
### LIST OF MORTGAGES ASSIGNED

1.  Substitute Mortgage A in the original principal amount of $1,075,000.00 made by Kunba LLC to Signature Bank, dated as of February 7, 2019 and recorded February 25, 2019 as CRFN 2019000063492 in the Office of the Register of the City of New York, Borough and County of Bronx, State of New York;

    Which above mortgage 1 was assigned by Assignment of Mortgage made by Signature Bank to CPC Mortgage Company LLC, executed February 5, 2019, dated and effective as of February 7, 2019 and recorded February 25, 2019 as CRFN 2019000063495 in the Office of said Register;

2.  Gap Multifamily Mortgage, Assignment of Rents and Security Agreement in the original principal amount of $675,000.00 made by Kunba LLC to CPC Mortgage Company LLC, dated as of February 7, 2019 and recorded February 25, 2019 as CRFN 2019000063496 in the Office of said Register; (Tax Paid: $18,900.00)

    Which above mortgages 1 and 2 were consolidated to form a single lien in the original principal amount of $1,750,000.00 and extended and modified by Consolidation, Extension and Modification Agreement made by and between Kunba LLC and CPC Mortgage Company LLC, dated as of February 7, 2019 and recorded February 25, 2019 as CRFN 2019000063497 in the Office of said Register; and

    Which above mortgages 1 and 2, as consolidated, extended and modified, were assigned by Assignment of Consolidated Security Instruments made by CPC Mortgage Company LLC to Federal Home Loan Mortgage Corporation, dated as of February 7, 2019 and recorded February 25, 2019 as CRFN 2019000063498 in the Office of said Register.

PRIOR HISTORY OF MORTGAGES
FOR INFORMATION ONLY:

A.  First Mortgage, Spreader and Security Agreement in the original principal amount of $2,700,000.00 made by Double Salt LLC, 3rd Avenue Heights LLC and Kunba LLC to Signature Bank, dated as of November 15, 2013 and recorded January 6, 2014 as CRFN 2014000004114 in the Office of the Register of the City of New York, Borough and County of the Bronx, State of New York;

    Which above mortgage A was severed and split by that certain Note and Mortgage Severance and Splitter Agreement made by and between Double Salt LLC, 3rd Avenue Heights LLC, Kunba LLC and Signature Bank, dated as of February 7, 2019 and recorded February 25, 2019 as CRFN 2019000063491 in the Office of said Register ("Agreement"); said Agreement severed and split the above mortgage into two separate and distinct liens in the amounts of:

Loan No.: 501841342
M&O File No.: 7578.124
Loan Name: 430 East 162nd Street
Pool: SB-65

(a) $1,075,000.00, encumbering the property known as 430 East 162nd Street, Bronx, New York (Block 2383, Lot 18) (Parcel I), which is evidenced by Substitute Mortgage A made by Kunba LLC to Signature Bank, dated as of February 7, 2019 and recorded February 25, 2019 as CRFN 2019000063492 in the Office of said Register; and

(b) $1,360,421.90, encumbering the properties known as 501 East 176th Street, Bronx, New York (Block 2924, Lot 1), 1170-1174 Shakespeare Avenue, Bronx, New York (Block 2506, Lot 5), and 1285 Shakespeare Avenue, Bronx, New York (Block 2519, Lot 26) (collectively, Parcel II), which is evidenced by Substitute Mortgage B made by Double Salt LLC and 3rd Avenue Heights LLC to Signature Bank, dated as of February 7, 2019 and recorded February 25, 2019 as CRFN 2019000063493 in the Office of said Register.

Loan No.: 501841342
M&O File No.: 7578.124
Loan Name: 430 East 162nd Street
Pool: SB-65

.

**EXHIBIT A**
LEGAL DESCRIPTION

ALL that certain plot, piece or parcel of land, situate, lying and being in the Borough and County of Bronx, City and State of New York, bounded and described as follows:

BEGINNING at a point on the southerly side of 162nd Street, distant 264.45 feet westerly at the corner formed by the intersection of the southerly side of 162nd Street with the westerly side of Elton Avenue;

RUNNING THENCE southerly at right angles to said southerly side of 162nd Street, 100 feet;

THENCE westerly parallel with the southerly side of 162nd Street, 25 feet;

THENCE northerly and again at right angles to the southerly side of 162nd Street and part of the distance through a party wall, 100 feet to the southerly side of 162nd Street;

THENCE easterly to said southerly side of 162nd Street, 25 feet to the point or place of BEGINNING.

SAID premises being known as 430 East 162nd Street, Bronx, New York.